UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MATTHEW MUCKEY,                                         No.:  24-cv-03348-AS

                                    Plaintiff,          **JURY TRIAL DEMANDED**

        -against-                                       **AMENDED COMPLAINT**

ASSOCIATED MUSICIANS OF GREATER NEW
YORK, LOCAL 802, AMERICAN FEDERATION OF
MUSICIANS and THE PHILHARMONIC-SYMPHONY
SOCIETY OF NEW YORK, INC. a/k/a THE NEW
YORK PHILHARMONIC ORCHESTRA,

                                    Defendants.
----------------------------------------------------------------X

        Plaintiff MATTHEW MUCKEY ("Plaintiff" or "Mr. Muckey"), by and through his

attorneys, McLAUGHLIN & STERN, LLP, as and for his amended complaint against Defendant

ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN

FEDERATION OF MUSICIANS ("LOCAL 802" or the "Union") and Defendant THE

PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC. a/k/a THE NEW YORK

PHILHARMONIC ORCHESTRA (the "Philharmonic" or the "Society") (Local 802/the Union

and the Philharmonic/the Society collectively referred to herein as the "Defendants"),

respectfully alleges, as follows:

## INTRODUCTION

        1.      The #MeToo movement, which was intended to serve the interests of women who

have been victimized by real perpetrators, has unfortunately been used by some as a weapon to

destroy the careers of innocent people, who in some instances, are men who are falsely accused

of sexual misconduct.

2.    This case involves the epitome of the #MeToo movement gone awry and a culmination of unlawful events, based upon Plaintiff's sex/gender, that ultimately led to the removal of Plaintiff, a tenured musician, from one of the most prestigious orchestras in the world, the New York Philharmonic.

3.    First, Plaintiff was suspended by the Philharmonic with the affirmative consent of his union, Local 802, based upon allegations of sexual misconduct which were published in an online magazine article, that were already found unsubstantiated by an arbitrator but nonetheless injected malicious rumors into the Philharmonic community and beyond about Plaintiff and imposed pressure upon the Philharmonic to remove him from the orchestra to "protect" female musicians.

4.    Then, in a collaborative process, using a contrived application of the collective bargaining agreement, which had no other purpose than to find grounds to remove him, the Philharmonic terminated Plaintiff, again with the agreement of Local 802,  purporting to justify such action by pointing to a false claim of sexual misconduct made by a woman some 16 years after the consensual encounter.

5.    In this case, societal calls to "believe the woman" went as far as crediting the testimony of such woman, even in the face of messages written by the woman herself, that included statements such as, "awwww you're really the best 😊 **thanks for everything, yes, even the sex. it was pretty good**…" (emphasis added).

6.    As detailed below, the actions by Local 802 and the Philharmonic give rise to essentially two core causes of action. The first set of causes of action involve hybrid claims against the Philharmonic for its breach of its obligations under the collective bargaining agreement and Local 802's concomitant breach of its duty to Plaintiff to provide him with fair

representation. The second set of causes of action for gender discrimination arise under Title VII and its State and City counterparts, where both the Philharmonic and Local 802: (a) deliberately ignored the overwhelming documentary evidence that Plaintiff was not guilty of wrongdoing; (b) engaged in a sham process calculated to achieve a predetermined finding of wrongdoing; and (c) succumbed to orchestra members' and the classic musical community's demands that Plaintiff be terminated, notwithstanding that there was no evidence of wrongdoing.

## PARTIES

7.      Mr. Muckey, at all relevant times, was and is a member of Local 802 and is an employee of the Philharmonic.  Mr. Muckey is a male and a citizen of the State of New York.

8.      Local 802 is the largest local union of professional musicians in the world and its community of musicians includes the New York Philharmonic.  Its principal place of business is located at 322 West 48th Street, #1308, New York, New York 10036.

9.      The Philharmonic is a domestic not-for-profit corporation.  Its principal place of business is located at David Geffen Hall, 10 Lincoln Center Plaza, New York, New York 10023.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 29 U.S.C. § 185 and 42 U.S.C. § 2000e-2, as the counts present a federal question.  In particular, Mr. Muckey states a hybrid claim, against the Philharmonic, pursuant to the Labor Management Relations Act (codified at 29 U.S.C. § 185), for breach of the collective bargaining agreement, and against Local 802, pursuant to § 9(a) of the National Labor Relations Act ("NLRA") (codified at 29 U.S.C.S. § 159(a)) for breach of its duty of fair representation.  Mr. Muckey also states a discrimination claim under Title VII (codified at 42 U.S.C. 2000e-2) based upon the discriminatory acts of both the Philharmonic and Local 802.

11. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) and the principles of pendent jurisdiction.

12. Venue properly lies in this judicial district pursuant to 28 U.S.C § 1391(b) and (c), in that Mr. Muckey is a natural person domiciled within this judicial district, Defendants Local 802 and the Philharmonic each maintain an office within the judicial district, and a substantial part of the events giving rise to the actions alleged herein have taken place within this judicial district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A. Background

13. Mr. Muckey is an internationally recognized, talented musician of the Philharmonic.

14. He commenced his employment at the Philharmonic on June 28, 2006 when he was only 21 years old and, thus, one of the youngest musicians of the Philharmonic.

15. On or about January 2, 2008, he was granted the esteemed, tenured position at the Philharmonic of Associate Principal and Third Trumpet.

16. As a tenured musician, Mr. Muckey has a lifetime appointment at the Philharmonic, absent dismissal for "just cause."

17. Specifically, Article VII of the Trade Agreement between Local 802 and the Philharmonic (the "collective bargaining agreement" or "CBA") provides as follows:

> ARTICLE VII – WORKING CONDITIONS
> … E.  CONDUCT OF MUSICIANS
> … 7:  Society may take disciplinary measures in the event of the violation of these rules or for other just cause.

18. When Mr. Muckey was granted tenure in January 2008, he received the following message from the then President and Executive Director of the Philharmonic, Zarin Mehta:

Dear Matthew,

I am delighted with the news of your receiving tenure, and on behalf of the entire New York Philharmonic family, we welcome you to spend your life and career as part of this great institution.

With deepest admiration and best regards,

Sincerely,

Zarin

19.     Each year, Mr. Muckey receives an agreement which memorializes his compensation as the tenured Associate Principal and Third Trumpet of the Philharmonic for each orchestra season.

20.     The last agreement entered into between Mr. Muckey and the Philharmonic covered the 2023-24 Season.

21.     Throughout his career, Mr. Muckey has performed in other orchestras, has lectured students, taught masterclasses worldwide, was a professor at Rutgers University, and participated in other musical engagements.

22.     Mr. Muckey is also a member of Local 802 and as such member, he is entitled to, *inter alia,* benefits provided by Local 802 as well as fair representation.

23.     In fact, in order to incentivize musicians to join Local 802, it promises to those who join fair representation in getting benefits by the following Q&A on its website- "Why join Local 802? Musicians can achieve more pay, benefits, job security and respect with a union than if they try to negotiate separately on their own. Secondly, the union movement empowers all of us to work together for more justice, equality, diversity, inclusiveness and fairness in all of society – it's a great way to be a part of social change. Thirdly, there are some core benefits in joining Local 802, which you can see below." *See* https://www.local802afm.org/benefits/.

24.     Mr. Muckey had enjoyed a successful career at the Philharmonic until July 2010 when Cara Kizer ("Ms. Kizer"), a probationary musician at the Philharmonic, with whom Mr. Muckey had consensual sex while they were on tour with the orchestra in Vail, Colorado, made false allegations of sexual assault against him (the "2010 Allegations").

25.     Mr. Muckey denied the 2010 Allegations as being false and fully cooperated in the multiple, thorough investigations conducted by local authorities in Vail.

26.     The local authorities, finding no basis to bring any criminal charges against Mr. Muckey, ultimately closed the investigations.

27.     The Philharmonic, which was fully informed of the false allegations made by Ms. Kizer against Mr. Muckey as well as the investigation conducted by the law enforcement authorities, had determined at that time that it would defer to the authorities with regard to the matter.

28.     At that time, the Philharmonic determined that there was no basis to inquire or take any adverse employment action against Mr. Muckey based upon the 2010 Allegations, and Mr. Muckey continued to remain employed at the Philharmonic without issue.

29.     In 2013, he became married, and he currently has two young children.

**B.    In 2018, in Response to the #MeToo Movement, the Philharmonic Investigates the 2010 Allegations and Terminate Mr. Muckey**

30.     Mr. Muckey's career with the Philharmonic continued until 2018 when inquiries generated in the context of the burgeoning #MeToo movement prompted the Philharmonic to suddenly revisit the 2010 Allegations.

31.     The Philharmonic commenced an investigation into the 2010 Allegations (the "2018 Investigation").

32.     During the 2018 Investigation, Mr. Muckey again denied the 2010 Allegations as being false and denied any allegations of wrongdoing.

33.     There had been no new facts warranting the Philharmonic revisiting a matter that it had previously considered and about which it had rejected taking action.

34.     However, after the 2018 Investigation concluded, on or about September 4, 2018, the Philharmonic terminated Mr. Muckey's employment and relied upon Article VII of the CBA, purporting to have "just cause" to terminate Mr. Muckey.

35.     At the same time, the Philharmonic had similarly conducted an investigation of another musician, Liang Wang ("Mr. Wang") and also terminated his employment, although based upon separate claims of sexual abuse unrelated to the 2010 Allegations or Mr. Muckey.

36.     The terminations of both Mr. Muckey and Mr. Wang were publicly announced by the Philharmonic.

## C. Local 802 Challenges the Termination of Mr. Muckey in 2018 by Submitting a Grievance and Then Commencing an Arbitration on His Behalf

37.     Mr. Muckey protested the termination and asked Local 802 to submit a grievance on his behalf to challenge his termination, as did Mr. Wang.

38.     After review of the allegations against both, Local 802 agreed with Mr. Muckey (and Mr. Wang) that there was no cause to terminate them and submitted a grievance on behalf of the two musicians pursuant to the terms of the CBA seeking their reinstatement on the grounds that there was no "just cause" to terminate the two tenured musicians from their employment and that, therefore, their dismissal from the Philharmonic was in breach of their rights under the CBA.

39.     After the matter could not be resolved between Local 802 and the Philharmonic, Local 802 then invoked Article XV of the CBA which provides in pertinent part that, "in the

event that the dispute should remain unresolved, it may be submitted by the Union or the Society to an Arbitrator appointed by the American Arbitration Association in accordance with its Voluntary Labor Arbitration Rules."

40.    Article XV of the CBA further provides as follows:

> The decision of the Arbitrator shall be ***final and binding*** upon the Society, the Union and the individual Orchestra member involved...

41.    The Philharmonic and Local 802 jointly selected Richard I. Bloch[1] ("Arbitrator Bloch") as the independent arbitrator and a formal, confidential arbitration proceeding was initiated by Local 802 on behalf of Mr. Muckey and Mr. Wang, against the Philharmonic challenging its actions (the "Arbitration").

42.    At the hearing, both Mr. Muckey and Mr. Wang were represented by Local 802 counsel as well as their own personal attorneys.

43.    From on or about November 2018 until January 2020, Local 802 worked with its own counsel, as well as Mr. Muckey's (and Mr. Wang's) independently-retained counsel, engaging in discovery, collecting and presenting evidence (which included, *inter alia*, testimony from witnesses, including expert testimony, and documentary evidence) in prosecution of its case on behalf of Mr. Muckey (as well as Mr. Wang) and against the Philharmonic for wrongful discharge.

44.    Arbitrator Bloch conducted extensive evidentiary hearings with regard to the charges against Mr. Muckey and Mr. Wang, including the 2010 Allegations.

45.    The arbitration proceedings encompassed a total of twenty (20) hearing days.

---

[1] Richard I. Bloch is the co-author of the book *Labor Agreement in Negotiation and Arbitration* (2d Ed.)

**D.  The Arbitrator Finds That the Philharmonic Did Not Have "Just Cause" to Terminate Mr. Muckey and Issues an Award in His Favor**

46.     At the conclusion of the Arbitration, Arbitrator Bloch issued a decision, dated April 4, 2020 (the "Award"), in which he determined that the Philharmonic had not established there was "just cause" to terminate Mr. Muckey.

47.     He also found in favor of Mr. Wang with regard to his termination as well.

48.     In the Award, Arbitrator Bloch granted the grievance of Local 802, ordering that Mr. Muckey (as well as Mr. Wang) be reinstated at the Philharmonic and restored with all contractual benefits lost, including full back pay for the period during which he was wrongfully terminated, and that seniority be restored.

49.     Shortly thereafter, Mr. Muckey was restored to his tenured position in the orchestra as the Associate Principal and Third Trumpet with much success and without any issue.

50.     Over the ensuing four years there had been no new allegation or complaint involving Mr. Muckey with his colleagues in the orchestra or anyone else.

51.     Mr. Muckey remained a tenured musician of the Philharmonic as Associate Principal and Third Trumpet and in good standing.

**E.  The Philharmonic Suspends Mr. Muckey Based Upon the Online Publication of the 2010 Allegations**

52.     On April 12, 2024, four years following the issuance of Award, an article appeared in *Vulture*, a *New York Magazine* website ("*Vulture*" or "*New York Magazine*") rehashing the 2010 Allegations, inaccurately portraying Ms. Kizer as a victim of wrongdoing by Mr. Muckey and Mr. Wang and criticizing the Philharmonic and the Award (the "Article").

53.     The thrust of the Article was that Mr. Muckey and Mr. Wang were men who had wrongfully victimized Ms. Kizer, a woman, and that the two men should not be permitted to continue to play in the Philharmonic orchestra.

54.     No new facts about the 2010 Allegations or any other claimed wrongdoing by Mr. Muckey or Mr. Wang were presented in the Article. The Article was simply a reiteration of the same 2010 Allegations that Local 802 argued, and the Arbitrator determined, did not constitute "just cause" to warrant Mr. Muckey's dismissal from the Philharmonic.

55.     Upon publication of the Article, there was internet chatter as well as communication among the orchestra members about the Article and inquiry from other publications including *The New York Times*.

56.     Notwithstanding that the subject matter of the Article concerned the same 2010 Allegations, which already had been arbitrated and determined not to constitute "just cause" in the Award issued in Mr. Muckey's favor, the next day, on April 13, 2024, based solely upon the 2010 Allegations, the Philharmonic barred Plaintiff from attending all rehearsals and performances of the Philharmonic and later that day informed him that his future at the Philharmonic was under further review.

57.     Immediately following the publication of the Article, on April 13, 2024, Howard Robbins ("Mr. Robbins") of the law firm Proskauer Rose, LLP ("Proskauer Rose"), counsel for the Philharmonic, informed Mr. Muckey's counsel, Steven J. Hyman ("Mr. Hyman"), that because of the Article, Mr. Muckey should not attend rehearsals or performances, including the ones he was scheduled for that weekend, pending further advice by the Philharmonic.

58.     Mr. Robbins subsequently sent an email to Mr. Hyman which stated - "I am writing to confirm that Mr. Muckey should not attend Philharmonic rehearsals or performances until further notice."

59.     In fact, Mr. Muckey, as well as Mr. Wang, were banned from all Philharmonic activities and could not come to their workplace at David Geffen Hall.

60.     The Philharmonic also removed Mr. Muckey, as well as Mr. Wang, from concerts to which they had already been assigned for the 2023-24 season.

61.     In sum, based solely upon the 2010 Allegations, the Philharmonic took adverse employment action against Mr. Muckey including, but not limited to, a ban from all rehearsals, performances, concerts, and tours and other Philharmonic activities, including those to which he had already been assigned (collectively, "Philharmonic Activities"), which is tantamount to a suspension and violates the Award.  For all intents and purposes, both Mr. Muckey and Mr. Wang were suspended by the Philharmonic solely based on the 2010 Allegations repeated in the Article (the "Suspension").

62.     The Philharmonic's refusal to abide by the Award is without justification.

**F.  Public Commentaries by Members of the Orchestra, the Classical Music Industry and the General Public Follow the Online Publication of the 2010 Allegations**

63.     The Article reported that, "[i]nterviews with current and former musicians and orchestra staff, however, reveal that some employees, particularly female employees, continue to feel unsafe."

64.     On April 15, 2024, the Orchestra Committee, which has the duty, together with Local 802, to represent musicians such as Mr. Muckey, stated in *The New York Times* article dated April 15th that it is "the overwhelming sentiment from the orchestra that we believe Cara" and added that, "the orchestra has a culture of 'not taking musician complaints seriously so

11

musicians often do not feel safe in raising accusations of sexual harassment and assault' and called on management to take action to provide a safe workplace."

65.     In addition, members of the orchestra made public statements that, based on the Article, they believed Ms. Kizer and that Mr. Muckey, as well as Mr. Wang, were therefore guilty of sexual abuse, all notwithstanding the Award rendered in their favor.

66.     On April 13, 2024, a message was posted on Facebook under the account name, "The Musicians of the New York Philharmonic," stating as follows:

> In light of recent events, we the Orchestra Committee of the New York Philharmonic, believe it is imperative that you hear our voices.
>
> We wholeheartedly denounce and find abhorrent all conduct that violates and degrades the women in our Orchestra. Such conduct is an affront to women everywhere. It must never be tolerated.
>
> We call on our fellow musicians and the Philharmonic-Symphony Society to provide a safe environment so that no one is afraid to come to work.

67.     Various web sites in the classical music community contained posts which, *inter alia*, portrayed Ms. Kizer, who was female, as "survivor," who was to be believed, portrayed Mr. Muckey, as well Mr. Wang, both of whom were males, as "predators," rejected their denials as well as the binding determination made by Arbitrator Bloch, and demanded that Mr. Muckey, as well as Mr. Wang, be ousted and permanently removed from the Philharmonic.

68.     Statements from the public were posted in the comments section of the Article as well as on a blog website called *Slippedisc.com* which served as the main channels for spreading various rumors and defamatory information about Mr. Muckey and casting Ms. Kizer as a victim.

69.     Furthermore, a petition dated April 15, 2024, entitled, "An Open Letter to Local 802 AFM Regarding Allegations of Sexual Misconduct by New York Philharmonic Musicians Matthew Muckey and Liang Wang" (the "Petition") by a group called Composers Collective was circulated among the classical music community contending that Mr. Muckey was guilty of sexual assault and demanded that he be permanently removed from the Philharmonic.

70.     Specifically, the Petition stated as follows:

> In response to Sammy Sussman's article, "A Hidden Sexual-Assault Scandal at the New York Philharmonic" in *Vulture* on 12 April 2024 (https://www.vulture.com/article/new-york-philharmonic-sexual-assault-scandal.html),we, a diverse community of composers, musicians, educators, leaders, and allies, call for the investigation of New York Philharmonic musicians Matthew Muckey and Liang Wang by Local 802 AFM to be immediately re-opened. We also call for both Muckey and Wang to be put on immediate suspension from the New York Philharmonic.
>
> By allowing the alleged perpetrators to remain in their positions, musicians and survivors face a daily affront, with the potential for further harassment, discrimination, and abuse. If no action is taken, institutions seemingly endorse illegal, unethical, and bigoted behavior.

71.     Also, on April 16, 2024, a message purporting to be from "The Musicians of the Philadelphia Orchestra" was posted on Facebook, stating, "we want to express our support for and solidarity with Cara, Amanda and the women of the NY Philharmonic who feel unsafe at work as a result of this moral failure."

72.     Other members of the orchestra who had previously supported and even testified under oath in the Arbitration in support of Mr. Muckey were cowed into silence.

73.     Two women, Katherine Needleman and Lara St. John, who are not musicians of the Philharmonic and neither know Mr. Muckey nor have personal knowledge of the facts concerning the 2010 Allegations, engaged in the unlawful dissemination of false and defamatory

statements about Mr. Muckey on social media such as Facebook, and/or organized and led petitions and protests at the Philharmonic.

74.    An article published by *The Violin Channel* dated May 20, 2024, entitled, "Protests Call for New York Phil to Dissolve Alleged Assault Victim's NDA," reported one such protest led by Ms. St. John and Ms. Needleman on that day in front of David Geffen Hall, and quoted them as stating, "[w]e are having a reckoning right now with misogyny and sexism and this is an opportunity for the New York Philharmonic to be leaders in righting the ship."  The same article included photos of Ms. Needleman and other protesters holding up posters which stated, "Clean Up Your Act," What are you afraid of NYPhil????" and "Do the Right Thing."

75.    From that point, Mr. Muckey and Mr. Wang were targeted by the Philharmonic which was intent on finding a way to dismiss them.

76.    Thereafter, both the Philharmonic and Local 802 took adverse action against Mr. Muckey in response to the escalating chatter in the orchestra and the classical music industry following publication of the article.

**G. The Philharmonic Violates the Award by Suspending Mr. Muckey Because of the 2010 Allegations**

77.    Within days of publication of the Article, the Philharmonic took a series of actions against and made a number of public statements about the action it took against Mr. Muckey (and Mr. Wang) in reaction to the Article, including, but not limited to, the following:

(a)    On April 12, 2024, hours after the publication of the Article, the Philharmonic's then President and Chief Executive Officer, Gary Ginstling ("Mr. Ginstling") sent an email to the orchestra members in which he suggested that the "article may well be distressing," and told them, "[i]f you feel you need support, you can reach out confidentially to

14

Kristine, Kristen, DeAnne or me for a conversation and/or a referral to external support resources."

(b)     On April 13, 2024, Mr. Ginstling sent an email addressed to "NY Phil Colleagues," which stated that, "…for the time being, Matthew Muckey and Liang Wang will not be at rehearsals or performances."

(c)     On April 15, 2024, an article appeared in *The New York Times*, titled, "Philharmonic Sidelines 2 Player It Tried to Fire for Misconduct," with the headline, "The New York Philharmonic said the musicians would not perform for now, after a magazine article brought new attention to allegation of misconduct.  They have denied wrongdoing," *The New York Times* article reported that, "[t]he New York Philharmonic said on Monday that two players it had tried to fire in 2018 – but was forced to rehire after the musicians' union challenged their dismissal – would not take part in rehearsals or performances for the time being after a magazine article detailed the allegations of misconduct that had been made against them." The article further reported that, "[t]he Philharmonic said that the players – the principal oboist, Liang Wang, and the associate principal trumpet, Matthew Muckey – would not appear as the orchestra deals with the fallout from a New York magazine article published on Friday." Moreover, Mr. Ginstling "said in an interview [that same day] that the New York magazine report had 'prompted a lot of strong feelings' and confirmed that Mr. Muckey and Mr. Wang were not playing with the orchestra at the moment."

(d)    On April 16, 2024, an article appeared on the website, www.broadwayworld.com titled, "New York Philharmonic Suspends Two Musicians Amid Outcry Over Past Allegations," with the headline, "[t]he renewed interest in the incident follows an article from New York Magazine."

(e)    On April 18, 2024, Mr. Ginstling issued a public statement to the "New York Philharmonic Community," stating that "the details revealed in the *New York* magazine article are horrifying to me personally…. I am deeply concerned about not only the specifics but broader issues of institutional culture" and announced that the Philharmonic had engaged a law firm "to launch an independent investigation into the culture of the New York Philharmonic in recent years" and "for the time being, musicians Matthew Muckey and Liang Wang are not being assigned to any Philharmonic activity as we work through this process, and a decision about their future with the New York Philharmonic will be made in due course."  That same day, on April 18th, an article in *The New York Times* quoted the Philharmonic's message to the public at large that Mr. Muckey was not being assigned to any Philharmonic activity based solely upon the 2010 Allegations.

(f)    On April 19, 2024, Mr. Ginstling sent a message to the Philharmonic musicians regarding the retention of "an investigator to investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic."

78. The clear message by the Philharmonic to the orchestra and to the public in response to the chatter in the classical music industry was that Mr. Muckey (and Mr. Wang) were not being assigned to any Philharmonic activity solely because of the 2010 Allegations.

**H. Local 802 Refuses to Fairly Represent Mr. Muckey Despite His Demands That Local 802 Seek the Philharmonic's Compliance with the Award and Instead Supports the Philharmonic's Action**

79. To add fuel to the fire, Local 802 took no action against the Philharmonic's violation of the Award, notwithstanding that Local 802 had commenced the arbitration on Mr. Muckey's behalf that restored him to the Philharmonic but instead, *supported* its unlawful action.

80. Within days of publication of the Article, Local 802 took a series of actions and made a number of statements in reaction to the Article, which openly displayed its support of the Philharmonic's adverse employment actions that violated the Award, including, but not limited to, the following:

    (a)    On April 15, 2024, *The New York Times* reported that, "Sara Cutler, the president and executive director of Local 802, who took office last year, struck a different tone than her predecessors. She said that the decision to keep Mr. Wang and Mr. Muckey offstage for the time being 'are good first steps but they can't be the last.'" Ms. Cutler also stated that, "[a]s a woman, a musician and a new union president, I am horrified by what was in the [Article] and we are committing the full resources of Local 802 to erase the culture of complicity that has raged at the N.Y. Philharmonic for too long."

    (b)    On April 18, 2024, an article appeared in *The New York Times,* titled, "Philharmonic Opens Inquiry After Misconduct Allegations Are

Revived," with the headline, "The New York Philharmonic commissioned an outside investigation into its culture after a magazine article explored how it handled an accusation of sexual assault in 2010." The article reported that, "Sara Cutler, the new president and executive director of Local 802, said that the union supported the new inquiry."

81.     Ms. Cutler did not state that the Philharmonic's sidelining of Mr. Muckey was in violation of the Award which ordered Mr. Muckey's reinstatement with back pay and seniority and that Local 802 would seek enforcement of the Award and restoration of Mr. Muckey to his tenured position as Associate Principal and Third Trumpet.

82.     Nor did Ms. Cutler state that the allegations which appeared in *New York Magazine* were the same as those that were the subject of the arbitration commenced by Local 802 four years ago when it was determined that such allegations did not constitute "just cause" to terminate Mr. Muckey and the Award was granted in his favor.

83.     Notwithstanding the fact that the Suspension was solely based upon the 2010 Allegations, Local 802, which had previously challenged Mr. Muckey's wrongful termination based upon the 2010 Allegations as not being based upon "just cause," Local 802, now under its new administration led by a woman, Ms. Cutler, refused to seek enforcement of the Award or take any necessary steps to restore Mr. Muckey to resume performing in his tenured position at the Philharmonic.

84.     Instead, Local 802 consented to, and acquiesced in, the Suspension.

85.     Counsel for Mr. Muckey sent a letter to Local 802's counsel dated April 18, 2024, demanding that Local 802 protect Mr. Muckey's rights as determined by the Award, perform its

duty of fair representation, and take all the necessary steps to cause the Philharmonic restore Mr. Muckey to resume performing in his tenured position at the Philharmonic.

86.     Counsel for Local 802 responded in a letter dated April 18th stating that Mr. Muckey had to contact Local 802's Chief of Staff, Dan Point, "if Mr. Muckey would like to do something in response to the Philharmonic's action" and then "the Union will evaluate his request at that time."

87.     The next day, on April 19th, Mr. Muckey sent a letter directly to Mr. Point demanding that Local 802 immediately act on his behalf to require the Philharmonic to comply with the Award and that Local 802 cease making statements in support of the Philharmonic's actions which contravene the Award.

88.     One week later, on April 26th, Local 802's counsel (whom Mr. Muckey's attorney had initially contacted) sent a letter to Mr. Muckey's counsel.

89.     Notwithstanding the fact that the Suspension was based solely upon the 2010 Allegations and the Philharmonic publicly announced same, and notwithstanding that the Award that Local 802 previously obtained in Mr. Muckey's favor determined that Mr. Muckey was entitled to reinstatement to the Philharmonic with back pay and seniority, the response of Local 802 in the April 26th letter was that Local 802 was not going to seek enforcement of the Award or take any necessary steps to restore Mr. Muckey to resume performing in his tenured position at the Philharmonic.

90.     Instead, Local 802's counsel responded that, "the NY Philharmonic engaged an investigator to determine whether there were any new or different allegations of sexual misconduct by any members of the Orchestra, including ... [Mr. Muckey]... Local 802 has determined to await the outcome of that investigation before determining how to proceed here."

19

91.     In its response, Local 802 failed to address: (a) the fact that the Suspension occurred *before* any such determination; (b) that no member of the Philharmonic other than Mr. Muckey (and Mr. Wang) was subject to the Suspension pending the "investigation;" and (c) that the Suspension was based solely upon the 2010 Allegations, which violated the Award.

**I.    The Philharmonic Conducts Two Investigations in Response to Escalating Chatter in an Effort to Find Grounds to Terminate Mr. Muckey**

92.     After Mr. Ginstling's announcement on April 18, 2024 that the Philharmonic had engaged a law firm to conduct an investigation into the culture of the New York Philharmonic (the "Culture Investigation"), it reached out to orchestra members and asked them to come forward to participate in the Culture Investigation.

93.     On April 19, 2024, at or around the same time that the Philharmonic was conducting the Culture Investigation, Mr. Ginstling announced that the Philharmonic had also engaged an investigator, Tracey Levy of Levy Employment Law, LLC ("Ms. Levy").

94.     Ms. Levy's background, as she boasts on her law firm's website, https://www.levyemploymentlaw.com/tracey-l-levy/, includes a prior position as "an employment attorney with Proskauer Rose LLP for more than a third of her career, where she advised and litigated on behalf of a broad range of clients to resolve their employment law issues."

95.     Given that the clients of Proskauer Rose include the Philharmonic, and that the Proskauer Rose has represented, and continues to represent, the Philharmonic, even in the instant action, Ms. Levy was by no means a "neutral" or "independent" investigator appointed by the Philharmonic to perform such investigation.

96.     Ms. Levy was purportedly retained "to investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic" (the "Levy Investigation").

97.     However, the Levy Investigation was targeted towards two men only, Mr. Muckey and Mr. Wang.

98.     In fact, from the outset, the whole investigative process was unfair and biased in order to effectuate a plan and process to make sure that Mr. Muckey (as well as Mr. Wang) would never return to the orchestra.

99.     The Philharmonic had the Levy Investigation focus on only two musicians, Mr. Muckey and Mr. Wang, both male.

100.    The Philharmonic ignored and did not investigate allegations raised against a female musician in the orchestra regarding a subordinate male orchestra member.

101.    On or about July 9, 2024, the Philharmonic informed Mr. Muckey that Ms. Levy wanted to interview him in connection with the Levy Investigation.

102.    Mr. Muckey's attorney, Mr. Hyman, contacted Ms. Levy to inquire about the subject matter of Levy Investigation, but Ms. Levy refused to provide any details regarding the scope of the investigation and merely responded that Mr. Muckey was the subject of the inquiry and that she was looking into allegations related to his conduct during the time he has been employed by the Philharmonic.

### J.   Local 802 Refuses to Provide Mr. Muckey with Independent, Nonaffiliated Representation During the Investigation

103.    Mr. Muckey contacted Local 802 to invoke his rights to have a union representative appear with him in the Levy Investigation once it became apparent that the Levy Investigation could lead to disciplinary action against him, legally referred to as his *Weingarten*

rights, established in the Supreme Court case of *National Labor Relations Board v. Weingarten*, 420 US 251 (1975).

104.    Since Local 802 and Mr. Muckey were active adversaries in the instant action, Mr. Muckey specifically requested that arrangements be made for a representative not affiliated with Local 802 to be assigned, so that he was afforded fair representation.

105.    However, Local 802 rejected the request, and Mr. Muckey was required to attend the interview with Ms. Levy with a Local 802 representative.

**K.    During the Levy Investigation, Mr. Muckey Learns About the Allegations Made Against Him and Provides Information Which Conclusively Refutes the Allegations**

106.    As part of the Levy Investigation, Mr. Muckey met with Ms. Levy virtually on August 8, 2024, which he attended with a Local 802 representative and his counsel.

107.    The primary focus of the Levy Investigation was a sexual relationship that Mr. Muckey had in 2008 with an unnamed woman, whom Ms. Levy refused to identify, and a party at which they met at 16 years earlier.

108.    Based upon Ms. Levy's questions about the woman, Mr. Muckey was able to identify the woman as someone with whom he acknowledged he had a brief consensual sexual relationship.  In the interests of the woman's privacy, she will be referred to in this Amended Complaint as C.S. ("C.S.").

109.    Since Mr. Muckey had not been told about the scope of the Levy Investigation or given an opportunity to prepare for it prior to meeting with Ms. Levy, once he understood that the subject matter concerned C.S., he requested that he have the opportunity to search his memory and records to more fully and accurately respond; Ms. Levy agreed.

110.    When the virtual meeting resumed on September 3, 2024, Mr. Muckey produced documentary evidence that he had retrieved, including messages he and C.S. exchanged on

Facebook Messenger in 2008 and again in 2011-2012 ("Facebook Messages"), and he was also able to more fully respond to Ms. Levy's questions about his relationship with C.S.

111.    Although Ms. Levy would not divulge what information she had about Mr. Muckey and C.S. or from whom, it was apparent from the line of questioning that the Levy Investigation centered on whether Mr. Muckey's sexual encounters with C.S. were consensual.

112.    Mr. Muckey understood that C.S. was alleging that the sex they had was not consensual (the "C.S. Allegation").

113.    Therefore, Mr. Muckey described the circumstances of his sexual relationship with C.S. and read to Ms. Levy the Facebook Messages he had retrieved.

114.    All of the Facebook Messages definitively established that their sexual relationship was consensual and that C.S. had a clear recollection of the sex she had with Mr. Muckey, on two separate occasions.

115.    Specifically, C.S. wrote to Mr. Muckey, "I did consent," expressing regret only because she had "wronged" her boyfriend, of whom Mr. Muckey had no prior knowledge.

116.    When she later pleads with Mr. Muckey not to "write back" to her boyfriend if he reached out to Mr. Muckey, she stated, "i know you'll want to say that i consented, which i did…"

117.    In another message, C.S. sent holiday greetings to Mr. Muckey and apologized for ignoring him, which she explained was because of problems she was having with her boyfriend after she informed him that she and Mr. Muckey had sex.

118.    Specifically, C.S. stated the following:

> ….I'm sorry for ignoring you. [NAME REDACTED] and I have been going through shit. … I **had a panic attack and told him that we slept together** …. (emphasis added)

23

119.    Not only did C.S. recall the sex she had with Mr. Muckey, she complimented and thanked Mr. Muckey for the sex, and also asked Mr. Muckey for his telephone number, so she could be in touch. Specifically, C.S. stated the following:

> awwww you're really the best 😊 **thanks for everything, yes, even the sex. it was pretty good**…
>
> and i sort of need your number to get in touch with you.  (emphasis added)

120.    She also begged Mr. Muckey not to tell her boyfriend that they had sex twice, stating:

> …PLEASEEEEEEEE **don't tell him about the sex. i told him that we did it twice because we did,** but i REALLY don't want this to evolve into anything and i don't want you dragged into it. DONT REPLY PLEASE (emphasis added)

121.    No other relationship between Mr. Muckey was the subject of the Levy Investigation as it pertained to Mr. Muckey.

**L.    The Philharmonic Lacks "Just Cause" to Terminate Mr. Muckey and So Utilizes a Never Before Used Provision of the CBA As a Basis to Execute its Plan to Terminate Mr. Muckey**

122.    With the overwhelming documentary evidence submitted by Mr. Muckey, it was manifestly clear that the Philharmonic did not have "just cause" to terminate Mr. Muckey.

123.    The Facebook Messages exchanged between C.S. and Mr. Muckey, as well as Ms. Levy's findings that there were no other claims made by any member of the orchestra since 2010, should have convinced the Philharmonic that Mr. Muckey had not engaged in any misconduct.

124.    However, the Philharmonic did not want Mr. Muckey returning to the orchestra.

125.    Since the Philharmonic knew that it could not sustain its burden of establishing "just cause" in order to support the Dismissal, it proceeded to attempt to find a way to circumvent such requirement, and to nonetheless terminate Mr. Muckey without "just cause."

126.    The Philharmonic, with the cooperation of Local 802, whose President publicly supported the Philharmonic's adverse employment actions and saw the Suspension as the "good first steps," implemented a plan and process to assure that Mr. Muckey, as well as Mr. Wang, who were both tenured musicians, would be terminated and not return to their positions in the orchestra.

127.    On October 15, 2024, the Philharmonic gave Mr. Muckey a "written notice of non-reengagement" (the "Dismissal Notice") informing him that, pursuant to Article XIV of the collective bargaining agreement ("Article XIV"), the Philharmonic would not be re-engaging him as a member of the orchestra for the 2025-26 season and that during the remainder of the current season (2024-25), he would remain subject to the Suspension (the "Dismissal").

128.    Mr. Muckey was also given a contract for the current season that reduced his total compensation by discontinuing the overscale weekly pay that he was entitled to receive as the Associate Principal and Third Trumpet.

129.    No reason was given by the Philharmonic for the Dismissal.

130.    In fact, counsel for the Philharmonic informed counsel for Mr. Muckey that no reason need be given under Article XIV and that the Philharmonic was exercising its prerogative to terminate Mr. Muckey.

131.    Article XIV had never been invoked or relied upon for the termination of any musician employed by the Philharmonic.

132.    In the musical industry, provisions similar to Article XIV have been used in collective bargaining agreements to dismiss a musician for non-disciplinary reasons, such as for the failure to fulfill one's artistic obligations.

133.    However, the Philharmonic's unprecedented use of Article XIV was not because Mr. Muckey lacked such artistic quality.

134.    Mr. Muckey later learned that Article XIV was used against him (as well as Mr. Wang) for the very first time, to do an "end run" around the requirement of "just cause" to terminate their employment.

135.    Also, Mr. Muckey later learned that pursuant to a written agreement between the Philharmonic and Local 802, the Philharmonic's use of Article XIV would be applied this one time, as against Mr. Muckey and Mr. Wang only, and that Article XIV would never be applied again as a disciplinary action based upon "just cause" where Article VII.E.7 would otherwise apply.

136.    The Philharmonic took a different course of action than it did after the 2018 Investigation concluded when it terminated Mr. Muckey's employment, purporting to have "just cause" to terminate him, and then Local 802 challenged the dismissal in arbitration. This time, with its application of Article XIV, the Philharmonic thus sought to avoid arbitration under Article XV where it would have to prove "just cause" (which it previously failed to do with regard to the 2010 Allegations).

137.    The invocation of Article XIV therefore deliberately deprived Mr. Muckey of an independent forum in which he could contest the C.S. Allegation made against him and (once again) challenge the Philharmonic's unlawful conduct.

**M.  The Philharmonic Informs the Public That It Dismissed Mr. Muckey After a Finding of Sexual Misconduct**

138.    Notwithstanding the Dismissal as not requiring "just cause," the statements made by the Philharmonic suggested that the Dismissal was based upon a finding of sexual misconduct.

139.    On November 4, 2024, *The New York Times* reported the Dismissal in an article titled, "Philharmonic Dismisses 2 Players Over Sexual Misconduct Allegations," with the headline, "The orchestra said an inquiry found credible claims against the musicians of sexual assault and harassment.  They denied the charges."

140.    In the November 4th article, the Philharmonic said, "an investigation that began… has now turned up additional claims of misbehavior."

141.    The article further quoted the reason for the Dismissal, which was given by the Philharmonic's Executive Adviser, Deborah Borda, as follows:

> Ms. Borda said the inquiry had uncovered "patterns of sexual misconduct and abuse of power" by the two men… The orchestra said the accusations ranged from inappropriate remarks to assault.

142.    The article also highlighted the fact that, notwithstanding the alleged "sexual misconduct" which would normally invoke Article VII.E.7, a termination based upon "just cause," "this year, the Philharmonic used a different strategy to dismiss Mr. Muckey and Mr. Wang.  The orchestra invoked a section in the labor agreement known as a 'non-reengagement' provision, notifying the two men that it did not plan to rehire them in the 2025-26 season."

143.    On November 5, 2024, Ms. Borda was similarly reported in the *New York Post* article titled, "NY Philharmonic fires two musicians over alleged sexual misconduct, abuse of power."

144.    In the November 5th article, Ms. Borda stated that the Levy Investigation, "found that both gentlemen had been involved in sexual abuse and rape as well as abuse of power."

145.    Ms. Borda also boasted in that same article that, "[Mr. Muckey, as well as Mr. Wang] are barred from the building…. They will never appear on the stage again with the philharmonic ."

**N.    Mr. Muckey Informs Local 802 That He Protests the Dismissal and At the Same Time, Local 802 Enters Into an Agreement with the Philharmonic Which Limits the Disclosure to Him of Requisite Information**

146.    After receiving the Dismissal Notice, on or about October 16, 2025, Mr. Muckey promptly invoked his limited rights pursuant to Article XV of the CBA and informed Local 802 that he protested the Dismissal.

147.    The process that followed was similarly unfair, lacked any due process, and was intended to facilitate the Dismissal and limit Mr. Muckey's ability to challenge same.

148.    Thereafter, Local 802 informed Mr. Muckey that it had a copy of the investigative report prepared by Ms. Levy (the "Levy Report"), which it was able to obtain pursuant to a confidentiality agreement that it had entered into with the Philharmonic (the "Confidentiality Agreement").  Local 802 also obtained a copy of an executive summary of the investigative report (the "Executive Summary") which was also subject of the Confidentiality Agreement.

149.    However, Local 802 refused to send Mr. Muckey either of the documents.

150.    Pursuant to the Confidentiality Agreement, Local 802 agreed not to discuss, provide or otherwise disclose to Mr. Muckey, the Levy Report, and agreed to only permit him to review the Executive Summary in person only, in the presence of a union representative.

151.    Mr. Muckey was informed by Local 802 that while counsel for Local 802 and the President of Local 802 would have access to the Levy Report, he would not, and that he was only

able to review the Executive Summary subject to his agreeing to the Confidentiality Agreement, which provided, among other prohibitions, that Mr. Muckey could not copy the Executive Summary, could not take notes while reviewing it, could not share its findings with Mr. Wang, or otherwise divulge its content.

152.    Although Mr. Muckey protested the terms of the Confidentiality Agreement, he was informed by Local 802 that if he did not sign the Confidentiality Agreement, he would not be able to view the Executive Summary, and he was therefore compelled to sign it.

### O. The Executive Summary Is Clearly Unreasonable in Light of the Overwhelming Documentary Evidence Submitted Which Proved That the C.S. Allegation Was False

153.    On October 24, 2025, Mr. Muckey and his counsel appeared at the offices of Local 802's counsel and signed the Confidentiality Agreement.

154.    At that time, Mr. Muckey and his counsel were permitted to review the Executive Summary, in the presence of counsel, but were prohibited from taking any notes during such review or making copies of it.

155.    The Executive Summary contained no exhibits or attachments and was a summary recounting of the Levy Investigation, by Ms. Levy as it pertained to Mr. Muckey.

156.    The Executive Summary focused on the C.S. Allegation and discussed orchestra members who expressed their reluctance to take the stage with Mr. Muckey based upon the Article and rumor circulated within the orchestra about him.

157.    The C.S. Allegation, according to the Executive Summary, consisted of an allegation now made some sixteen years later that when she had sex with Mr. Muckey in 2008, she was unable to consent.

158.    The Executive Summary concluded that C.S. was inebriated in 2008 when she left a party with Mr. Muckey, attended by students of the Manhattan School of Music as well as members of the Philharmonic who taught at the Manhattan School of Music, and went back with him to his apartment to have sex with him.

159.    In the Executive Summary, Ms. Levy found the C.S. Allegation "credible" notwithstanding the contemporaneous statements made by C.S. in the Facebook Messages referenced above, in which she, *inter alia*:

      (a)    makes no mention of her being inebriated or otherwise impaired in her sexual encounter with Mr. Muckey;

      (b)    affirmatively states that she "consented" to the sex;

      (c)    comments that the "sex was pretty good" and thanks him for it;

      (d)    acknowledges that she had sex with Mr. Muckey on a separate occasion thereafter; and

      (e)    renewed her relationship with Mr. Muckey as a friend three (3) years later in 2011 and gave Mr. Muckey her new cell phone number, asking him to call her.

160.    The determination by Ms. Levy that the C.S. Allegation was "credible" was clearly erroneous and contrary to documentary and testimonial evidence.

161.    Ms. Levy also found the C.S. Allegation "credible" notwithstanding the apology provided by C.S. when she was confronted by Ms. Levy with the Facebook Messages.

162.    Ms. Levy's finding was also erroneous because it was not based upon a single interview with any witnesses present at the party, including members of the Philharmonic who were also present at the party, to substantiate C.S.'s belated claim.

30

163.    Indeed, there was no evidence reported by Ms. Levy that contradicted Mr. Muckey's statements and documents, or in any way called into question the authenticity or accuracy of the Facebook Messages.

164.    Ms. Levy did not give any weight to the Facebook Messages exchanged between C.S. and Mr. Muckey which proved that the C.S. Allegation was false, and when referred to, the Facebook Messages were taken out of context and quoted in such a manner to justify finding the C.S. Allegation "credible."

165.    The findings were arbitrarily drafted in such a biased manner to place C.S., the alleged female "victim," in the most positive light and to place Mr. Muckey, the alleged male "perpetrator" in the most negative light.

166.    For example, Ms. Levy drew no adverse conclusion regarding the veracity of C.S.' allegation even though C.S. apologized after she was shown her own Facebook messages in which she expressly that she both consented to and enjoyed the sex with Mr. Muckey.

167.    Nor was an adverse conclusion drawn after C.S. did not deny that she had sent the Facebook messages.

168.    Also, the Executive Summary gave no weight to the fact that it was C.S.' boyfriend (and not C.S.) who removed Mr. Muckey as C.S.' "Facebook friend" on Facebook, after he found the messages exchanged between C.S. and Mr. Muckey, and that a few years later, it was C.S. who reached out to Mr. Muckey by sending him a "Friend Request" on Facebook so she could connect with him on Facebook again.

169.    Ms. Levy discredited the message exchange between C.S. and Mr. Muckey as "meaningless," even though in those messages, C.S. provided Mr. Muckey, (the man with whom she now claimed to have had nonconsensual sex) with her new telephone number.

170.    The Executive Summary was otherwise biased and drafted to portray Mr. Muckey in the most negative light to justify Ms. Levy's "finding" of wrongdoing.

**P.    The Executive Summary Erroneously Finds a "Pattern" of Abuse by Mr. Muckey**

171.    The Executive Summary purported to document alleged pattern of abuse of women by Mr. Muckey (and Mr. Wang).

172.    However, with the exception of the C.S. Allegation, which was proven false by the documentary evidence, there was no other credible complaint of any misconduct of Mr. Muckey made by any orchestra member, so as to establish a "pattern" of abuse.

**Q.    The Philharmonic Has its Investigator Conduct an Unprecedented Survey As Part of Its Plan to Terminate Mr. Muckey, Since it Lacks "Just Cause" to Do So**

173.    In the Executive Summary, Ms. Levy reported that she had not received any complaints from any of the orchestra members about Mr. Muckey.

174.    After conducting interviews of the orchestra members, and receiving no such complaints, in an extraordinary turn of events, Ms. Levy then solicited the orchestra members to consider whether or not they wanted to play with Mr. Muckey by asking them to respond to the two questions (the "Survey").  Specifically, the Survey asked the following:

      (a)    How do you feel about Mr. Muckey (and Mr. Wang) being put on "leave"?

    and,

      (b)    How would you feel about Mr. Muckey (and Mr. Wang) returning to the orchestra?

175.    The Survey did not concern any other musician in the orchestra.

176.    Indeed, Ms. Levy singled out only two men, Mr. Muckey and Mr. Wang, for such extraordinary action.

177.    The Survey was a further part of the plan to find a rationale for removing Mr. Muckey and Mr. Wang from the orchestra in the absence of "just cause" to do so.

178.    The Survey was not based upon any allegations made by any of the musicians against Mr. Muckey of any misconduct.

179.    In fact, the Survey asked no such question.

180.    Instead, the Survey was calculated to find a justification to support the Philharmonic's decision to:

      (a)    initially place Mr. Muckey on "leave pending an investigation" when there was not a single allegation made against him of sexual harassment, violence and/or abuse at the time of such "leave;" and

      (b)    thereafter terminate Mr. Muckey, after the investigation which was conducted to find allegations of sexual harassment, violence and/or abuse alleged to have been committed by Mr. Muckey, yielded no such allegations, other than an allegation by a woman, which was proven false by her own messages.

181.    The Executive Summary stated that Ms. Levy's conclusion from her Survey was that a significant number of musicians in the orchestra said that they did not want to be in the orchestra with Mr. Muckey because they said they were  uncomfortable or felt unsafe due to allegations they either read about or heard about from rumors circulated among orchestra members or blogs in social media.

182.    Yet, Ms. Levy acknowledged that she could not document any allegation about Mr. Muckey's conduct with women in the orchestra since 2010, involving the 2010 Allegations.

183.    Thus, the Survey was calculated as yet another "end run" around the "just cause" requirement.

184.    The purpose of the Survey was to develop grounds for the Suspension and Dismissal of of Mr. Muckey regardless of what the Levy Investigation found.

185.    After the Philharmonic did not succeed in obtaining any complaints about Mr. Muckey of misconduct, it then attempted to justify the disciplinary actions it took against Mr. Muckey as being based upon a supposed significant number of orchestra members not wanting to work with him and, therefore, supporting both the Suspension and the Dismissal.

186.    It did not matter to the Philharmonic that none of the musicians surveyed alleged that Mr. Muckey had engaged in any acts of sexual harassment, violence and/or abuse.

### R. Local 802 Conducts a Dismissal Review Process Which is Unfair, Biased and Predetermined to Find Against Mr. Muckey

187.    Following Mr. Muckey's review of the Executive Summary, he prepared a written response to it (the "Muckey Statement") and submitted it to Local 802's counsel for presentation to the Executive Committee as directed.

188.    At that time, a Dismissal Review Committee, consisting of nine (9) orchestra members had been elected, which was to serve as an "advisory group" to Local 802 in reviewing the Dismissal.

189.    Since the Dismissal Review Committee played a role in the review process, Mr. Muckey requested, through counsel, to appear and present the Muckey Statement to the Dismissal Review Committee; however, Local 802 rejected the request.

190.    In making its recommendation to the Executive Committee, the Dismissal Review Committee reviewed only the Executive Summary and Mr. Muckey was given no opportunity to either appear before the Dismissal Review Committee or present the Muckey Statement to them.

191.    The Dismissal Review Committee met and presented its recommendation to the Executive Committee.

192.    With only the Executive Summary, which did not contain the Facebook Messages exchanged between C.S. and Mr. Muckey, and did not include a responsive statement from Mr. Muckey, the Dismissal Review Committee "unanimously recommended that Local 802 not contest Muckey's and Wang's terminations."

193.    Then, on November 1, 2024, Mr. Muckey orally presented his statement to the Executive Committee.

194.    The oral statement was limited to 15 minutes and there was no interaction permitted between Mr. Muckey and members of the Executive Committee.

195.    Thereafter, Mr. Muckey had no opportunity to address the Dismissal Review Committee's recommendation since Mr. Muckey was neither given notice of what the Dismissal Review Committee recommendation was nor a copy of it.

**S.    Local 802 Refuses to Challenge the Dismissal and The Philharmonic Unilaterally Amends the Confidentiality Agreement to Permit Local 802 to Publish the Written Decision**

196.    After the Executive Committee met, it issued a written decision on November 4, 2024 (the "Union Decision"), in which it determined not to challenge the Dismissal of Mr. Muckey (as well as the dismissal of Mr. Wang) and not take the issue to arbitration as provided for in Article XV.

197.    The Union Decision reveals that it was similarly unfair, biased and predetermined to find against Mr. Muckey in that, *inter alia*:

(a)    it did not prepare a separate decision based solely upon the investigation of Mr. Muckey, but intentionally issued a collective decision which stated

that there was a "pattern of predatory conduct" so as to portray Mr. Muckey as having many allegations, notwithstanding its admission that, "the allegations concerning Muckey are not as numerous as those involving Wang," but that,"[w]ith respect to Muckey, the Investigator credited the testimony of a woman;"

(b)     it combined its consideration of Mr. Muckey with the allegations against Mr. Wang notwithstanding that the grievances of Mr. Muckey and Mr. Wang concerned entirely separate claims involving different allegations and findings by Ms. Levy;

(c)     it acknowledged that Article XIV had never been used to terminate a tenured musician such as Mr. Muckey previously, but that the Philharmonic had agreed to do so that for this "exceptional circumstances" involving Mr. Muckey as well as Mr. Wang, and further agreed that in the future it will "not use Article XIV to do an end-run around Article VII.E.7 to avoid its burden of showing 'just cause';"

(d)     while contending that it did not consider the allegations adjudicated in the Award, it "vociferously rejected" expert testimony referred to in the Award that was not the subject of Mr. Muckey's grievance;

(e)     it stated that it was because of the results of the Levy Investigation that it had decided not to take further steps to grieve the Dismissal through an arbitration;

(f)     it relied heavily on the recommendation of the Dismissal Review Committee before which Mr. Muckey could not appear, and which

rendered its opinion based on "stories they had heard" and apparent claims not even considered in the Levy Report or Executive Summary;

(g)    it claimed that some percent of the orchestra members would "not take the stage" or felt "extremely uncomfortable or unsafe" without any allegation that Mr. Muckey had done anything abusive to such members;

(h)    it also claimed that "a number of musicians, most of whom were young women who had not heard anything about the allegations before the *Vulture* article, reported to the NY Phil HR Department that they did not feel safe in their workplace, not just because of what they read in the *Vulture* article, but also because their colleagues had begun to share stories of sexual misconduct by the two musicians," which Ms. Levy acknowledged had no basis in fact;

(i)    it found that Mr. Muckey's case presented "extreme circumstances," notwithstanding there was only one allegation against Mr. Muckey by C.S. which Mr. Muckey proved to be false by submitting documentary evidence;

(j)    it concluded that its finding regarding Mr. Muckey was consistent with a "pattern" of failing to "secure meaningful consent from women" when the Union Decision could document no other allegation concerning Mr. Muckey other than the reference to the one C.S. Allegation;

(k)    it considered the "soul crushing" and "heart breaking" regret of the culture in the orchestra which was "plagued" by Mr. Muckey (and Mr. Wang)

when even the Executive Summary by Ms. Levy conceded that no

allegation had been made against Mr. Muckey since 2010; and,

(l)    it stated that Mr. Muckey exhibited no "contrition" or "empathy" towards

his female "victims" although Mr. Muckey submitted evidence which

conclusively established that the C.S. Allegation was false.

198.    Notwithstanding that the Dismissal pursuant to Article XIV purportedly did not

require upon a determination by the Philharmonic of "just cause," Local 802 still made the

decision that, "[b]ased on the information in the Executive Summaries, as well as the unanimous

recommendation of the DRC…" that "Local 802 will not challenge the dismissals in arbitration."

199.    In fact, in the Union Decision, Local 802 went to great lengths to detail the

"findings" of the Levy Investigation which, if true, suggested that Mr. Muckey engaged in sexual

misconduct and that the Dismissal was based upon "just cause."

200.    Local 802 explained that the Dismissal was "based on extreme circumstances,

including the type and scope of the sexual misconduct at issue and the overwhelming sentiment

of the Orchestra members who spoke to the investigator concerning the impact of returning [Mr.

Muckey and Mr. Wang] to their workplace."

201.    The Union Decision also stated that, "Although Muckey 'categorically denies'

engaging in *any* of the misconduct in the report, we rely on the testimony that was credited by

the investigator in her report, which is consistent with a pattern she identified of Muckey failing

to secure meaningful consent from women with whom he had sex."

202.    The Union Decision further stated that, "[w]hile we have signed confidentiality

agreements and are not permitted to disclose most of the specific factual details and witness

testimony discussed in the Executive Summaries, we are sickened by the pattern of predatory

38

conduct and the failure to comprehend the concept of 'consent' that the witnesses, whom the investigator spoke to and found to be credible, discussed in detail..."

203.    Thus, Local 802 decided not to take any further steps to grieve the Dismissal through arbitration because of the results of the Levy Investigation and the "sentiment" of orchestra members.

204.    Local 802 publicly shared the results of the Levy Investigation when it disseminated the Union Decision to all orchestra members and its contents were also divulged to the public.

205.    Local 802 was permitted to share selected portions of the Executive Summary, which were purportedly "confidential information" pursuant to an amendment of the Confidentiality Agreement, which amendment was unilaterally made without any notice to Mr. Muckey.

206.    Specifically, the amendment permitted Local 802 to publish the Philharmonic's purported reasons for the non re-engagement and share such contents of the Executive Summary with orchestra members and the public.

207.    Although the Philharmonic did not cite to the Levy Investigation for its decision to terminate Mr. Muckey, the Philharmonic used the Levy Investigation, and Local 802 used the Union Decision and excerpts from the Executive Summary, to smear Mr. Muckey within the orchestra and before the general public.

208.    Both the Philharmonic and Local 802 were also motivated to counter public criticism that it had not done enough in the past to address women's concerns about male misconduct.

209.    After Mr. Muckey learned that contents of the Executive Summary had been shared, he wanted the same opportunity to be able to comment.

210.    Mr. Muckey asked Local 802, through counsel, to have a waiver of confidentiality in a similar amendment so that he could respond to what was published in the Union Decision but was informed that he would have to contact the Philharmonic.

211.    Mr. Muckey thereafter asked the Philharmonic, through counsel, for a similar waiver and his request was ignored.

212.    In the end, both the Philharmonic and Local 802 knew that there was no "just cause" to terminate Mr. Muckey and so they both relied upon Article XIV as a device to support the Dismissal of him from his tenured position without having to prove "just cause."

213.    Yet, both the Philharmonic and Local 802 made statements to the public about the "findings" of sexual misconduct, which if true, would constitute "just cause" and in doing so, smeared Mr. Muckey within the orchestra and before the general public.

**T.    Mr. Muckey Has Suffered Harm and Sustained Damages As a Result of Both the Suspension and the Dismissal by the Philharmonic and Local 802's Support of the Philharmonic's Adverse Employment Actions**

214.    As a result of the Suspension, Mr. Muckey was not permitted to perform in any Philharmonic concert for the remainder of the 2023-24 season, including the Spring Gala with Gustavo Dudamel, and was not permitted to perform in the Philharmonic tours in China in June 2024 and in Vail in July 2024, among other Philharmonic Activities.

215.    Also, as a result of the Suspension, Mr. Muckey was removed from the following rehearsals, concerts and projects:

(a)    Soloist performance with Chamber Music Society of Lincoln Center;

(b)     Inaugural orchestral concert of Composing Inclusion, a partnership of the Juilliard Preparatory Division, sponsored by the Philharmonic;

(c)     All-City Orchestra coaching, sponsored by the Philharmonic; and

(d)     other opportunities of a like nature.

216.     The Suspension of Mr. Muckey at the Philharmonic and the Philharmonic's public announcement of same, have resulted in a false perception within the classical music community, and beyond, that the Suspension was due to misconduct stemming from the 2010 Allegations.

217.     Similarly, as a result of the Notice of Dismissal, Mr. Muckey was not permitted to perform in a single concert for the current 2024-25 season and will not be permitted to perform in the Spring Gala with Sutton Foster which is scheduled for May 2025 or the tour in Vail which is scheduled for July 2025.

218.     The Dismissal of Mr. Muckey at the Philharmonic and the Philharmonic's public announcement of same, also have resulted in a false perception within the classical music community, and beyond, that the Dismissal is due to misconduct stemming from the C.S. Allegation.

219.     Additionally, Local 802's public statements that it supports the Philharmonic's adverse employment actions against Mr. Muckey, have similarly resulted in a false perception within the classical music community, and beyond, that Mr. Muckey's Suspension from the Philharmonic is due to misconduct stemming from the 2010 Allegations and that Mr. Muckey's Dismissal from the Philharmonic is due to misconduct stemming from the C.S. Allegation.

220.    Furthermore, Mr. Muckey's reputation has been immensely damaged over social media, in which the statements of the Philharmonic and Local 802 regarding the Suspension and the Dismissal have been reposted and reshared, thereby having exponential effects.

221.    As a result, Mr. Muckey has sustained irreversible damage to his reputation as well as his professional musical career, has been removed from other rehearsals, concerts and projects, and lost opportunities with various other music societies and symphonies, that have subsequently canceled or retracted invitations, offers and/or contracts, among other damages.

222.    Mr. Muckey has applied for positions as a trumpet player in various orchestras, educational institutions, businesses, and even branches of the military.

223.    Despite Mr. Muckey's impressive musical background, and tenured position in one of the most prestigious orchestras in the world, he has been repeatedly denied employment because of the unwarranted, adverse employment action that the Philharmonic has taken against him which is known all throughout the classical music industry.

224.    Indeed, the fact that Mr. Muckey was dismissed from such an esteemed position at the Philharmonic sends no message other than he has engaged in misconduct, albeit untrue.

225.    Both the Philharmonic and Local 802 told orchestra members and the public at large that Mr. Muckey was terminated based upon sexual misconduct supposedly uncovered during the Levy Investigation when both the Philharmonic and Local 802 knew that there was compelling and uncontroverted evidence in the Facebook messages that refuted the C.S. Allegation and proved such allegation to be false.

226.    Moreover, both the Philharmonic and Local 802 intentionally published false statements to orchestra members and the public which created the false narrative there was a "pattern" of sexual misconduct by Mr. Muckey, notwithstanding their knowledge of such falsity

given that he prevailed in the arbitration regarding allegations of sexual misconduct and submitted compelling and uncontroverted evidence in Facebook messages that refuted the C.S. Allegation and proved it to be false.

227.    Their false statements have exposed and continue to expose Mr. Muckey to public contempt, hatred, aversion, and disgrace.

228.    The actions of the Philharmonic and Local 802 have not only blemished the reputation of Mr. Muckey, but have permanently maimed his musical career, professional image, and ability to simply earn a livelihood.

229.    As a result of the actions of the Philharmonic and Local 802, Mr. Muckey has suffered, and continues to suffer, economic harm, as well as sustained emotional distress and mental suffering, for which he has sought and continues to seek psychological treatment.

**U.  Mr. Muckey Exhausts His Federal Administrative Remedies**

230.    On March 4, 2025, Mr. Muckey filed a charge of discrimination against the Philharmonic (the "Philharmonic Charge") and a charge of discrimination against Local 802 (the "Local 802 Charge") with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging violations of the law including, but not limited to, Title VII, the New York State Human Rights Law and New York City Human Rights Law based upon his sex.

231.    On March 5, 2025, the EEOC issued a Notice of Right to Sue letter ("Right to Sue Letter") on the Philharmonic Charge and on March 7, 2025, issued a Notice of Right to Sue letter regarding the Local 802 Charge, both of which Mr. Muckey received on March 7, 2025.

232.    The Right to Sue Letters authorize Mr. Muckey to proceed with his discrimination claims against both the Philharmonic and Local 802 in either state or federal court.

### V.  A Step-by-Step Account of the Collusion Between the Philharmonic and Local 802 to Remove Mr. Muckey From the Orchestra

233.    From the time the Article was published, both the Philharmonic and Local 802 devised a plan to remove him from the orchestra, with or without just cause, and in order to effectuate such plan, the Philharmonic and Local 802 colluded to take the following steps, *inter alia*:

> (a)    The Philharmonic would engage an investigator, who was not neutral or independent, but was a former attorney of the law firm representing the Philharmonic, to find and investigate alleged claims of abuse of women that would focus on Mr. Muckey (and Mr. Wang);
>
> (b)    The investigator would prepare the Levy Report and Executive Summary that would document purported abuse of women by Mr. Muckey (and Mr. Wang);
>
> (c)    The investigation would be used as ground for terminating the employment of Mr. Muckey (and Mr. Wang);
>
> (d)    Local 802 would not grieve the Dismissal of Mr. Muckey (and Mr. Wang) but in fact would support it;
>
> (e)    The Philharmonic would invoke Article XIV, a never before used provision, against Mr. Muckey and Mr. Wang to do an "end run" around the requirement of "just cause" to terminate their employment in the absence of "just cause;"
>
> (f)    The Levy Report or Executive Summary would be used by the Philharmonic and Local 802 to demonstrate Mr. Muckey's purported abuse of women as a basis to support the Dismissal, notwithstanding that

both the Philharmonic and Local 802 knew that such claim could not

withstand scrutiny under a "just cause" standard;

(g)    The Philharmonic and Local 802 would enter into a Confidentiality

Agreement with regard to the Levy Report to not share the Levy report

with Mr. Muckey;

(h)    The Philharmonic would require that Mr. Muckey enter into the

Confidentiality Agreement in order to have limited review of the

Executive Summary such that Mr. Muckey could not copy it, take notes

while reviewing it, share its findings with Mr. Wang, or otherwise divulge

its content;

(i)    After Mr. Muckey's execution of the Confidentiality Agreement, the

Philharmonic and Local 802 would unilaterally amend the Confidentiality

Agreement(s), without any notice to Mr. Muckey, to permit Local 802 to

publish their reasons for the non re-engagement and share contents of the

Executive Summary with orchestra members and the public, while Mr.

Muckey would be unable to publicly respond to such comments based

upon the Confidentiality Agreement which had not been similarly

amended for him;

(j)    Local 802 would agree to the Philharmonic's use of Article XIV to avoid

its burden of showing "just cause" to support the Dismissal of Mr.

Muckey (and the dismissal of Mr. Wang);

(k)    Local 802 and the Philharmonic would enter into a written agreement in

which the Philharmonic would agree that it "will not use Article XIV as an

end- run around Article VII.E.7 to avoid its burden of showing 'just

cause'" for any other tenured orchestra member;

(l)    Local 802 would undertake its obligations under Article XV in such a

manner to ostensibly give Mr. Muckey a futile right to contest the

allegations against him in the Executive Summary, and Local 802 could

then issue a decision rejecting Mr. Muckey's grievance on the grounds

that he abused women, thereby permitting the Philharmonic to proceed

with terminating Mr. Muckey;

(m)    The Philharmonic would invoke Article XIV to terminate Mr. Muckey,

which does not require "just cause," and thus avoid arbitration under

Article XV where the Philharmonic would have to prove "just cause" and

therefore deprive Mr. Muckey of an independent forum in which he could

contest the allegations made against him;

(n)    In furtherance of the plan on October 15, 2024, the Philharmonic would

give Mr. Muckey the Dismissal Notice advising him that, pursuant to

Article XIV, the Philharmonic would not be re-engaging him as a member

of the orchestra for the 2025-26 season and that during the remainder of

the current season (2024-25), he would remain subject to the Suspension.

Mr. Muckey would be also given a contract that reduced his total

compensation by discontinuing the overscale weekly pay that he was

entitled to receive as the Associate Principal and Third Trumpet;

(o)    Thus, Mr. Muckey would be given notice that he would remain subject to

the Suspension, his compensation would be reduced for the current 2024-

46

25 season, and he would not be re-engaged for the 2025-26 concert season but would be terminated from his position as a tenured orchestra member;

(p)    The Philharmonic and Local 802, based upon the amended Confidentiality Agreement, would then be able to issue public statements claiming that based upon the Levy Investigation, which erroneously found that Mr. Muckey had abused women, he was being removed from his tenured position at the orchestra;

(q)    Local 802 would also, based upon the amended Confidentiality Agreement, be able to share with orchestra members the Union Decision stating that it will not challenge the Dismissal in arbitration, which was ultimately disseminated to the public at large.

234.    The plan, as orchestrated between the Philharmonic and Local 802, left Mr. Muckey with no other remedy than to commence an action on his own behalf to seek redress.

## AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST LOCAL 802
### (Violation of NLRA, Section 9(a),
### Breach of the Duty of Fair Representation)

235.    Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth in paragraphs "1" through "234" as if set forth in full herein.

236.    Pursuant to Section 9(a) of the NLRA, Local 802 has an implied duty of fair representation to Plaintiff who is a member of Local 802.

237.    There is a CBA between Local 802 and the Philharmonic which provides for the terms and conditions of employment, *inter alia*, compensation, disciplinary action, grievance procedures and the arbitration of disputes involving union members such as Plaintiff.

238.    Pursuant to Article XV of the CBA, Local 802 and the Philharmonic agreed that an award by an arbitrator is final and binding.

239.    In addition, Local 802 has the obligation to its members, such as Plaintiff, to ensure that an arbitral award is enforced according to its terms.

240.    Further, pursuant to Article VII and XV of the CBA, Local 802 and the Philharmonic agreed that the Philharmonic can only take disciplinary measures, including dismissal, against a tenured musician of the Philharmonic only in the event of "just cause."

241.    As its union representative, Local 802 has an obligation to a tenured musician that the Philharmonic adheres to such terms when seeking to terminate a member.

242.    The Philharmonic breached the CBA and violated the Award rendered in the Arbitration by its Suspension of Plaintiff on April 13, 2024 which, *inter alia*, banned him from all Philharmonic Activities solely based upon the publication of the 2010 Allegations in the Article.

243. Plaintiff duly requested that Local 802 enforce the Award and have the Philharmonic restore him to his tenured position as Associate Principal and Third Trumpet, but it refused and, in fact, endorsed the Suspension.

244. Local 802's refusal to enforce the Award on Plaintiff's behalf was arbitrary, discriminatory and in bad faith, and in breach of its duty of fair representation.

245. Following the Suspension, Local 802, in collaboration with the Philharmonic, created a process whereby Plaintiff could be terminated without "just cause," which was unique to Plaintiff (and Mr. Wang), had never been used before in such circumstances, and would never be used again as an "end run" around "just cause."

246. Local 802 engaged in a series of actions calculated to avoid Plaintiff's rights pursuant to the "just cause" provisions of the CBA including, but not limited to:

(a) it refused to provide Plaintiff with an independent *Weingarten* representative at the Levy investigation inquiry;

(b) it requested the Levy Report from the Philharmonic, notwithstanding that the Philharmonic had given Plaintiff a notice of non-reengagement that purportedly avoided the need for "just cause;"

(c) it required Plaintiff to agree to the stringent Confidentiality Agreement prohibiting Plaintiff from reviewing the Levy Report and limiting Plaintiff in reviewing the Executive Summary under prohibitive and onerous restrictions;

(d) it agreed with the Philharmonic to modify the Confidentiality Agreement so that both the Philharmonic and Local 802 would be able to make public those parts of the Levy Report which would cast Plaintiff in a false light as

if he engaged in sexual misconduct so as to justify the extraordinary use of Article XIV against him;

(e)    it conducted a sham dismissal review process under Article XV, including convening a Dismissal Review Committee, which is the designated body to consider the validity of the basis for the Philharmonic's claimed actions under Article XIV and providing it with the Executive Summary but refusing Plaintiff the opportunity to appear and rebut it;

(f)    it issued a public decision adopting the Levy Report as to the allegations by C.S. against Plaintiff, notwithstanding there was overwhelming documentary evidence refuting it; and;

(g)    it obtained a written agreement with the Philharmonic that Article XIV would only be used in this instance against Plaintiff (and Mr. Wang) and that it would never be used again as an "end run" around the "just cause" requirement with regard to a tenured musician of the Philharmonic.

247.    Under such circumstances, Local 802's consenting to the Dismissal under Article XIV of the CBA as an "end run" around the "just cause" requirement and refusal to challenge the Dismissal in arbitration behalf of Plaintiff, was arbitrary, discriminatory and in bad faith, thereby breaching its duty of fair representation to Plaintiff.

248.    By reason of Local 802's arbitrary, bad faith, and discriminatory conduct, Plaintiff has suffered and continues to suffer damages.

249.    Based upon the foregoing, Plaintiff is entitled to an Order granting the following relief:

    (a)    a declaratory judgment that Local 802 has breached its duty of fair representation to Mr. Muckey;

    (b)    an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

## AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST THE PHILHARMONIC
### (Violation of § 301 of the LMRA, 29 U.S.C. § 185, Breach of the Collective Bargaining Agreement)

250.    Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth in paragraphs "1" through "249" as if set forth in full herein.

251.    The Philharmonic is a party to the CBA with Local 802 and liable to Plaintiff for breach of the CBA pursuant to Section 301 of the LMRA.

252.    As previously alleged above, Plaintiff was the subject of the Arbitration commenced pursuant to Article XV of the CBA in which an Award was rendered.

253.    Based upon the Award, Plaintiff was reinstated in 2020 as Associate Principal and Third Trumpet and remained in good standing through April 13, 2024.

254.    Notwithstanding the Award, as a result of the Article which rehashed the 2010 Allegations, Plaintiff was suspended and barred from all Philharmonic Activities.

255.    The Suspension of Plaintiff and the continuation of same was thereby violative of the Award, and Plaintiff was entitled to be reinstated to his position in the Philharmonic.

256.    Thereafter, the Philharmonic sought to find some basis to terminate Plaintiff (and Mr. Wang) and accordingly initiated the Levy Investigation even though no claims of wrongdoing against Plaintiff had been alleged.

257.    Ms. Levy then conducted her inquiry into Plaintiff and issued the flawed Levy Report.

258.    Based on the Levy Report, the Philharmonic learned of the C.S. Allegation against Plaintiff, but that there was documentary evidence produced by Plaintiff that refuted the allegation and proved that the sex was consensual and, in fact, was rated by C.S. as "pretty good."

259.    The Levy Report also established that since the 2010 Allegations, there were no complaints by any orchestra member against Plaintiff.

260.    Under such circumstances, the Philharmonic understood that there was no basis to terminate Plaintiff for "just cause" and it could not prevail under Article VII and Article XV of the CBA.

261.    Therefore, in collaboration with Local 802, the Philharmonic devised a plan to use Article XIV of the CBA to do an "end run" around the "just cause" requirement and terminate Plaintiff under the Dismissal Notice.

262.    The Philharmonic agreed with Local 802 that:

(a)    it would use the Levy Report as a basis for justifying the use of Article XIV against Plaintiff;

(b)    it would restrict Plaintiff's review of the Levy Report to an Executive Summary under the prohibitive Confidentiality Agreement;

      (c)     it would amend the Confidentiality Agreement so that both Local 802 and the Philharmonic could publicize parts of the Report to place Plaintiff in a bad light;

      (d)     it would agree that Article XIV would never again be used as an "end run" around "just cause" to terminate a tenured member of the Philharmonic.

263.    By reason of the foregoing, the Philharmonic's actions in imposing the Suspension and the Dismissal, the Philharmonic has breached the CBA, thereby causing Plaintiff to suffer, and continue to suffer, damages.

264.    Based upon the foregoing, Plaintiff is entitled to an Order granting the following relief:

      (a)     a declaratory judgment that the Suspension and the Dismissal constitute a breach of the CBA;

      (b)     a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff;

      (c)     reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority;

      (d)     an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

**AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST LOCAL 802**
**(Violation of Title VII of the Civil Rights Act of 1964,**
**28 U.S.C. § 2000e-2, Sex Discrimination)**

265.    Plaintiff incorporates by reference and repeats and realleges each and every

allegation set forth in paragraphs "1" through "264" as if set forth in full herein.

266.    Title VII, 28 U.S.C. § 2000e-2 states as follows:

(c)    Labor organization practices

It shall be an unlawful employment practice for a labor organization -

> (1)    to exclude or to expel from its membership, or otherwise to discriminate
> against, any individual because of his … sex…;

> (2)    to limit, segregate, or classify its membership or applicants for
> membership, or to classify or fail or refuse to refer for employment any
> individual, in any way which would deprive or tend to deprive any
> individual of employment opportunities, or would limit such employment
> opportunities or otherwise adversely affect his status as an employee or as
> an applicant for employment, because of such individual's … sex…; or

> (3)    to cause or attempt to cause an employer to discriminate against an
> individual in violation of this section.

267.    Local 802 discriminated against Plaintiff based upon his sex.

268.    In addition, Local 802 caused and/or attempted to cause the Philharmonic to

discriminate against Plaintiff because of his sex.

269.    Local 802 colluded with the Philharmonic to concoct a way to terminate Plaintiff

because of his sex and caused the Philharmonic to discriminate against Plaintiff based upon his

sex.

270.    Local 802's actions as alleged were motivated by a discriminatory animus against

Plaintiff because he was a male accused of sexual misconduct and to placate other union

members who wrongfully feared and/or believed that Plaintiff was a threat to women,

notwithstanding that there was no credible evidence of any wrongdoing and there was no allegation of wrongdoing by Plaintiff since the 2010 Allegations.

271.    As a result of its bias against Plaintiff based upon his sex, Local 802 consented to, acquiesced and/or joined in the Philharmonic's plan to terminate Plaintiff.

272.    By reason of the foregoing, Local 802 has violated Title VII in its unlawful discrimination against Plaintiff on the basis of sex, thereby causing Plaintiff to suffer, and continue to suffer, damages.

273.    Based upon the foregoing, Plaintiff is entitled to an Order granting an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

### AS AND FOR A FOURTH CLAIM FOR RELIEF AGAINST THE PHILHARMONIC
#### (Violation of Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000e-2, Sex Discrimination)

274.     Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth in paragraphs "1" through "273" as if set forth in full herein.

275.    Title VII, 28 U.S.C. § 2000e-2 states as follows:

(a)    Employer practices

It shall be an unlawful employment practice for an employer –

(1)    to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex…

276.    Plaintiff was subject to adverse employment actions by his employer, based upon his sex up to and including the Dismissal.

277.    The Philharmonic had a motive to discriminate against Plaintiff on the basis of sex, given the public pressure and general sentiment to favor the accusing female over the accused male and embarked on a plan to show the public that it was indeed committed to protecting female musicians from male musicians, regardless of the true facts.

278.    The whole process leading up to, and including, the Dismissal consisted of significant investigatory and procedural irregularity that raises a plausible inference of discrimination.

279.    The climate, still in the midst of the #MeToo movement, was that the Philharmonic, and the classical music industry as a whole, were not taking complaints of sexual harassment and misconduct against women seriously.

280.    Since the publication of the Article and continuing throughout the proceedings above, there have been ongoing statements in online blog sites and among orchestra members that there is a culture at the Philharmonic and in the classical music community which is abusive to women.

281.    In addition, since the publication of the Article and continuing throughout the proceedings above, there have been ongoing petitions and demonstrations calling for Plaintiff and Mr. Wang's dismissal from the Philharmonic because they were men and were allegedly abusive to women.

282.    There was also the sentiment that, notwithstanding the Award, Ms. Kizer, who is a woman, was to be believed, and Plaintiff, who was a man, was not to be believed.

283.    These factors motivated the Philharmonic to take a strong stance against Plaintiff, a male, by the Suspension and the Dismissal.

284.    Thus, the Philharmonic was determined to show orchestra members, and the public, that it was taking complaints of sexual harassment and misconduct by men against women seriously, even in the absence of any meritorious claims against Plaintiff.

285.    The Philharmonic's motivation for its determination to take a strong stance against Plaintiff, a male, reflect an impermissible bias favoring females.

286.    The Philharmonic discriminated against Plaintiff because of his sex when it focused an investigation on Plaintiff, a male, and it ignored and did not investigate allegations raised against a female musician in the orchestra.

287.    The Philharmonic displayed a deliberate indifference during the Levy Investigation by knowingly refusing to consider the evidence presented by Plaintiff, a male, which not only refuted the allegations of C.S., a woman, but *proved* that the allegations against him were false.

288.    The findings in the Executive Summary were clearly arbitrary and erroneous and contrary to the weight of the overwhelming documentary evidence as well as the testimony of Plaintiff.

289.    Moreover, the findings were unfair, biased and pre-determined to find against Plaintiff because he is a male.

290.    In deciding to terminate the employment of Plaintiff, despite the lack of evidence to sustain any disciplinary action, the Philharmonic was impermissibly motivated by its concern regarding the reaction of orchestra members, particularly female orchestra members, to the return of Plaintiff, a male, against whom allegations of sexual misconduct, albeit unfounded, had been made and whom they wrongfully feared and/or believed was a threat to women, notwithstanding

that there was no credible evidence of any wrongdoing and there was no allegation of wrongdoing by Plaintiff since the 2010 Allegations.

291.    As a result of the Philharmonic's actions, Plaintiff has been damaged by the loss of his employment, his career and his reputation.

292.    By reason of the foregoing, the Philharmonic has violated Title VII in its unlawful discrimination against Plaintiff on the basis of sex, thereby causing Plaintiff to suffer, and continue to suffer, damages.

293.    Based upon the foregoing, Plaintiff is entitled to an Order granting the following relief:

    (a)    a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff in the absence of "just cause;"

    (b)    reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority;

    (c)    an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

## AS AND FOR A FIFTH CLAIM FOR RELIEF AGAINST LOCAL 802
### (Violation of the New York State Human Rights Law,
### N.Y.S. Executive Law § 296, Sex Discrimination)

294.    Plaintiff incorporates by reference and repeats and realleges each and every

allegation set forth in paragraphs "1" through "293" as if set forth in full herein.

295.    The New York State Human Rights Law, Executive Law § 296 states as follows:

§ 296.  Unlawful discriminatory practices.

1.    It shall be an unlawful discriminatory practice:

(c)    For a labor organization, because of the … sex… of
any individual, to exclude or to expel from its
membership such individual or to discriminate in
any way against any of its members or against any
employer or any individual employed by an
employer.

296.    Local 802 discriminated against Plaintiff based upon his sex.

297.    In addition, Local 802 caused and/or attempted to cause the Philharmonic to

discriminate against Plaintiff because of his sex.

298.    Local 802 colluded with the Philharmonic to concoct a way to terminate Plaintiff

because of his sex and caused the Philharmonic to discriminate against Plaintiff based upon his

sex.

299.    Local 802's actions as alleged were motivated by a discriminatory animus against

Plaintiff because he was a male accused of sexual misconduct and to placate other union

members who wrongfully feared and/or believed that Plaintiff was a threat to women,

notwithstanding that there was no credible evidence of any wrongdoing and there was no

allegation of wrongdoing by Plaintiff since the 2010 Allegations.

300. As a result of its bias against Plaintiff based upon his sex, Local 802 consented to, acquiesced and/or joined in the unlawful discrimination, which included the Philharmonic's plan to terminate Plaintiff.

301. By reason of the foregoing, Local 802 has violated the NYS Human Rights Law in its unlawful discrimination against Plaintiff on the basis of sex, thereby causing Plaintiff to suffer, and continue to suffer, damages.

302. Based upon the foregoing, Plaintiff is entitled to an Order granting an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

## AS AND FOR A SIXTH CLAIM FOR RELIEF AGAINST THE PHILHARMONIC
### (Violation of the New York State Human Rights Law, N.Y.S. Executive Law § 296, Sex Discrimination)

303. Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth in paragraphs "1" through "302" as if set forth in full herein.

304. The New York State Human Rights Law, Executive Law § 296 states as follows:

§ 296. Unlawful discriminatory practices.

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of an individual's … sex, … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

305. Plaintiff is a member of a protected class because he is a male.

306. Plaintiff is qualified for the tenured position of Associate Principal and Third Trumpet.

307.    The Philharmonic discriminated against Plaintiff because of his sex when it focused an investigation on Plaintiff, a male, and it ignored and did not investigate allegations raised against a female musician in the orchestra.

308.    Plaintiff was subject to an adverse employment action by his employer, the Philharmonic, based upon his sex when he was placed on the Suspension.

309.    Plaintiff was also subject to an adverse employment action by his employer, based upon his sex when he was given the Notice of Dismissal.

310.    In addition, Plaintiff was treated differently, and in fact worse, than other tenured musicians, based solely upon his sex.

311.    The adverse and different employment actions taken against Plaintiff by the Philharmonic occurred under circumstances giving rise to an inference of discrimination.

312.    As a result of the Philharmonic's actions, Plaintiff has been damaged by the loss of his employment, his career and his reputation.

313.    By reason of the foregoing, the Philharmonic has violated the NYS Human Rights Law in its unlawful discrimination against Plaintiff on the basis of sex, thereby causing Plaintiff to suffer, and continue to suffer, damages.

314.    Based upon the foregoing, Plaintiff is entitled to an Order granting the following relief:

    (a)    a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff in the absence of "just cause;"

    (b)    reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost,

including full back pay for the period during which he was wrongfully
suspended and terminated, and the restoration of seniority;

(c)     an award of economic damages of not less than $25,000,000, in an exact
amount to be determined at trial, plus prejudgment interest, compensatory
and punitive damages, and attorneys' fees, expenses, costs and
disbursements, in an amount not presently capable of ascertainment.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF AGAINST LOCAL 802
**(Violation of the New York City Human Rights Law,
N.Y.C. Administrative Code § 8-107, Gender Discrimination)**

315.    Plaintiff incorporates by reference and repeats and realleges each and every
allegation set forth in paragraphs "1" through "314" as if set forth in full herein.

316.    The New York City Human Rights Law, N.Y.C. Administrative Code, 8-107
states as follows:

§ 8-107. Unlawful discriminatory practices.

1. Employment. It shall be an unlawful discriminatory practice:

(c)     For a labor organization or an employee or agent thereof,
because of the actual or perceived … gender…of any
person, to exclude or to expel from its membership such
person, to represent that membership is not available when
it is in fact available, or to discriminate in any way against
any of its members or against any employer or any person
employed by an employer.

317.    Local 802 discriminated against Plaintiff based upon his gender.

318.    In addition, Local 802 caused and/or attempted to cause the Philharmonic to
discriminate against Plaintiff because of his gender.

319.    Local 802 colluded with the Philharmonic to concoct a way to terminate Plaintiff because of his gender and caused the Philharmonic to discriminate against Plaintiff based upon his gender.

320.    Local 802's actions as alleged were motivated by a discriminatory animus against Plaintiff because he was a male accused of sexual misconduct and to placate other union members who wrongfully feared and/or believed that Plaintiff was a threat to women, notwithstanding that there was no credible evidence of any wrongdoing and there was no allegation of wrongdoing by Plaintiff since the 2010 Allegations.

321.    As a result of its bias against Plaintiff based upon his gender, Local 802 consented to, acquiesced and/or joined in the unlawful discrimination, which included the Philharmonic's plan to terminate Plaintiff.

322.    By reason of the foregoing, Local 802 has violated NYC Human Rights Law in its unlawful discrimination against Plaintiff on the basis of gender, thereby causing Plaintiff to suffer, and continue to suffer, damages.

323.    Based upon the foregoing, Plaintiff is entitled to an Order granting an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF AGAINST THE PHILHARMONIC
**(Violation of the New York City Human Rights Law,
N.Y.C. Administrative Code § 8-107, Gender Discrimination)**

324.    Plaintiff incorporates by reference and repeats and realleges each and every allegation set forth in paragraphs "1" through "323" as if set forth in full herein.

325.    The New York City Human Rights Law, N.Y.C. Administrative Code, 8-107 states as follows:

> § 8-107. Unlawful discriminatory practices.
>
> 1.    Employment. It shall be an unlawful discriminatory practice:
>
> (a)  For an employer or an employee or agent thereof, because of the actual or perceived … gender… of any person:
>
>> (2)  To refuse to hire or employ or to bar or to discharge from employment such person; or
>>
>> (3)  To discriminate against such person in compensation or in terms, conditions or privileges of employment.

326.    Plaintiff is a member of a protected class because he is a male.

327.    Plaintiff is qualified for the tenured position of Associate Principal and Third Trumpet.

328.    The Philharmonic discriminated against Plaintiff because of his sex when it focused an investigation on Plaintiff, a male, and it ignored and did not investigate allegations raised against a female musician in the orchestra.

329.    Plaintiff was subject to an adverse employment action by his employer, the Philharmonic, based upon his gender when he was placed on the Suspension.

330.    Plaintiff was also subject to an adverse employment action by his employer, based upon his gender when he was given the Notice of Dismissal.

331.    In addition, Plaintiff was treated differently, and in fact worse, than other tenured musicians, based solely upon his gender.

332.    The adverse and different employment actions taken against Plaintiff by the Philharmonic occurred under circumstances giving rise to an inference of discrimination.

333.    As a result of the Philharmonic's actions, Plaintiff has been damaged by the loss of his employment, his career and his reputation.

334.    By reason of the foregoing, the Philharmonic has violated NYC Human Rights Law in its unlawful discrimination against Plaintiff on the basis of gender, thereby causing Plaintiff to suffer, and continue to suffer, damages.

335.    Based upon the foregoing, Plaintiff is entitled to an Order granting the following relief:

(a)    a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff in the absence of "just cause;"

(b)    reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority;

(c)    an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages of up, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

WHEREFORE, Plaintiff requests that this Court issue an Order grating the following relief to Plaintiff:

A.    On the First Claim for Relief Against Local 802:

1)    a declaratory judgment that Local 802 has breached its duty of fair representation to Mr. Muckey; and

  2) an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

B. On the Second Claim for Relief Against the Philharmonic, a declaratory judgment that the Suspension and the Dismissal constitute a breach of the CBA;

  1) a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff;

  2) reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority; and

  3) an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

C. On the Third Claim for Relief Against Local 802, an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

D. On the Fourth Claim for Relief Against the Philharmonic:

1)    a permanent injunction enjoining the Philharmonic from terminating the
      employment of Plaintiff in the absence of "just cause;"

2)    reinstatement of Plaintiff to his position at the Philharmonic as Associate
      Principal, Third Trumpet, and restoration of all contractual benefits lost,
      including full back pay for the period during which he was wrongfully
      suspended and terminated, and the restoration of seniority; and

3)    an award of economic damages of not less than $25,000,000, in an exact
      amount to be determined at trial, plus prejudgment interest, compensatory
      and punitive damages, and attorneys' fees, expenses, costs and
      disbursements, in an amount not presently capable of ascertainment.

E.    On the Fifth Claim for Relief Against Local 802, an award of economic damages
      of not less than $25,000,000, in an exact amount to be determined at trial, plus
      prejudgment interest, compensatory and punitive damages, and attorneys' fees,
      expenses, costs and disbursements, in an amount not presently capable of
      ascertainment.

F.    On the Sixth Claim for Relief Against the Philharmonic:

1)    a permanent injunction enjoining the Philharmonic from terminating the
      employment of Plaintiff in the absence of "just cause;"

2)    reinstatement of Plaintiff to his position at the Philharmonic as Associate
      Principal, Third Trumpet, and restoration of all contractual benefits lost,
      including full back pay for the period during which he was wrongfully
      suspended and terminated, and the restoration of seniority; and

3)      an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

G.      On the Seventh Claim for Relief Against Local 802, an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment.

H.      On the Eighth Claim for Relief Against the Philharmonic:

1)      a permanent injunction enjoining the Philharmonic from terminating the employment of Plaintiff in the absence of just cause;"

2)      reinstatement of Plaintiff to his position at the Philharmonic as Associate Principal, Third Trumpet, and restoration of all contractual benefits lost, including full back pay for the period during which he was wrongfully suspended and terminated, and the restoration of seniority; and

3)      an award of economic damages of not less than $25,000,000, in an exact amount to be determined at trial, plus prejudgment interest, compensatory and punitive damages, and attorneys' fees, expenses, costs and disbursements, in an amount not presently capable of ascertainment; and

I.      Such other and further relief as this Court may deem just, proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Dated:        New York, New York
              April 10, 2025

                        McLAUGHLIN & STERN, LLP

                        By:      /s/ Steven J. Hyman
                                 STEVEN J. HYMAN, ESQ.
                                 JACQUELINE C. GERRALD, ESQ.
                                 PAUL H. LEVINSON, ESQ.

                        260 Madison Avenue - 18th Floor
                        New York, NY 10016
                        (212) 448-1100
                        shyman@mclaughlinstern.com
                        jgerrald@mclaughlinstern.com
                        plevinson@mclaughlinstern.com
                        *Attorneys for Plaintiff Matthew Muckey*