UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW MUCKEY,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE PHILHARMONIC-SYMPHONY<br>SOCIETY OF NEW YORK, INC., AND<br>ASSOCIATED MUSICIANS OF GREATER<br>NEW YORK, LOCAL 802, AMERICAN<br>FEDERATION OF MUSICIANS,<br><br>                    Defendants. | Case No. 24-cv-03348-AS<br><br>[rel. 1:24-cv-03356-AS, 1:24-cv-03987-AS]<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC.'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Ashley R. Lynam (NY Bar No. 5701404) (admitted *pro hac vice*)
Jacob Sand (admitted *pro hac vice*)
Natalie Georges (NY Bar No. 5011325)
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103-3007
T: 215.963.5000 | F: 215.963.5001
ashley.lynam@morganlewis.com
jacob.sand@morganlewis.com
natalie.georges@morganlewis.com

Geneva Ramirez (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 North Wacker Drive
Chicago, IL 60606
T: 312.324.1000 | F: 312.324.1001
geneva.ramirez@morganlewis.com

*Attorneys for The Philharmonic-Symphony
Society of New York, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

   A.  Muckey's Contractual Rights.................................................................................... 2

   B.  The 2018 Investigation and Subsequent Arbitration............................................. 3

   C.  2024 *Vulture* Article .............................................................................................. 4

   D.  Muckey's Administrative Leave and the 2024 Investigation................................. 5

   E.  Reports of Sexual Misconduct and Abuse of Power.............................................. 6

   F.  Other Musicians Refusal to Play with Muckey ..................................................... 7

   G.  Muckey's Non-Reengagement................................................................................ 8

   H.  Muckey's Right to Dismissal Review..................................................................... 8

   I.  Exhaustion of Administrative Remedies............................................................... 10

ARGUMENT......................................................................................................................... 10

   I.  Standard of review. .............................................................................................. 10

   II.  Muckey Fails to State a Hybrid DFR / § 301 Claim (Count II)..........................11

      A. The Society Did Not Breach the CBA.............................................................11

         1.  The CBA does not require "just cause" for non-reengagements. ......................... 12

         2.  The Society complied with the CBA. ................................................................ 14

         3.  Muckey's placement on paid leave did not breach the CBA............................... 16

      B. Muckey Does Not Allege Facts to Suggest That the Union Breached Its DFR. ........ 17

      C. The Union Had Valid Reasons Not to Contests Muckey's Paid Leave or Subsequent Non-Reengagement...................................................................................................... 18

   III.  Muckey's State Law Claims Are Preempted (Counts VI and VIII)................................. 19

   IV.  Muckey Fails to Plead Discrimination (Counts IV, VI, and VIII). ................................. 21

      A. Muckey Does Not Plead Someone Similarly Situated Received Preferential Treatment. ................................................................................................................... 21

B.  Muckey Is No Sacrificial Lamb on the Altar of Public Sentiment. ............................ 23

V.  Muckey's Title VII Claim Sould Also Be Dismissed for Failure to Exhaust Administrative
Remedies (Count IV). ...................................................................................................... 24

**CONCLUSION** ............................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Abdullayeva v. Attending Homecare Servs., LLC*,
928 F.3d 218 (2d Cir. 2019) .................................................................................................. 11

*Allis-Chalmers Corp. v. Luek*,
471 U.S. 202 (1985) ............................................................................................................. 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................. 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................. 10

*Blige v. City Univ. of N.Y.*,
2017 WL 498580 (S.D.N.Y. Jan. 19, 2017) ......................................................................... 22

*Cancile Inv. Co. v. Archer Daniels Midland Co.*,
784 F. Supp. 2d 296 (S.D.N.Y. 2011) ................................................................................. 15

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ............................................................................................... 10

*CNH Indus. N.V. v. Reese*,
583 U.S. 133 (2018) ............................................................................................................. 13

*Collins v. Travers Fine Jewels Inc.*,
2018 WL 1470590 (S.D.N.Y. Mar. 23, 2018) ..................................................................... 11

*Cooper v. Templeton*,
629 F. Supp. 3d 223 (S.D.N.Y. 2022) ................................................................................. 24

*Cummings v. City of N.Y.*,
302 F. Supp. 3d 511 (S.D.N.Y. 2017) ................................................................................. 12

*Deltondo v. Sch. Dist. of Pittsburgh*,
2023 WL 2534817 (W.D. Pa. Mar. 16, 2023) ..................................................................... 16

*Doe v. N.Y. Univ.*,
438 F. Supp. 3d 172 (S.D.N.Y. 2020) ................................................................................. 24

*Doe v. Trs. of Columbia Univ.*,
2022 WL 3666997 (S.D.N.Y. Aug. 25, 2022) ..................................................................... 23

*Domnister v. Exclusive Ambulette, Inc.*,
2007 WL 4244151 (E.D.N.Y. Nov. 29, 2007) ..................................................................... 20

*Dumas v. New United Motor Mfg., Inc.*,
   2011 WL 5006462 (N.D. Cal. Oct. 20, 2011).............................................................................17

*Gibb v. Tapestry, Inc.*,
   2018 WL 6329403 (S.D.N.Y. Dec. 3, 2018) ...........................................................................24

*Haggood v. Rubin & Rothman, LLC*,
   2014 WL 6473527 (E.D.N.Y. Nov. 17, 2014)...........................................................................22

*Henry v. NYC Health & Hosp. Corp.*,
   18 F. Supp. 3d 396 (S.D.N.Y. 2014).........................................................................................22

*Henschke v. N.Y. Hosp. – Cornell Med. Ctr.*,
   821 F. Supp. 166 (S.D.N.Y. 1993) ...........................................................................................24

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984)....................................................................................................................11

*Johnson v. Andy Frain Servs., Inc.*,
   638 F. App'x 68 (2d Cir. 2016) ...............................................................................................21

*Jones v. Gen. Bd. of Glob. Ministries of United Methodist Church*,
   1997 WL 458790 (S.D.N.Y. Aug. 11, 1997)...........................................................................24

*Kajoshaj v. City of N.Y.*,
   2013 WL 249408 (E.D.N.Y. Jan. 23, 2013),  ........................................................................22

*Laborers' Int'l Union of N. Am. (LIUNA), Local __*,
   2022 BNA LA 106 (Lowe, 2022).............................................................................................17

*Mason County*,
   127 BNA LA 141 (Siegel, 2010) ..............................................................................................12

*Middleton v. City of Tucson*,
   2018 WL 1581628 (D. Ariz. Mar. 31, 2018) ...........................................................................17

*Mitchell v. Planned Parenthood of Greater N.Y., Inc.*,
   745 F. Supp. 3d 68 (S.D.N.Y. 2024).......................................................................................21

*Morrissey v. Verizon Commc'ns Inc.*,
   2011 WL 2671742 (S.D.N.Y. July 7, 2011) ............................................................................20

*Muckey v. Levy Emp. L., LLC et al.*,
   Index No. 152917/2025 (N.Y. Sup. Ct. Mar. 4, 2025) ..............................................................7

*Nnebe v. City of New York*,
   2023 WL 2393920 (S.D.N.Y. Jan. 30, 2023) ..........................................................................22

*Novick v. Vill. of Wappingers Falls*,
   376 F. Supp. 3d 318 (S.D.N.Y. 2019).......................................................................21

*Osborne v. Moody's Invs. Serv., Inc.*,
   2018 WL 1441392 (S.D.N.Y. Mar. 22, 2018) .........................................................22

*Pathania v. Metro. Museum of Art*,
   2013 WL 1182076 (E.D.N.Y. Mar. 21, 2013).........................................................17

*Perkins v. 199 SEIU United Healthcare Workers E.*,
   73 F. Supp. 3d 278 (S.D.N.Y. 2014)................................................................18, 19

*Rapaport v. Asia Elecs. Holding Co.*,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000).......................................................................10

*Rodriguez v. Connection Tech. Inc.*,
   65 F. Supp. 2d 107 (E.D.N.Y. 1999) .......................................................................25

*Roe v. St. John's Univ.*,
   91 F.4th 643 (2d Cir. 2024) ....................................................................................23

*Roenick v. Flood*,
   2021 WL 2355108 (S.D.N.Y. June 9, 2021) ..........................................................21

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000).......................................................................................10

*Soloviev v. Goldstein*,
   104 F. Supp. 3d 232 (E.D.N.Y. 2015) .....................................................................23

*Spellacy v. Airlien Pilots Ass'n-Int'l*,
   156 F.3d 120 (2d Cir. 1998).....................................................................................19

*Stafford v. Sealright, Inc.*,
   100 F. Supp. 2d 137 (N.D.N.Y. 2000).....................................................................25

*Stetz v. Reeher Enters., Inc.*,
   70 F. Supp. 2d 119 (N.D.N.Y. 1999).......................................................................25

*Sullivan v. Am. Airlines, Inc.*,
   424 F.3d 267 (2d Cir. 2005).....................................................................................20

*Tomney v. Int'l Ctr. for Disabled*,
   357 F. Supp. 2d 721 (S.D.N.Y. 2005)......................................................................17

*Truck Drivers, et al. v. Schneider Tank Lines, Inc.*,
   958 F.2d 171 (7th Cir. 1992) ...................................................................................13

*U.S. Tr. Co. of N.Y. v. Jenner*,
    168 F.3d 630 (2d Cir. 1999).........................................................................................12

*United Steelworkers of Am, AFL-CIO-CLC v. Rawson*,
    495 U.S. 362 (1990).....................................................................................................19

*Univ. Hosp.,*

    1997 BNA LA Supp. 103253 (Goldberg, 1997).......................................................17

*VTR Inc. v. Goodyear Tire & Rubber Co.*,
    303 F. Supp. 773 (S.D.N.Y. July 30, 1969)..............................................................11

*Wang v. Sussman*,
    No. 24-cv-03987 (S.D.N.Y. May 23, 2024) ...............................................................4

*White v. White Rose Food*,
    237 F.3d 174 (2d Cir. 2001)..........................................................................11, 17, 19

*Whitehurst v. 1199SEIU United Healthcare Workers E.*,
    928 F.3d 201 (2d Cir. 2019)........................................................................................20

*Young v. N. Drury Lane Prods., Inc.*,
    1995 WL 110126 (N.D. Ill. Mar. 13, 1995).............................................................13

*Young v. U.S. Postal Serv.*,
    907 F.2d 305 (2d Cir. 1990)........................................................................................17

*Zeuner v. Suntrust Bank Inc.*,
    181 F. Supp. 3d 214 (S.D.N.Y. 2016).........................................................................10

**STATUTES**

42 U.S.C. § 2000e-5(f)(1)...............................................................................................24

Labor-Management Relations Act § 301 (29 U.S.C. § 185).................................... *passim*

N.Y. City Human Rights Law, N.Y.C. Admin. Code § 8-107 ..........................19, 20, 21

New York State Human Rights Law, N.Y. Exec. Law § 296......................19, 20, 21, 23

**OTHER AUTHORITIES**

29 C.F.R. § 1601.28 .........................................................................................................25

Fed. R. Civ. P. 12.......................................................................................................1, 10

*Suspension*, Black's Law Dictionary (12th ed. 2024).....................................................17

Defendant The Philharmonic-Symphony Society of New York, Inc. ("Society," "Philharmonic," or "New York Philharmonic") submits this memorandum of law in support of its Motion to Dismiss Plaintiff Matthew Muckey's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

An orchestra's performance is a collaborative act, requiring dozens of musicians to adhere to a set of rules—read from the same score, follow the conductor, respect their colleagues—and to trust their colleagues will do the same. Failure to follow those rules turns a symphony into a cacophony. Plaintiff Matthew Muckey—the Philharmonic's Associate Principal and Third Trumpet—understands this concept on stage. But his behavior offstage demonstrates his belief that the rules do not apply to him after the curtain drops. Muckey's "repeated failure to recognize when sexual partners lack capacity or withdrew consent to sex" and "presum[ption] of consent without considering power disparities, capacity, or more subtle indicators to the contrary" have destroyed trust and fostered fear among so many of his fellow musicians that many will not retake the stage with him.

In this case, Muckey once again fails to appreciate the importance of the rules. Specifically, he claims that his placement on paid leave during the Society's internal investigation and his subsequent non-reengagement somehow violates the Collective Bargaining Agreement ("CBA") that governs his employment. But he can point to no such violated term because such a term does not exist. Indeed, Muckey received everything bargained for under the CBA and can point to no right he was deprived of or procedure that was not followed. So he asks this Court to ignore or rewrite or invent provisions of the CBA and apply Muckey's version rather than what his union and the Society negotiated and agreed to. He also tries to portray himself as the victim of some social conspiracy to discriminate against him because he is a man. But he cannot point to a single

occasion when a female Philharmonic member was in the same situation—accused of having or attempting to have sex with others while they were too intoxicated to consent or had withdrawn consent—and received comparatively better treatment.

By pushing these claims, which are doomed to fail, the Amended Complaint merely confirms what his colleagues have said about him, that Muckey believes "everything in the world is [his] for the taking." Muckey's claims should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    Muckey's Contractual Rights

The musicians of the New York Philharmonic (including Muckey) are members of the Associated Musicians of Greater New York, Local 802, American Federation of Musicians ("Union"), which is their exclusive collective bargaining representative. Ex. C,[1] Art. I. The CBA— negotiated by the Society and Union—governs the terms of each Philharmonic member's employment and provides that members shall be "employed [by the Society] for fifty-two (52) weeks in each year of the term of the Agreement[.]" *Id.* Art. III, § A. But the Society maintains broad discretion in controlling performing personnel, including: "[c]hoosing the performing personnel" and "schedul[ing] whatever activities of the Orchestra it may determine, both in the United States and abroad[.]" *Id.*; *see also id.* Art. XXIV, § A. There is no minimum number of performances or rehearsals a member must be assigned to.

The CBA also provides that tenured Philharmonic members are reengaged on a yearly basis to play with the Philharmonic. *Id.* Art. XIV; *see also* FAC ¶¶ 19–20 and Ex. E. All new Philharmonic members are on probation for the first 17 months of their employment, after which a committee of non-probationary (tenured) members votes on whether the new member should

---

[1] Exhibits referenced in this Memorandum refer to those attached to the Declaration of Ashley R. Lynam filed in support of the Society's Motion to Dismiss the Amended Complaint.

stay or go. Ex. C, Art. XXIV, § A(2); *see also id.* at Ex. B, § 3 ("Unsuccessful Auditions"); *id.* Art. XIV. Members, like Muckey—the Philharmonic's Associate Principal and Third Trumpet (FAC ¶ 15)—who are taken off probation are referred to as "tenured" musicians and are "deemed automatically re-engaged for the following year," unless the Society provides advanced notice of their non-reengagement if it so "desires." Ex. C, Arts. I, XIV.

In addition to its right not to re-engage members if sufficient notice is given, the Society may terminate a Philharmonic member without notice as a "disciplinary measure" if there is "just cause" to do so. *Id.* Art. VII, § E. If a Philharmonic member objects to his non-reengagement or termination for cause, the CBA contains two separate grievance-arbitration procedures: one that applies to non-reengagements, and another that applies to for-cause terminations and "other disputes." *Id.* Art. XV, §§ A–B.

The CBA also contemplates that the Philharmonic's titled members may negotiate individual agreements with the Society concerning overscale salary above the base pay provided for in the CBA. *See, e.g.*, *id.* Art. IV, § D; *id.* Art. III, § C(2); *id.* Ex. A, § 13; Ex. E. Muckey and the Society executed an individual agreement for the 2023–24 season, which incorporated the terms of the CBA. Ex. E; FAC ¶¶ 19–20. That contract expired on September 15, 2024. FAC ¶ 20; Ex. E. Muckey and the Society have entered no subsequent agreements, so the sole contract governing his employment is the CBA. FAC ¶ 20; Ex. E.

### B.    The 2018 Investigation and Subsequent Arbitration

In 2018, the Society hired former Federal Judge Barbara S. Jones to investigate allegations by Cara Kizer (a former probationary Philharmonic horn player) that Muckey raped her after Liang Wang (the Philharmonic's Principal Oboe) served her wine laced with a date-rape drug. FAC ¶¶ 30–31; Ex. F at 1–2; Ex. D at 1 n.1. That investigation unearthed a second rape allegation against Muckey. *Id.*; Ex. F at 2. The investigator credited both rape allegations, and Society fired

Muckey for cause in September 2018. Ex. D at 1 n.1; Ex. F at 2; FAC ¶ 34. Muckey and Wang appealed to their Union, which challenged their dismissals in an arbitration. Ex. D at 1 n.1; FAC ¶¶ 38–39.

The arbitrator found that the allegations against Muckey had not been proven by "clear and convincing" evidence and ordered Muckey be "reinstated and made whole for all contractual benefits lost, including full back pay and seniority" ("Award").[2] *Id.* ¶ 48; Ex. F at 2 n.2; Ex. D at 1 n.1.

### C.    2024 *Vulture* Article

On April 12, 2024, *Vulture*—an entertainment-and-culture outlet of *New York* magazine— published an article titled, "A Hidden Sexual-Assault Scandal at the New York Philharmonic: Two Musicians Were Fired for Sexual Misconduct. Why Were They Allowed Back in the Orchestra?"[3] Ex. B. The article details an incident during one of the Philharmonic's residencies in Vail, Colorado, involving Kizer, Muckey, and Wang. *Id.* It describes how Kizer joined Muckey and Wang for a drink at Muckey's condo while she waited for her husband's flight to arrive. *Id.* Kizer said that Wang brought her a glass of red wine, and she has no recollection of the evening after she drank from that glass. *Id.* The article describes Kizer waking up the next morning naked in Muckey's bed, feeling groggy and sick, with red vomit stains on the floor around the bed. *Id.* It describes how Kizer returned to her hotel room and realized a tampon had been pushed so far into her vagina that she had trouble removing it. *Id.* And it describes how Muckey's DNA was found

---

[2] With respect to Kizer's claim, the arbitrator adopted the view that a person could consent to sex in a blackout state. Ex. D at 1 n.1. With respect to the second claim, the arbitrator questioned whether the complainant had communicated her desire to stop having sex clearly enough by telling Muckey "no" and "it hurts" and trying to "close her legs and push[] Muckey off her." Ex. F at 2.

[3] Wang filed a defamation lawsuit against the author and the media outlet, which the Court dismissed for failure to state a claim. Compl., *Wang v. Sussman*, No. 24-cv-03987 (S.D.N.Y. May 23, 2024), ECF No. 1; Opinion and Order, *Wang v. Sussman*, No. 24-cv-03987 (S.D.N.Y. Jan. 13, 2025), ECF No. 67. Muckey has not brought such an action.

on the tampon and how a lab later found GHB—a date-rape drug—in a sample of her hair. *Id.*

According to the article, Kizer reported the incident to the Vail police and participated in a "controlled call" with Muckey, during which he stated that: when he woke up after the incident, he "felt fine" and had a "terrible hangover"; he recalled details of the night in question, but couldn't remember what happened between him and Kizer. *Id.* He later admitted to law enforcement that he had sex with Kizer but claimed it was consensual. *Id.* Ultimately, the detective who investigated the case recommended that the District Attorney press charges. *Id.* The article then explains that the Society fired Muckey after Judge Jones's internal investigation, the Union arbitrated the termination, and the arbitrator refused to draw an adverse inference against Muckey despite his refusal to testify and invocation of his right not to incriminate himself. *Id.*

### D.    Muckey's Administrative Leave and the 2024 Investigation

The Society placed Muckey on administrative leave with pay the day after the *Vulture* article came out. FAC ¶¶ 56–60; Ex. D at 2. Muckey claims this decision was solely in response to public outcry caused by the article, which he claims contained "no new facts warranting the Philharmonic revisiting the matter." But the Society actually did so because "several musicians had reported that the conduct in the *Vulture* article was not an isolated incident, but rather part of a pattern of improper conduct." *Compare* FAC ¶¶ 33, 54, 56, 61, 63–73, *with* Ex. D at 2.

The Society engaged an attorney (the "Investigator") to investigate allegations of sexual misconduct "distinct from those in the *Vulture* article or the 2020 arbitration award—by any member of the Orchestra." Ex. D at 2; FAC ¶¶ 93, 96; Ex. G. The investigation notice posted on the Society's website did not solicit reports about specific individuals or reports solely against men. *Compare* Ex. G *with* FAC ¶¶ 97, 99. The investigation's purpose was to "ensure a safe and respectful environment for *all*[.] Ex. G; *see also* Ex. F at 1.

The Investigator interviewed 69 members of the Philharmonic (including Muckey) and 23

other individuals. Ex. F at 1; FAC ¶¶ 106, 174. New reports of misconduct by Muckey surfaced. Ex. F at 2; FAC ¶¶ 111–12. Muckey was notified that he was a subject of the investigation and interviewed on several occasions with his legal counsel and a Union representative present. FAC ¶¶ 102, 106, 110. He was also given the opportunity to provide evidence about the subject matter of his interviews. FAC ¶¶ 109–10; Ex. D at 4.

### E.   Reports of Sexual Misconduct and Abuse of Power

According to the Investigator's Executive Summary, three different women reported that Muckey sexually assaulted them after they had withdrawn consent or blacked out. Ex. F at 2–6. A fourth reported a "physical interaction" with Muckey "involving alcohol" during which "she had to push him off her after he sought to progress from making out to trying to get his hands up her dress and have sex with her." Ex. F at 6. Two of the sexual assault allegations were arbitrated in 2019. *See supra* § 3 n.2. The third complainant ("Complainant 3") recounted that when she was an 18-year-old college freshman studying music and Muckey was a 24-year-old tenured member of the Philharmonic, Muckey invited her to a party where alcohol was being "ladled … down people's throats." Ex. F at 2–3. Despite knowing that Complainant 3 was "18 ½," Muckey encouraged her to drink. *Id.* She does not recall how much she drank but had only vague memories of later that night, including kissing Muckey and waking up in his bed. *Id.* She does not remember having sex with him, but concluded she must have when her vagina was sore the next morning. *Id.*

After the Investigator questioned Muckey about this interaction, he produced photos from the party and messages Complainant 3 had sent him sometime later. *Id.* at 3–4. In the messages, Complainant 3 wrote, "thanks for everything, yes, even the sex. it was pretty good." and "I really think that what we did was wrong… yes, I did consent, but still, what we did was wrong… [xxx] and I have been having issues. … I told him that we did it twice, because we did, but I REALLY

don't want this to evolve into anything …." *Id.* at 4. Muckey claims these messages prove consent.[4] FAC ¶ 172. The Investigator disagreed, explaining that the "power differential between Mr. Muckey and Complainant 3 was substantial"—she "was just 18, almost six years younger than Mr. Muckey, and barely two months into her freshman year while he was a college graduate in a professional position at one of the most prestigious orchestras in the world"—which would explain "why and how Complainant 3 … would shake off what seemed like one bad drunken episode after a party and continue to engage with Mr. Muckey[.]" Ex. F at 6.

Additionally, the Investigator questioned Muckey's versions of events, including because he "repeatedly deflected responsibility for that night" and made a slew of statements about Complainant 3's claims that were contradictory or contradicted by other evidence. *Id.* at 4–6. Based on these findings, the Investigator concluded that it was "more likely than not that Complainant 3 lacked the capacity to consent to that interaction," and that "Muckey could be physically forward with women to a degree that presumed consent without considering power disparities, capacity, or more subtle indicators to the contrary."[5] *Id.* at 8.

### F.    Other Musicians' Refusal to Play with Muckey

Many of the Philharmonic's members who spoke with the Investigator expressed the view that Muckey should not be permitted to return to the Philharmonic. Ex. F at 8–9. Of the 67 members interviewed, 50 (a majority of the Philharmonic's total members) "said they would be concerned" if Muckey returned, for various reasons, and 25 expressed that they would not retake

---

[4] Muckey filed a petition for pre-suit discovery in New York County Supreme Court, seeking the Investigator's files related to Complainant 3's allegations so that he could sue her for defamation. *Muckey v. Levy Emp. L., LLC et al.*, Index No. 152917/2025 (N.Y. Sup. Ct. Mar. 4, 2025), NYSCEF Doc. No. 1. The court denied the petition on May 19, 2025, noting that Muckey's claim that Complainant 3 "defamed him by lying about their sexual contact during the investigation is an assumption and amounts to conjecture." *Id.* NYSCEF Doc. No. 24. Muckey filed a notice of appeal on May 29, 2025. NYSCEF Doc. No. 27.

[5] The Investigator did not credit every allegation of misconduct levied against Muckey, including speculative allegations that he had drugged or attempted to drug peoples' alcoholic beverages. *Id.* at 6–7.

the stage with Muckey or that Muckey should not be allowed to return. *Id.*; Ex. D at 7; FAC ¶¶ 156, 197(g).

### G.    Muckey's Non-Reengagement

On October 15, 2024, the Society notified Muckey in writing that he would not be reengaged as a Philharmonic member for the 2025–26 season pursuant to Article XIV of the CBA. FAC ¶ 127. Article XIV provides:

> If the Society desires not to engage a member of the Orchestra for the following year (years computed September 21 to September 20), it must give written notice to that effect to said member by February 15th prior to the beginning of the year in question; otherwise, said member shall be deemed automatically re-engaged for the following year.

Ex. C, Art. XIV.

An exercise of the Society's non-reengagement rights does not require just cause. *Id.* If the Society "desires" not to reengage a musician, timely written notice is the sole prerequisite. *Id.* The only reference to "just cause" in the entire CBA is found in Article VII, § E, which governs the "Conduct of Musicians," and provides that musicians may be subject to "disciplinary measures in the event of the violation of these rules or for other just cause." *Id.* Art. VII, § E. But the Society did not terminate Muckey under Article VII in 2024—it exercised its right not to reengage him under Article XIV. FAC ¶ 127. There is no limitation in the CBA on the Society's discretion to do so because no such limitation was collectively bargained for.[6] *Id.* Muckey continues to be paid after receiving notice of his non-reengagement. FAC ¶ 128; Ex. D at 2.

### H.    Muckey's Right to Dismissal Review

Article XV of the CBA provides:

> In the event a notice of termination is given to any [Philharmonic] member in accordance with Article XIV above, a copy of such notice shall be mailed to the

---

[6] Even if some rationale was required to exercise the Society's right not to reengage a member, the Society had one: nearly half of the Philharmonic's members informed the Investigator that they would be concerned if Muckey returned. Ex. F at 8–9; Ex. D at 3.

> Union by registered mail within two (2) weeks after it is mailed to the member. If the individual concerned protests such termination, the Union shall then instruct the Orchestra Committee to call a meeting of the Orchestra so that a Dismissal Review Committee of nine (9) shall be elected. The Union, in conjunction with the Dismissal Review Committee and the Society, shall meet immediately to settle the dispute. If the matter is not settled within two (2) weeks after notice to the Union, then the propriety of the termination may be submitted to arbitration by the Union within sixty (60) days after receipt of said notice, under the Voluntary Labor Arbitration Rules of the American Arbitration Associations. … The provisions of this Section A shall apply to all members of the Orchestra except probationary employees.

Ex. C, Art. XV, § A. The Society and the Union followed this procedure to a tee.

On October 15, 2024—the same day the Society sent Muckey the notice of non-reengagement—the Society notified the Union. Ex. D at 2; FAC ¶ 127. Muckey protested the non-reengagement under Article XV. FAC ¶¶ 103, 146. The Union asked the Philharmonic's members to nominate candidates for the nine-member Dismissal Review Committee ("DRC") and held an election. FAC ¶ 188; Ex. D at 2–3. On October 23, 2024, the Union's President and members of the DRC met and reviewed the allegations against Muckey. Ex. D at 2; FAC ¶ 190. After considerable discussion and evaluation of the evidence presented and recognizing the fact that many Philharmonic members would not take the stage if Muckey returned, the DRC unanimously recommended that the Union not contest Muckey's non-reengagement. Ex. D at 3; FAC ¶¶ 191–92.

On October 25, 2024, three members of the DRC, the Union President, and the Executive Advisor to the Society's Board of Directors met to determine if the dispute could be settled. Ex. D at 3–4. The DRC again emphasized that "a supermajority of the [Philharmonic] who spoke to the investigator—who comprise a majority of the entire Orchestra—will not take the stage or will feel unsafe or uncomfortable if [Muckey] returns." Ex. D at 7. The Union's Executive Board later met to review the matter, at which time they reviewed Muckey's written submission and allowed him to present his position orally. *Id.* 7–8; FAC ¶¶ 187, 193. "[I]gnoring the *Vulture* article and the facts

underlying the 2020 arbitration award," the Executive Committee unanimously agreed Muckey's

non-reengagement was appropriate and not to contest his dismissal. Ex. D at 9. The Executive

Committee issued its written decision on November 4, 2024. *Id.*; FAC ¶ 196. This process

complied exactly with Article XV, § A. *See* Ex. C, Art. XV, § A.

## I.    Exhaustion of Administrative Remedies

On March 4, 2025, Muckey filed a charge of discrimination against the Society with the

United States Equal Employment Opportunity Commission ("EEOC"). FAC ¶ 230. The EEOC

issued a right-to-sue letter the next day. *Id.* ¶ 231.

## ARGUMENT

## I.    STANDARD OF REVIEW.

In assessing a Rule 12(b)(6) motion, "a court must accept as true all of the allegations

contained in a complaint," but that tenet "is inapplicable to legal conclusions" and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009). The court may consider the facts alleged in the complaint,

documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). If documents

attached to or relied upon in the complaint "contradict the allegations of the … complaint, the

documents control and this Court need not accept as true the allegations in the … complaint."

*Rapaport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); *see also Rothman

v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Zeuner v. Suntrust Bank Inc.*, 181 F. Supp. 3d 214, 218–

19 (S.D.N.Y. 2016). "[O]nly a complaint that states a plausible claim for relief survives a motion

to dismiss." *Ashcroft*, 556 U.S. at 679. Where "the allegations in a complaint, however true, could

not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of

minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 558 (2007) (cleaned up). If it appears from the face of the complaint that a plaintiff cannot prove a set of facts that would entitle him or her to the relief sought, the Court should dismiss plaintiffs' claims. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## II.    MUCKEY FAILS TO STATE A HYBRID DFR / § 301 CLAIM (COUNT II).

"To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement *and* (2) that the union breached its duty of fair representation vis-à-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001) (emphasis added); ); *see also* § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. Muckey has not pleaded a breach by either the Society or the Union; thus, the Court should dismiss his hybrid § 301/DFR claim.

### A.    The Society Did Not Breach the CBA.

Muckey has not plausibly alleged a violation of any provision of the CBA, the Award, or his individual agreement. Instead, he seeks to rewrite the CBA for his sole benefit by inserting "just cause" requirements where they do not exist and striking all of the rights bargained for by the Society and Union to manage the activities of the Philharmonic. "[C]ollective bargaining agreements must be interpreted according to ordinary principles of contract law." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) (cleaned up); *see also Abdullayeva v. Attending Homecare Servs., LLC*, 928 F.3d 218, 222 (2d Cir. 2019). And a plaintiff "must identify what provisions of the contract were breached as a result of the acts at issue." *Collins v. Travers Fine Jewels Inc.*, 2018 WL 1470590, at *3 (S.D.N.Y. Mar. 23, 2018). "[I]f defendants were given the right to do what they did by the express provisions of the contract, there can be no breach." *VTR Inc. v. Goodyear Tire & Rubber Co.*, 303 F. Supp. 773, 778 (S.D.N.Y. July 30, 1969). Muckey has identified no actual contractual provision that the Society supposedly breached.

### 1.    The CBA does not require "just cause" for non-reengagements.

"[W]here … a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *U.S. Tr. Co. of N.Y. v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999). Both courts and labor arbitrators apply this rule when interpreting the provisions of the CBA. *See, e.g.*, *Cummings v. City of N.Y.*, 302 F. Supp. 3d 511, 524 (S.D.N.Y. 2017) ("Unambiguous provisions [of a CBA] should be enforced as written."); *Mason County*, 127 BNA LA 141 (Siegel, 2010) ("To ignore clear and unambiguous contract language would usurp the role of the union and the employer and demonstrate disrespect for the collective bargaining process."). Muckey does not identify a "just cause" requirement in the CBA's non-reengagement clause because there is none. Ex. C, Art. XIV. The Court's analysis can start and end there because the term Muckey claims was breached does not exist.

To get around this inevitable conclusion, Muckey attempts to rewrite the CBA for his own benefit by conflating its non-reengagement and disciplinary provisions and by repeatedly pleading that the Society's invocation of the non-reengagement clause is "unprecedented." FAC ¶¶ 131, 197, 245. Muckey alleges that by not reengaging him pursuant to Article XIV, the Society did an "end run" around Article VII's "just cause" requirement. FAC ¶¶ 16–17, 134, 142. But the Society did not terminate Muckey pursuant to Article VII—the only provision in the CBA requiring "just cause." It provided notice of his non-reengagement under Article XIV:

> If the Society *desires* not to engage a member of the Orchestra for the following year… it must give written notice to that effect to said member by February 15th prior to the beginning of the year in question; otherwise, said member shall be deemed automatically re-engaged for the following year. The Society, however, will endeavor whenever possible to give the Orchestra member concerned one year's dismissal notice.

Ex. C, Art. XIV.

Article XIV contains no "just cause" requirement and stands on its own, separate from and

without any cross-reference to Article VII. *Id.* Under Article XIV, the Society may exercise its right not to reengage a Philharmonic member for any reason—including a member's inability to coexist with the other members of the ensemble—if it "desires" and as long as it gives sufficient notice. Article XIV does not reference "discipline" or Article VII such that the Court could reasonably conclude that the parties intended for Article XIV to incorporate Article VII's "just cause" requirement. *Id.* This makes sense because Article XIV contains other safeguards. Specifically, the non-reengaged member can challenge the "propriety" of his non-reengagement, which triggers a detailed collectively bargained-for review process that involves, among other things, the election of a Dismissal Review Committee—nine members of the Philharmonic elected by the members at large (i.e., Muckey's peers)—who weigh in regarding the "propriety" of the non-reengagement. *Id.* Art. XV, § A. By contrast, Article VII applies when the Society terminates a member, with *or without notice*, for "disciplinary" reasons. *Id.* Art. VII, § E(7). Because the comparative severity of immediate loss of employment and pay, a termination under Article VII (unlike Article XIV) must be supported by "just cause." *Id.* Muckey advocates that the Court should obliterate these distinct procedures and rewrite Article XIV of the CBA to require just cause, collapsing it into Article VII, even though the parties agreed to no such term and clearly intended to keep these provisions separate.

Moreover, no principle of contract law supports the position that a contractual term (like Article XIV) should not be given effect just because it has not been used before. And courts have applied the CBA language as written when confronted with similar provisions not requiring "just cause." *See Truck Drivers, et al. v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 174–75 (7th Cir. 1992) (declining to interpolate a just-cause provision into a grievance procedure); *Young v. N. Drury Lane Prods., Inc.*, 1995 WL 110126, at *3 (N.D. Ill. Mar. 13, 1995), *aff'd*, 80 F.3d 203 (7th

Cir. 1996) (refusing to imply a "just cause" requirement and finding plaintiff's argument that the CBA was atypical to be unavailing). Accordingly, Muckey's arguments regarding the "unprecedented" exercise of Article XIV are irrelevant.[7]

### 2.    The Society complied with the CBA.

The Society strictly adhered to the non-reengagement review process outlined in Article XV, § A, and Muckey pleads as much.

| Requirements of Arts. XIV & XV, § A | Allegations |
|---|---|
| 1. "If the Society desires not to engage a member of the Orchestra for the following year (years computed September 21 to September 20) it must give written notice to said member by February 15th prior to the beginning of the year in question[.]" Ex. C, Art. XIV. | "On October 15, 2024, the Philharmonic gave Mr. Muckey a 'written notice of non-reengagement' … informing him that, pursuant to Article XIV of the collective bargaining agreement …, the Philharmonic would not be re-engaging him as a member of the orchestra for the 2025–26 season[.]" FAC ¶ 127; *see also* FAC ¶ 128 (noting that Muckey received a "contract" under which he would be paid for the 2024–25 season). |
| 2. "The Society, however, will endeavor whenever possible to give the Orchestra member concerned one year's dismissal notice." Ex. C, Art. XIV. | Given that the 2024–25 season ends on September 20, 2025 (Ex. C, Art. XIV), Muckey received notice eleven months before the start of the 2025–26 season. FAC ¶ 127. |
| 3. "In the event a notice of termination is given to any Orchestra member in accordance with Article XIV above, a copy of such notice shall be mailed to the Union by registered mail within two (2) weeks after it is mailed to the member." Ex. C, Art. XV, § A. | "On October 15, 2024, the NY Phil notified [the Union] that … they had issued notices of non-reengagement to … Muckey pursuant to Article XIV of the parties collective bargaining agreement" (the "CBA"). Ex. D at 2; *see also* FAC ¶ 196 (incorporating Ex. D by reference). |
| 4. "If the individual concerned protests such termination, the Union shall then instruct the Orchestra Committee to call a meeting of the Orchestra so that a Dismissal Review Committee of nine (9) shall be elected." Ex. C, Art. XV, § A. | The Union "accepted nominations to the DRC and ballots were sent to all members of the Orchestra electronically on October 21, 2024. The ballots were counted, and the DRC was elected on October 22, 2024." Ex. D at 2; *see also* FAC ¶ 188 ("a Dismissal Review Committee, consisting of nine (9) orchestra members had been elected"). |

---

[7] Muckey's allegations that the Society violated the Award fail for the same reason. The Society does not need just cause to not reengage Muckey and being put on paid leave is not a disciplinary action requiring just cause, discussed *infra*. Furthermore, the Society's decision to not reengage Muckey was based on findings not subject to the arbitration. *See infra* § II.C.

| 5. "The Union, in conjunction with the Dismissal Review Committee and the Society, shall meet immediately to settle the dispute." Ex. C, Art. XV, § A. | "The Dismissal Review Committee met and presented its recommendation to the Executive Committee." FAC ¶ 191. "[O]n October 25, 2024, members of the DRC, [Union] President Cutler, and Deborah Borda, Executive Advisor to the NY Phil Board of Directors, met to determine if the dispute could be settled. … On November 1, 2024, … the [Union's] Executive Board … unanimously … decided not to challenge the two terminations." Ex. D at 3–4; *see also* FAC ¶ 191 ("The Dismissal Review Committee met and presented its recommendation to the Executive Committee."); FAC ¶ 196 ("After the Executive Committee met, it issued a written decision on November 4, 2024 (the "Union Decision"), in which it determined not to challenge the Dismissal of Mr. Muckey … and not take the issue to arbitration as provided for in Article XV."). |
|---|---|

Muckey's only argument that the Society breached Article XIV or XV is that it "reduced his total compensation by discontinuing the overscale weekly pay that he was entitled to receive as the Associate Principal and Third Trumpet," violating Article XIV's notice requirement. FAC ¶ 128. But he identifies no provision in the CBA or any other contract that entitles him to "overscale weekly pay" during the 2024–25 season. *See generally* FAC *and* Ex. C. He acknowledges that the last agreement he entered into with the Society expired on September 15, 2024. FAC ¶ 20; Ex. E. And he does not allege that he and the Society ever executed a new agreement for the 2024–25 season that would entitle him to overscale pay; to the contrary, he alleges they did not, meaning that the only agreement governing his pay is the CBA. *Id.* ¶ 128; Ex. C, Prefatory Clause; *see also Cancile Inv. Co. v. Archer Daniels Midland Co.*, 784 F. Supp. 2d 296, 304 (S.D.N.Y. 2011) ("Plaintiff has failed to allege the first element of a contract claim: an enforceable agreement to do what Plaintiff alleges Defendant has failed to do.").

Given that the Society complied with the unambiguous terms of the CBA governing non-reengagement and review of non-reengagement decisions and that Muckey has failed to identify terms entitling him to more, Muckey has not plausibly alleged a breach of the CBA under § 301 of

the LMRA, and Count II must be dismissed.

### 3. Muckey's placement on paid leave did not breach the CBA.

Muckey's second theory of relief under § 301 of the LMRA attempts to establish what amounts to a right to play.

> In sum, based solely upon the 2010 Allegations,[8] the Philharmonic took adverse employment action against Mr. Muckey including, but not limited to, a ban from all rehearsals, performances, concerts, and tours and other Philharmonic activities, including those to which he had already been assigned (collectively, "Philharmonic Activities"), which is tantamount to a suspension and violates the Award.

FAC ¶ 61; *see also id.* ¶ 217. But no provision in the CBA or his individual agreement for the 2023–24 season requires the Society to schedule Muckey to play during a minimum number of rehearsals and concerts. *See generally* Ex. C, Ex. E. His individual agreement makes no mention of how much Muckey was entitled to play. Ex. E. And the CBA provides no minimum number of performances or rehearsals a Philharmonic member must participate in. Ex. C; rather, it empowers the Society to "schedule whatever activities of the Orchestra it may determine." *Id.* Art. III, § A.

Moreover, to accept Muckey's argument that placement on paid leave violated the CBA, the Court would have to conclude that paid leave constitutes a "disciplinary measure," requiring "just cause," despite the fact that the CBA does not define "disciplinary measures" to include paid leave. Other courts have rejected the same argument. *See, e.g.*, *Deltondo v. Sch. Dist. of Pittsburgh*, 2023 WL 2534817 (W.D. Pa. Mar. 16, 2023) (claims related to paid suspension dismissed in part because plaintiff failed to identify any provision of the CBA stating that a suspension with pay constitutes a "disciplinary action" under the CBA). So too should this Court.

---

[8] Muckey's claim that he was placed on paid leave based on the same facts subject to the earlier binding arbitration decision is contradicted by the documents incorporated into the Amended Complaint by reference. *See* Ex. D; Ex. F at 6 ("In response to the Sussman article's reporting of what happened between Mr. Muckey and Ms. Kizer in Vail, and Ms. Kizer's belief that she was drugged, several people shared accounts of possible spiking of alcoholic drinks in relation to Mr. Muckey and Mr. Wang."); Ex. D at 2 ("several musicians had reported that the conduct described in the Vulture article was not an isolated incident").

Finally, Muckey's claim that his placement on paid leave is "tantamount to a suspension," is unsupported by law or fact. FAC ¶ 61; *Suspension, Black's Law Dictionary* (12th ed. 2024) ("The temporary withdrawal from employment," e.g., "suspension from teaching without pay."). Muckey continued (and *continues*) to be employed and paid by the Society through the end of the 2024–25 season. FAC ¶¶ 127–28. So there can be no question that his placement on paid leave did not sever his employment relationship with the Society. *See Dumas v. New United Motor Mfg., Inc.*, 2011 WL 5006462, at *7 (N.D. Cal. Oct. 20, 2011); *see generally Middleton v. City of Tucson*, 2018 WL 1581628, at *5–6 (D. Ariz. Mar. 31, 2018); *Laborers' Int'l Union of N. Am. (LIUNA), Local __*, 2022 BNA LA 106 (Lowe, 2022) (employee was "placed on unpaid administrative leave" and was not terminated"); *Univ. Hosp.*, 1997 BNA LA Supp. 103253 (Goldberg, 1997) (Grievant was placed on paid administrative leave and was not terminated until four months later). In sum, placement on paid leave is not the equivalent of employment loss, and Muckey can point to no term in the CBA or his individual agreement for the 2023–24 season to support his contention that he had a right to play. As such, Count II should be dismissed.

### B.    Muckey Does Not Allege Facts to Suggest That the Union Breached Its DFR.

The "Union's breach is a prerequisite to a consideration of the merits of [a] claim against [a plaintiff's] former employer." *Young v. U.S. Postal Serv.*, 907 F.2d 305, 307 (2d Cir. 1990); *see also Tomney v. Int'l Ctr. for Disabled*, 357 F. Supp. 2d 721, 738 (S.D.N.Y. 2005) (dismissing breach of CBA claim against employer where union did not violate "its duty of fair representation in handling of the employee's grievance"); *Pathania v. Metro. Museum of Art*, 2013 WL 1182076, at *23–26 (E.D.N.Y. Mar. 21, 2013) (same). But to adequately allege a DFR breach, Muckey must allege that the Union's decision not to challenge his placement on leave and non-reengagement were "arbitrary, discriminatory, or in bad faith," i.e., the result of some "fraudulent, deceitful, or dishonest action." *White*, 237 F.3d at 179 (citation omitted). Its actions are only "arbitrary" if, "in

light of the factual and legal landscape at the time of [its] actions, [its] behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Id.* (citation omitted). Given the evidence of misconduct and the DRC's unanimous recommendation not to reengage Muckey, he cannot plead as much.

He alleges only that the Union "breached its duty of fair representation" when it chose not to grieve Muckey's placement on paid leave pending the outcome of the 2024 investigation or his subsequent non-reengagement for lack of "just cause." FAC ¶¶ 240–49. But "[a] union's failure or refusal to pursue a grievance on its own does not constitute a breach of the duty of fair representation." *Perkins v. 199 SEIU United Healthcare Workers E.*, 73 F. Supp. 3d 278, 284 (S.D.N.Y. 2014). And even if this refusal could be considered a breach (as discussed *infra*, it is not), Muckey's allegations are wholly conclusory or contradicted by the documents incorporated into his Complaint. *Id.* (allegations "that the Union failed to provide a reasonable, non-arbitrary or capricious investigation" were conclusory).

### C. The Union Had Valid Reasons Not to Contests Muckey's Paid Leave or Subsequent Non-Reengagement.

The Union proffered multiple valid reasons for its decision not to grieve Muckey's paid leave or subsequent non-reengagement, including: the number and severity of credible allegations of sexual misconduct against him; his lack of contrition; a DRC member's personal experience being "plagued by [Muckey's] presence"; "the sobering fact that 2/3 of the Orchestra members interviewed will not take the stage, or will feel unsafe or uncomfortable, if Muckey and Wang return"; and the reality that the Society "will not be able to stage performances" if its members refuse to take the stage. Ex. D at 6, 8; FAC ¶¶ 145, 181.

Muckey's claim that the Union breached its DFR amounts to a claim that, regardless of the rationale for doing otherwise, Muckey is entitled to have the Union do as *he alone* pleases. *See*

FAC ¶¶ 244, 246–67. But the Union need only have taken "a position on the basis of an informed, reasoned judgment regarding the merits of [Muckey's] claim in light of the language contained in the collective bargaining agreement." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 127 (2d Cir. 1998). Even if the Union's rationale for not pursuing a grievance was incorrect (it was not), Muckey's argument still fails because unions may act within a "wide range of reasonableness[,] [which] gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *White*, 237 F.3d at 179; *see also Perkins*, 73 F. Supp. 3d at 284 (DFR not "breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance").

The Union based its decision on a correct interpretation of the CBA (*see supra* § II.A) and issued a well-reasoned decision illustrating the numerous bases for its determination, including the thorough investigation by the Society, the unanimous recommendation of the elected nine-member Dismissal Review Committee not to challenge the non-reengagement, the overwhelming sentiment of the Philharmonic's members, and the more permissive standard and limited scope of review applicable to non-reengagement under Article XIV. *See generally* Ex. D. Count II must be dismissed for failure to state a claim because Muckey has alleged no facts to show that this determination was arbitrary, discriminatory, or in bad faith. And because the Union did not breach its DFR, Muckey's Hybrid § 301 Claim fails too.

## III.    MUCKEY'S STATE LAW CLAIMS ARE PREEMPTED (COUNTS VI AND VIII).

Muckey's discrimination claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107, are preempted by § 301 of the LMRA. Section 301 empowers federal courts to hear contract disputes between employers and labor unions. 29 U.S.C. § 185(a). In doing so, courts apply federal law, *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362,

368 (1990), and state-law claims, including discrimination claims, that are "inextricably intertwined with consideration of the terms of [a] labor contract," are completely preempted. *Allis-Chalmers Corp. v. Luek*, 471 U.S. 202, 213 (1985); *see also Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 (2d Cir. 2005) (explaining § 301 of the LMRA completely preempts related state-law claims); *Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 (2d Cir. 2019) ("when resolution of a state law claim is 'substantially dependent' upon or 'inextricably intertwined' with analysis of the terms of a CBA, the state law claim 'must either be treated as a § 301 claim, or dismissed as pre-empted").

Muckey essentially claims that the Society discriminated against him based on sex by placing him on leave and subsequently opting not to reengage him. But these allegations turn on the Court's analysis of the terms of the CBA, including whether non-reengagement requires any justification at all, whether paid leave is "disciplinary," and whether Muckey's non-reengagement was appropriately reviewed. *See Whitehurst*, 928 F.3d at 207 (employee's discrimination claims under NYSHRL and NYCHRL were preempted because whether the employer needed just cause to terminate the employee and the employee's rights after termination "were entirely defined by the grievance process in the parties' CBA"); *see also Morrissey v. Verizon Commc'ns Inc.*, 2011 WL 2671742, at *5 (S.D.N.Y. July 7, 2011); *Domnister v. Exclusive Ambulette, Inc.*, 2007 WL 4244151, at *12 (E.D.N.Y. Nov. 29, 2007) (claim that defendant's failure to apply certain provisions of the CBA to plaintiffs was an adverse action under the NYSHRL and NYCHRL "necessarily involve[d] 'interpretation' of the CBA in order to determine whether Plaintiffs were, in fact, entitled to be covered by the provisions"). Muckey's NYSHRL and NYCHRL claims, therefore, are "inextricably intertwined" with his § 301 claim and are preempted, warranting dismissal with prejudice.

## IV.    MUCKEY FAILS TO PLEAD DISCRIMINATION (COUNTS IV, VI, AND VIII).

Even if § 301 did not preempt Muckey's state-law claims, Muckey has not stated a state or

federal discrimination claim. To state a Title VII claim, a plaintiff must allege that he "(1) is a

member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and

(4) has at least minimal support for the proposition that the employer was motivated by

discriminatory intent." *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68,

89 (S.D.N.Y. 2024). Similarly, to state a discrimination claim under NYSHRL or NYCHRL, a

plaintiff must allege "(1) he or she is a member of a protected class, (2) he or she was to hold the

position, (3) he or she was subject to an unfavorable change or treated less well than other

employees, and (4) the unfavorable change or different treatment occurred under circumstances

giving rise to an inference of discrimination." *Id.* at 104, 107. Muckey has failed to allege any facts

that could give rise to an inference of discrimination under either standard.

### A.    Muckey Does Not Plead Someone Similarly Situated Received Preferential Treatment.

To plausibly allege an inference of sex discrimination under Title VII, the NYSHRL, or

the NYCHRL, based on differential treatment, a plaintiff must plead facts to show he "was

similarly situated in all material respects" to a comparator who "engaged in comparable conduct"

and received comparatively preferential treatment. *Roenick v. Flood*, 2021 WL 2355108, at *5

(S.D.N.Y. June 9, 2021) (citations omitted); *see also Novick v. Vill. of Wappingers Falls*, 376 F.

Supp. 3d 318, 342–43 (S.D.N.Y. 2019) ("To be similarly situated in all material respects, Plaintiff

must show that similarly situated employees who went undisciplined engaged in comparable

conduct."); *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 70 (2d Cir. 2016). Muckey has

not done so.

Instead, he vaguely alleges that the Society "ignored and did not investigate allegations

raised against a female musician in the orchestra regarding a subordinate male orchestra member." FAC ¶ 100. But these "threadbare allegations do not present any non-speculative basis upon which this Court could conclude that he was similarly situated to the alleged comparator[]," because it does not even describe what the allegations were. *Blige v. City Univ. of N.Y.*, 2017 WL 498580, at *10 (S.D.N.Y. Jan. 19, 2017); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (complaint did "not allege that any similarly situated male employee received more favorable treatment than Henry [and] … fails to identify, let alone describe, any purported comparator"); *Kajoshaj v. City of N.Y.*, 2013 WL 249408, at *2 (E.D.N.Y. Jan. 23, 2013), *aff'd sub nom.*, 543 F. App'x. 11 (2d Cir. 2013) ("[W]ithout specific factual allegations concerning these allegedly similarly situated individuals, such a bare conclusion cannot survive a motion to dismiss."); *Haggood v. Rubin & Rothman, LLC*, 2014 WL 6473527, at *12 (E.D.N.Y. Nov. 17, 2014); *Osborne v. Moody's Invs. Serv., Inc.*, 2018 WL 1441392, at *5 (S.D.N.Y. Mar. 22, 2018); *Nnebe v. City of New York*, 2023 WL 2393920, at *14 (S.D.N.Y. Jan. 30, 2023), *report and recommendation adopted*, 2023 WL 2088526 (S.D.N.Y. Feb. 17, 2023).

To adequately allege that he "was similarly situated in all material respects" to a comparator who "engaged in comparable conduct," Muckey would have to plead that:

1) After the publication of an article describing sexual misconduct by a tenured female Philharmonic member, "several musicians … reported that the conduct described in the … article was not an isolated incident, but rather part of a pattern of improper conduct" (Ex. D at 1–2; Ex. F at 6), and the Society did not put her on leave or investigate the reports that followed the article;

2) The Society renewed the contract of a tenured female Philharmonic musician after:

   a) An independent investigation unearthed credible allegations of sexual misconduct against her, including encouraging an 18 ½-year-old college freshman male, six-years her junior, to drink copious amounts of alcohol and having sex with him while he was so intoxicated that he did not recall the encounter the next morning (Ex. F at 2–6); and

   b) A "supermajority of the Orchestra who spoke to the investigator—who comprise a

majority of the entire Orchestra—will not take the stage or will feel unsafe or uncomfortable if [Muckey] return[s]" (Ex. D at 7; Ex. F at 8).

But Muckey cannot plead that his placement on paid leave or non-reengagement constitute disparate treatment because no woman has ever found herself in Muckey's situation. All Muckey has really pleaded is that "the Philharmonic was impermissibly motivated by its concern regarding the reaction of … female orchestra members[] to the return of Plaintiff, a male, against whom allegations of sexual misconduct … had been made and whom they wrongfully feared and/or believed was a threat to women." FAC ¶ 290. This kind of conjecture is routinely rejected by courts at the motion to dismiss stage. *See Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 249 (E.D.N.Y. 2015) (plaintiff failed to state a claim under Title VII or the NYSHRL where "he ha[d] done no more than point to various ways in which he [felt] he was mistreated and argue[d] that it must have been because of his gender" (internal quotation omitted)). It should be rejected here as well.

### B.    Muckey Is No Sacrificial Lamb on the Altar of Public Sentiment.

In the absence of a similarly situated comparator, Muckey attempts to conjure up a discrimination claim by alleging that the Society succumbed to public pressure to "tak[e] complaints of sexual harassment and misconduct by men against women seriously, even in the absence of any meritorious claims." FAC ¶ 284. But "public pressure, standing alone, is not sufficient to permit a plaintiff to survive a motion to dismiss." *Roe v. St. John's Univ.*, 91 F.4th 643, 675 (2d Cir. 2024). "[T]he pressure must be combined with clear procedural irregularities in a [defendant's] response to allegations of sexual misconduct." *Id.* But, as described above in § II.A.2, Muckey has alleged that the Society *complied* with the CBA's non-reengagement or review requirements. Ex. C, Art. XIV; *id.* Art. XV, § A. And he does not "allege any facts showing how [defendant's] compliance with its own policy amounts to a 'clearly irregular' process." *Doe v. Trs. of Columbia Univ.*, 2022 WL 3666997, at *18 (S.D.N.Y. Aug. 25, 2022); *see also Roe*, 91 F.4th at

655 (complaints that defendant "justified its decision against [plaintiff] with an unsatisfying explanation" did not "rise[] to the level of the allegations of objectively deficient investigations").

He also fails to plead that anything was wrong with the 2024 investigation other than that he disagreed with the Investigator's conclusions. *See, e.g.*, FAC ¶ 170. But "dissatisfaction with the adequacy of Defendants' investigation—even if objectively warranted—is insufficient to support an inference of discrimination." *Cooper v. Templeton*, 629 F. Supp. 3d 223, 233 (S.D.N.Y. 2022), *aff'd sub nom. Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977 (2d Cir. June 8, 2023); *see also Jones v. Gen. Bd. of Glob. Ministries of United Methodist Church*, 1997 WL 458790, at *2 (S.D.N.Y. Aug. 11, 1997) ("attempts to challenge the validity of the investigation … and the credibility of the witnesses … may prove that the investigation was poorly conducted and that plaintiff was unfairly discharged, [but] it does not raise an inference of discrimination based on … sex"); *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 185 (S.D.N.Y. 2020) ("Plaintiff's remaining contentions regarding the investigations and hearings were 'minimal irregularities,' and are insufficient to infer sex discrimination."). There were no irregularities in the investigation or the review process, thus, the discrimination claim should be dismissed.

## V.    MUCKEY'S TITLE VII CLAIM SHOULD ALSO BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES (COUNT IV).

Muckey's Title VII claim should be dismissed because charges were not pending before the EEOC for at least 180 days. Title VII provides:

> If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within *one hundred and eighty days* from the filing of such charge … whichever is later, the Commission has not filed a civil action under this section …. or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party… the Commission … shall so notify the person aggrieved and … a civil action may be brought against the respondent named in the charge.

42 U.S.C. § 2000e-5(f)(1) (emphasis added). This section "plainly provides that, after a charge has

been filed, the EEOC has 180 days to dismiss the charge or file a civil action." *Gibb v. Tapestry, Inc.*, 2018 WL 6329403, at \*5 (S.D.N.Y. Dec. 3, 2018). "Only after 180 days have elapsed may the charging party pursue his or her claims in court." *Id.*; *see also Henschke v. N.Y. Hosp. – Cornell Med. Ctr.*, 821 F. Supp. 166, 170 (S.D.N.Y. 1993); *Rodriguez v. Connection Tech. Inc.*, 65 F. Supp. 2d 107, 111–12 (E.D.N.Y. 1999) (allowing early right-to-sue letters would undermine EEOC's statutory duty to investigate every charge filed); *Stetz v. Reeher Enters., Inc.*, 70 F. Supp. 2d 119, 124 (N.D.N.Y. 1999) (early EEOC letters would enable "parties to circumvent the administrative scheme").[9] Muckey alleges only that he filed a charge of sex-based discrimination against the Society on March 4, 2025, and that the EEOC issued a right-to-sue letter the next day. FAC ¶¶ 230–213. Accordingly, his right-to-sue letter is invalid because its early issuance "violates the threshold provision of Title VII" that the EEOC "shall make an investigation of the complaint." *Rodriguez*, 65 F. Supp. 2d at 112 (notice issued 39 days after filing of charge was invalid); *Stafford v. Sealright, Inc.*, 100 F. Supp. 2d 137, 138–40 (N.D.N.Y. 2000) (notice issued 16 days after filing of charge was invalid).

## CONCLUSION

For these reasons, the Society respectfully requests that the Court dismiss the claims against the Society (Counts II, IV, VI, and VIII of the Amended Complaint) with prejudice.

Dated: June 9, 2025                    Respectfully submitted,


                                       */s/ Ashley R. Lynam*

                                       Ashley R. Lynam
                                       (NY Bar No. 5701404) (admitted *pro hac vice*)
                                       Jacob Sand (admitted *pro hac vice*)

---

[9] The EEOC regulations that purport to permit early right-to-sue notices do not provide that such notices may be automatically issued upon request. 29 C.F.R. § 1601.28(a)(2). The EEOC must determine, and certify, that it has investigated whether it is capable of completing its processing of the charge within 180 days. *Id.* Muckey does not allege the right-to-sue letter he received contained such a certification.

Natalie Georges (NY Bar No. 5011325)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
T: 215.963.5000 | F: 215.963.5001
ashley.lynam@morganlewis.com
jacob.sand@morganlewis.com
natalie.georges@morganlewis.com

Geneva Ramirez (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
T: 312.324.1000 | F: 312.324.1001
geneva.ramirez@morganlewis.com

*Attorneys for The Philharmonic-Symphony Society of New York, Inc.*

## <u>LOCAL RULE 7.1(c) CERTIFICATE</u>

The undersigned attorney certifies that this document complies with the word-count limitation of Local Rule 7.1(c) because it contains 8,744 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and certificates.

*/s/ Ashley R. Lynam*
Ashley R. Lynam