# Exhibit F



To: Deborah Borda
Cc: Howard Robbins, Esq.
From: Tracey I. Levy, Esq.
Date: October 22, 2024
Re: Summary Findings and Conclusions from Workplace Investigation of Matthew Muckey

On April 16, 2024, Vulture magazine published an article by freelance reporter Sammy Sussman titled, "A Hidden Sexual-Assault Scandal at the New York Philharmonic," (the "Sussman article") which detailed an incident in 2010 following a late-night party when the New York Philharmonic (the "Philharmonic," or "NYP" or the "Orchestra") was performing in Vail. The article, attached as Exhibit A, recounted that a probationary horn player, Cara Kizer, had gone from the party back to the condo that NYP Principal Oboist Liang Wang and NYP Associate Principal Trumpet player Matthew Muckey had rented, where she believes she was drugged and then raped by Mr. Muckey. The Philharmonic had terminated Mr. Wang's and Mr. Muckey's employment in 2018, based on this incident, and both men were reinstated in 2020 after an arbitrator determined that there was not sufficient cause to support the Philharmonic's decision. The Sussman article cited from police records and interviews with named and unnamed individuals, and provided details about what had been alleged that were not previously shared with Orchestra members or otherwise made public.

In response to the Sussman article, I was formally engaged on April 20, 2024, to look into allegations of sexual harassment or otherwise inappropriate conduct by musicians and other current employees of the Philharmonic.[1] Information about my engagement for this purpose was shared with the Associated Musicians of Greater New York, Local 802, of the American Federation of Musicians ("Local 802"), which represents members of the Orchestra, and both the Philharmonic through its website and Local 802 then dispensed that information to the music community at large, who were invited to contact me if they had relevant information. Beginning in mid-June 2024, I proactively reached out to every current member of the Orchestra who had not already contacted me and invited them to meet with me. My investigation ultimately included interviews with 69 members of the Orchestra (including Mr. Wang and Mr. Muckey) and 23 other individuals, including people who contacted me directly or who I reached out to based on information provided by others I had interviewed, and Orchestra members who responded to my outreach. Attached as Exhibit B is an anonymized list of the individuals who I interviewed. In addition to those interviews, I reviewed the arbitrator's decision and exhibits from the arbitration. With respect to Mr. Muckey, I also reviewed: screenshots of Facebook messages, photos, and a

---

[1] Independent of my investigation, the Philharmonic retained Katya Jestin, Co-Managing Partner with Jenner & Block LLP, to conduct a cultural assessment of the Orchestra. It was agreed that Ms. Jestin would refer to me any specific complaints of inappropriate behaviors by current members of the Orchestra for investigation, and I referred to her concerns I received that pertained more to the culture of the organization.



more recent version of the Vail police report that were provided by individuals I interviewed. I completed my review on October 8, 2024.

In addition to the incident with Ms. Kizer, another former probationary employee with the Orchestra had testified in the arbitration about a 2008 sexual encounter with Mr. Muckey where she said she had withdrawn her consent. A third woman (Complainant 3) came forward in this investigation, and reported that Mr. Muckey sexually assaulted or raped her after she became intoxicated at a party he had invited her to when she was a freshman college student and he was a member of the Orchestra. Mr. Muckey acknowledged having had sex with Complainant 3, and I find it more likely than not that she lacked capacity to consent at the time. I further find that Mr. Muckey's sexual encounters with these three women and potentially one other demonstrate a repeated failure to recognize when sexual partners lacked capacity or withdrew consent to sex. Longer-tenured Orchestra members credibly recounted how Mr. Muckey was immature and irresponsible in his early years with the Philharmonic, and I find he may have made some inappropriate comments about women at that time. I do not, however, find that there have been any reports of Mr. Muckey engaging in nonconsensual sexual behavior since the last incident with Ms. Kizer in 2010 and no one I interviewed reported offensive conduct by Mr. Muckey, of any sort, that occurred in the past decade.

### Concerns of Mr. Muckey's Sexual Behavior Toward Women

Two women testified at the arbitration that they had been raped by Mr. Muckey. Ms. Kizer recounted what she recalled of the night in Vail, how she woke up naked in bed with Mr. Muckey, confronted Mr. Muckey about what happened, and believes that Mr. Wang had slipped a drug into the glass of wine that she had when she was with the two of them at their condo. Mr. Muckey did not testify at the arbitration but had admitted to the police that he and Ms. Kizer had sex that night. The ultimate question in the arbitration was whether the sex was consensual.

Complainant 2 testified at the arbitration to an evening in February 2008 at Mr. Muckey's apartment, where she initially engaged in consensual foreplay with Mr. Muckey and went with him to the bedroom, permitting herself to be undressed, but that Mr. Muckey did not stop when she told him "it hurts" and "no." Complainant 2 also testified that she attempted to close her legs and pushed Mr. Muckey off her a little. The arbitrator questioned whether Mr. Muckey would have recognized Complainant 2's desire to stop and concluded that there was not clear and convincing evidence that the sex was not consensual.[2]

    A. <u>Complainant 3's Account</u>

Complainant 3 reported that as an 18-year-old freshman in 2008 she recalled having woken up in Mr. Muckey's apartment, which was in the 70s toward West End Avenue, after attending a party he

---

[2] Since the arbitration, the union contract has been revised to expressly provide that a "preponderance of the evidence" standard should be applied when determining just cause. I have evaluated the information provided to me in this investigation under a preponderance of the evidence standard, whereby I determined what I find was "more likely than not" to have occurred. Under this standard, the differential tipping the scale toward more likely may be as little as the weight of a feather, but nevertheless it reflects a considered determination that evaluates varying accounts and plausibilities.



had invited her to more than five miles away in Washington Heights.  Complainant 3 identified by name members of the Philharmonic and one sub who were at the party and said that Mr. Muckey and the sub were encouraging her to drink a lot.  Complainant 3 said they had an ice luge and ladled alcohol down people's throats; she said she has no sense how much she drank, but Mr. Muckey and everyone else were drinking too.  Complainant 3 said she had come to the party with a guy she was casually dating who drank too much, got really sick, and left while she stayed.  Complainant 3 provided a dated Instagram photo that she said was from the party that tags the sub and one NYP member.  Complainant 3 recounted vague memories of later that night, which included kissing Mr. Muckey at some point, waking up in his bed, and then getting back to her dorm where she could not get in because she had left her id at his apartment.  Complainant 3 said she does not remember having sex with Mr. Muckey, but after she retrieved her id and showered in her dorm, she realized her vagina was sore.

Complainant 3 said she had met Mr. Muckey several weeks before on the subway platform near her school, and he then messaged her on Facebook.  Complainant 3 said that Mr. Muckey continued to text her, and she recalled having gone to his apartment one other time, maybe a week later, after attending a concert in which he was performing with a ticket he gave her.  At the apartment, Complainant 3 said that Mr. Muckey offered her marijuana, and she left shortly after he made some sexual comment.  Complainant 3 said she thought she was "the bees' knees" because this older successful person was interested in her.

Complainant 3 said that she continued dating the guy who had gone with her to the party and after she told him that she had slept with Mr. Muckey the night of the party, her boyfriend accessed her Facebook and deleted Mr. Muckey as a friend, with all their prior messages.  Complainant 3 later added Mr. Muckey back to her Facebook and provided a screen recording of several exchanges they had over the next two years, all but the most cursory of which were initiated by Mr. Muckey.  Complainant 3 said they also had texted, but on a flip phone that she no longer has.  Complainant 3 said she did not realize the inappropriateness of her interactions with Mr. Muckey until she was much older and realized that Mr. Muckey took advantage of her.

### Mr. Muckey's Account Regarding Complainant 3's Experience

Mr. Muckey confirmed having been at the party and had sex with Complainant 3 at his apartment that night.  Mr. Muckey said he did not recall inviting her to watch him perform the following week and they never went out together, but he invited Complainant 3 back to his apartment a handful of times and they had sex one or two times more, all "absolutely" consensual.  Mr. Muckey said that he does not remember what year Complainant 3 was at school but she was 18 ½ or so and he was not much older, maybe 23 or 24.

Mr. Muckey initially said he did not remember an ice luge at the party, never served drinks to anyone, and did not remember himself or Complainant 3 drinking at the party.  Mr. Muckey said neither were intoxicated at his apartment and Complainant 3 provided clear consent to have sexual intercourse with him that night, given the physicality of her involvement.  He said she seemed very aware, was talking concisely, had no slurred speech or glossy eyes, and he did not smell alcohol on her breath.  Mr. Muckey also denied ever offering Complainant 3 marijuana.



Mr. Muckey confirmed that he was Facebook friends with Complainant 3. I met with Mr. Muckey a second time after he had reviewed and provided screenshots of his Facebook messenger exchanges with Complainant 3, and several photos that he said were taken from the night of the party, including the same photo that Complainant 3 had provided. Mr. Muckey said that based on those documents, he sees that, prior to the party, he did initially meet Complainant 3 at the subway and had corresponded with her briefly on Facebook. Mr. Muckey said he has no independent recollection of what occurred at the party beyond what is in the photos, but he shared a photo which he explained showed him ladling alcohol into the ice luge, with Complainant 3 standing behind him and the NYP sub sitting at the base of the ice luge waiting for the alcohol to pour down. Mr. Muckey said there may have been other images, which he has not shared with me, of the sub pouring one ladle for him. Mr. Muckey said he could not find anything that showed Complainant 3 drinking at the party and he does not remember if most people at the party were drinking.

Mr. Muckey said he did not usually go to parties like this, and if he went to bars it was with other Philharmonic members where he just drank socially, not to the point of intoxication and he was never hungover. Mr. Muckey acknowledged there were times he was late or missed rehearsals or performances. He said that that was because he was a very heavy sleeper who had not yet developed a good alarm system and that he was never dealing with alcohol issues.

Mr. Muckey reviewed with me Facebook messenger screenshots of texts he exchanged with Complainant 3, including one in which Complainant 3 wrote, "thanks for everything, yes, even the sex. it was pretty good." A later text strand included the following by Complainant 3, "i really think that what we did was wrong… yes, i did consent, but still, what we did was wrong...[xxx] and I have been having issues. He's probably going to message you and be a real dick to you. please do me a solid and don't write back. i know you'll want to say that i consented, which i did, … and PLEASEEEEEEEE don't tell him about the sex. i told him that we did it twice, because we did, but i REALLY don't want this to evolve into anything and i don't want you to get dragged into it" [punctuation as in the original]. Mr. Muckey said he had not discussed consent with Complainant 3 and it was always clear that she did consent.

<u>Findings Regarding Complainant 3's Account</u>

Complainant 3 confirmed that the additional Facebook messages that Mr. Muckey had shared seemed to be written by her and she repeatedly apologized to me because the messages read to her like she had been friends with Mr. Muckey, and make her look not credible. Complainant 3 also said the messages did not trigger any different or greater recollection of her interactions with Mr. Muckey and she did not know why she twice referenced "consent" because she did not speak in those terms at that time in her life.

Both Complainant 3 and Mr. Muckey were vague on details of their interactions at and after the party. In balancing their varied accounts and the Facebook messages and Instagram photos, I credit Mr. Muckey's account that he and Complainant 3 had sex at his apartment after the party and she may even have seemed like a willing participant, but contrary to Mr. Muckey's assertion I find it more likely than not that Complainant 3 lacked the capacity to consent to that interaction. I base my findings on several key points. First, Mr. Muckey repeatedly deflected responsibility for that night, as he:

- denied that they had consumed much alcohol or were intoxicated;



- asserted that he had "never" served drinks to anyone;
- said it was her idea to go back to his apartment;
- said he did not remember what year she was at college; and
- said she was 18 ½ but he was not much older.

Second, Mr. Muckey was very clear and specific in his recollection of the ways in which Complainant 3 was reportedly not exhibiting intoxication, as he stated she seemed very aware, was talking concisely, had no slurred speech or glossy eyes, and he did not smell alcohol on her breath, yet he was vague and contradictory in his recollection of what he, Complainant 3, and others had consumed.  I had interviewed two other Orchestra members who were able to recall attending that party from 16 years ago largely because of the ice luge, at our first meeting Mr. Muckey denied there was an ice luge and after reviewing the photos, he explained to me that when I initially asked about it, he had not known that was what it was called.  Mr. Muckey also told me in our first meeting that he never served drinks to anyone, and then in our second meeting he shared a picture of him ladling alcohol into the ice luge to serve to a sub with the Philharmonic.  Mr. Muckey said he had no independent recollection of anyone drinking at the party, yet he acknowledged there were other photos from the party that he had not shared with me including perhaps one of him on the receiving end of the ice luge.

Third, Complainant 3's account of everyone drinking is consistent with both witness accounts of the party, and every photo that Mr. Muckey shared featured people drinking what appeared to be alcohol.  The photos also confirm that Complainant's friend was present at the party, and I find credible Complainant 3's account that he left because he became sick from drinking.[3]  In a follow-up meeting with Complainant 3, she said that more recently she had shared the Sussman article with a friend from high school, and he said he remembered her telling him about her night with Mr. Muckey back at the time.  Complainant 3 said that her friend recalled her talking about vomiting, but she does not recall having gotten sick like that, and she read to me from a screenshot from Facebook messenger that her friend had sent, dated three weeks after the party, in which he advised, "what is done is done" and there is no fixing it now.

Fourth, beyond what occurred at the party, Mr. Muckey's more general assertions as to his overall sobriety are contradicted by the accounts that I received from others.  Two Orchestra members recalled times (one to four) that Mr. Muckey had come to rehearsal smelling like alcohol, and one said he told Mr. Muckey he could not be doing that.   Another Orchestra member recalled having sat next to Mr. Muckey on the plane for tours several times and he was wasted, hung over, and quietly sleeping; a fourth Orchestra member described Mr. Muckey and Mr. Wang as drinking buddies.  Two other individuals I interviewed recounted having personally observed Mr. Muckey out socially, getting drunk.  These accounts do not align with Mr. Muckey's assertions that he was just a heavy sleeper.

---

[3] Complainant 3 said she is no longer in contact with the former boyfriend, and I was unable to locate him in my own internet searches.



Curiously, in my first meeting with Mr. Muckey, when I began generally asking if he recalled inviting a female student to a party in Washington Heights, Mr. Muckey replied that he "did not invite an 18 year-old" even though I had not mentioned anyone's age. Complainant 3 was just 18, almost six years younger than Mr. Muckey, and barely two months into her freshman year while he was a college graduate in a professional position at one of the most prestigious orchestras in the world. I find that Mr. Muckey also carried the imprimatur of his role with the Philharmonic at that party. He attended the party with colleagues from the Orchestra (he said that one had invited him and given him a ride there) and was socializing with the students of those Orchestra members, at least some of whom (including Complainant 3) were well aware that he was the Associate Principal Trumpet of the New York Philharmonic. I find the power differential between Mr. Muckey and Complainant 3 was substantial and it explains why and how Complainant 3 would think she was "the bees' knees" for engaging in any form of interaction with Mr. Muckey, why she would shake off what seemed like one bad drunken episode after a party and continue to engage with Mr. Muckey including perhaps even having sex with him a second time, and why she would maintain some contact with him even after her boyfriend pressured her to end all interactions.

### B. Other Reported Behaviors

Several members of the Philharmonic recounted exchanges they had with Mr. Muckey, including related to viewing porn back around 2012 on tour or on the computer in the locker room, looking at someone in a flirtatious manner, showing a video of him making out with his then girlfriend, a well-known pianist, and him and Mr. Wang making a comment about another Orchestra member's buttocks while standing on a buffet line on tour in 2013. At least ten Orchestra members described Mr. Muckey otherwise acting immature and irresponsible early in his tenure by coming late and making them wait on buses, forgetting to turn off his cell phone in concerts, or missing a rehearsal or concert in its entirety.

I was more recently contacted by another musician (Complainant 4) who had met Mr. Muckey as a college student through mutual friends in his early years with the Philharmonic. Complainant 4 recounted several physical interactions with Mr. Muckey, all involving alcohol, including one time when she had to push him off her after he sought to progress from making out to trying to get his hands up her dress and have sex with her; one time that he was hitting on her, trying to kiss and touch her and other girls while they were all at a party, dancing; and one time when they had sex, which she recalls consenting to, and she remembers Mr. Muckey telling her she could not tell anyone about it.[4]

Numerous individuals I interviewed recounted concerns they personally have or that they heard expressed by Orchestra members about not feeling safe around Mr. Muckey, and how new women who join the Philharmonic are warned to be careful around him. In response to the Sussman article's reporting of what happened between Mr. Muckey and Ms. Kizer in Vail, and Ms. Kizer's belief that she was drugged, several people shared accounts of possible spiking of alcoholic drinks in relation to Mr. Muckey and Mr. Wang. One such account involved a former Orchestra member who said the rumor that she had received a spiked drink was untrue. Complainant 4 recounted an

---

[4] Complainant 4 did not authorize me to speak with Mr. Muckey about these interactions and instead asked that I consider them as "background."



incident at a party she attended with an ex-boyfriend, at which she was handed two shots, she thinks by Mr. Muckey, one of which she gave to her ex-boyfriend who subsequently exhibited behavior that suggested he had been drugged. Complainant 4 said she was contacted she thinks by the Vail Police Department several years later and was asked questions about the party and possible drugging, but she was caught off guard and may have shared fewer details.

A report from the Vail police department related to Ms. Kizer reflects that another individual provided an account of Complainant 4's ex-boyfriend having apparently been drugged at a party, but said the drink was handed to Complainant 4 by Mr. Wang. The police report reflects Complainant 4 was subsequently interviewed and said Mr. Wang was not at the party, she thought Mr. Muckey had left early, and she did not believe her ex-boyfriend had been drugged.

Mr. Muckey denied viewing pornography in the locker room or on tour or showing a video of him making out with his girlfriend. Mr. Muckey said he has never made sexual comments about or sexual gestures toward any of the women in the Orchestra, nor other derogatory comments on the appearance of any of the women in the Orchestra. Mr. Muckey said that he respects women, he never assaulted anyone, and he thinks the allegations he was asked about are "completely ridiculous."

### Findings Regarding Other Reported Behaviors

I find insufficient support to conclude that Mr. Muckey spiked someone's drink at either of the parties referenced in the accounts I received. I further find it would be wholly speculative for me to infer beyond that and assume that Mr. Muckey spiked a drink with the intent that it would be consumed by Complainant 4 to thereby incapacitate and sexually assault her, and I decline to draw that conclusion.

I find no reason for the Orchestra member to have invented an account of Mr. Muckey asking about and viewing pornography, and no reason for Mr. Muckey to admit having done so. Most of the individuals who commented on their observations of Mr. Muckey in the shared locker room joined the Orchestra well after 2012, and therefore they could only confirm that Mr. Muckey has not viewed pornography there more recently. On balance, I credit the account that Mr. Muckey was viewing pornography in the locker room, but not subsequent to 2012.

Based on several secondhand accounts from Orchestra members that are consistent with the firsthand report, I find that Mr. Muckey likely either commented or participated in joking with Mr. Wang about their colleague's buttocks on one occasion around 2013, but I do not otherwise find him to have engaged in much by way of sexual banter or derogatory comments toward women in the Orchestra. Aside from the incidents discussed above, no member of the Orchestra claimed that Mr. Muckey had engaged in any inappropriate behavior toward them or that they were aware of him engaging in behavior that made someone else uncomfortable.

I credit the accounts that women who join the Philharmonic are warned to be careful around Mr. Muckey, but I find that is based on rumors regarding what occurred at Vail and other women who had been targeted. It is striking that over the past six months of gathering information, Complainants 3 and 4 were the only women to have alleged significant inappropriate sexual behaviors by Mr. Muckey, including in the 68 interviews I conducted with other Orchestra



members. I find sufficient reason, in the similarities between those two complainants' accounts, my analysis of Complainant 3's complaint, and the arbitrator's findings with respect to Complainant 2, to conclude that Mr. Muckey could be physically forward with women to a degree that presumed consent without considering power disparities, capacity, or more subtle indicators to the contrary.[5] I do not, however, find any basis to infer that Mr. Muckey has engaged in such conduct subsequent to the incident with Ms. Kizer in Vail in 2010.

    C. <u>Orchestra Members' Concerns</u>

Some of the Orchestra members who I had spoken with in my initial interviews expressed concerns that Mr. Wang and Mr. Muckey (who had been placed on leave pending completion of my investigation) not be permitted to return and resume playing with the Philharmonic. Ms. Jestin indicated that she was receiving similar feedback from the members of the Philharmonic who met with her team. So that I could gather and consider a range of perspectives, I therefore reached out to every member of the Orchestra who had not already contacted me, including those who had spoken with Ms. Jestin, and made up to three attempts to contact those who were nonresponsive (except for two members who I knew to be on medical leave). I asked each member of the Orchestra who agreed to meet with me, and did not independently raise the subject during our interview, the following two questions:

1. What was your reaction to Mr. Wang and Mr. Muckey being placed on leave recently?
2. Would you have a concern with either of them coming back/resuming rehearsal and performing with the Orchestra? If so, why?

Of the 67 Orchestra members I spoke with (excluding Mr. Muckey and Mr. Wang), 50 said that they would be concerned with Mr. Muckey and Mr. Wang returning, for various reasons. The largest group, 25 members, expressed they were personally concerned with Mr. Muckey and Mr. Wang returning, with comments like they cannot imagine ever sharing the stage or working with them again, or they have heard enough information from sources they trust to conclude they should not be allowed to return. Another 16 members indicated they were less concerned about themselves, some commenting they had managed once before when Mr. Muckey and Mr. Wang were reinstated, but they were concerned for their peers and wanted to support colleagues who had expressed concern. This group included statements about female colleagues who feel unsafe or would be upset, and the "untenable working conditions," "turmoil," or negative impact their return would create for the work environment. Eight Orchestra members framed their concerns in terms of the negative public reaction, how that would hurt the image of the Philharmonic, exacerbate the critiques on social media, be bad for business, or might lead to being boo'ed onstage. One

---

[5] There is reason to question the credibility of Complainant 4's account to me, given its deviation from what she told the Vail police officer more than 10 years ago when these events were fresher in her recollection, and at that time she described Mr. Muckey as a "very nice person." However, Complainant 4's current account of the spiked drink does align closely with what the other individual interviewed by the Vail police had reported back in 2013. Further, the manner in which Complainant 4 narrated her account to me is consistent with her explanation that she had packaged these and other memories away for a long time. Also, Complainant 4 was early in her tenure with her current employer back in 2013, while Mr. Muckey was in a more powerful position. I therefore credit Complainant 4's account for the limited purpose of cumulative support that Mr. Muckey has engaged in a pattern of flirtatious behavior with women who were junior to him in age and position, particularly when he was under the influence of alcohol.



additional Orchestra member framed a concern around recruitment of new musicians, particularly women, to play with the Philharmonic.

Fourteen Orchestra members said they would not be concerned by either Mr. Muckey or Mr. Wang returning and one other only expressed concern with Mr. Wang returning.  Of these individuals, a few referenced their colleagues' discomfort, some expressed confidence in the past public exposure to keep Mr. Muckey and Mr. Wang from engaging in similar behavior, others expressed a commitment to the legal process or confusion because they thought that had already cleared them, and the rest did not elaborate on their reasoning.

The remaining two Orchestra members essentially abstained.  One declined to proffer an opinion and the other said the administration should make that determination.

Conclusion

I therefore find that Mr. Muckey likely behaved in an immature and irresponsible manner early in his employment with the Philharmonic, particularly by failing to arrive on time and in his sexual activities.  I specifically find it more likely than not that Mr. Muckey had sex with an 18-year-old college freshman who was six years his junior at a time when she was too incapacitated by alcohol to voluntarily consent to the interaction, and similarly made sexual advances toward other women without much regard to indicators of a lack of consent.  I find, however, that he has demonstrated a different pattern of more appropriate behavior for at least the past decade, with no reported recurrence of any nonconsensual sexual encounters.

As investigator, my role was to gather information and I did not share with the Orchestra members I interviewed any of the information in this report, or anything beyond my broad remit to look into workplace concerns of sexual harassment or otherwise inappropriate conduct by musicians and other current employees of the Philharmonic.  Based on the information the Orchestra members who I met with have read, heard, experienced, and observed elsewhere, more than three-quarters of them expressed that they would be concerned, either on a personal level or out of regard for colleagues or the organization as a whole, if Mr. Muckey resumed rehearsing and performing with them.