UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MATTHEW MUCKEY,

                                        Plaintiff,

                   -against-

ASSOCIATED MUSICIANS OF GREATER NEW
YORK, LOCAL 802, AMERICAN FEDERATION OF
MUSICIANS and THE PHILHARMONIC-
SYMPHONY SOCIETY OF NEW YORK, INC. a/k/a
THE NEW YORK PHILHARMONIC ORCHESTRA,

                                        Defendants.
------------------------------------------------------------------------X

1:24-cv-03348-AS

[rel. 1:24-cv-03356-AS,
 1:24-cv-03987-AS]

**ORAL ARGUMENT
REQUESTED**


**MEMORANDUM OF LAW IN OPPOSITION TO
THE MOTIONS TO DISMISS OF
DEFENDANT ASSOCIATED MUSICIANS OF GREATER NEW YORK,
LOCAL 802, AMERICAN FEDERATION OF MUSICIANS and
DEFENDANT THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC.
a/k/a THE NEW YORK PHILHARMONIC ORCHESTRA**


Steven J. Hyman, Esq.
Jacqueline C. Gerrald, Esq.
Paul H. Levinson, Esq.
**McLAUGHLIN & STERN, LLP**
260 Madison Avenue
New York, New York 10016
Telephone: (212) 448-1100
shyman@mclaughlinstern.com
jgerrald@mclaughlinstern.com
plevinson@mclaughlinstern.com

*Attorneys for Plaintiff Matthew Muckey*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 5

      Background ................................................................................................................ 6

      Public Commentaries by Members of the Orchestra, the Classical Music Industry
      and the General Public Follow the Online Publication of the 2010 Allegations ........... 7

      The *Vulture* Article First Leads to the Suspension, and Then the Investigation,
      of Mr. Muckey by the Philharmonic ....................................................................... 8

      The Philharmonic Terminates Mr. Muckey ............................................................ 13

      The Investigative Process is Revealed as Unfair, Biased, and Predetermined
      to Find Against Mr. Muckey .................................................................................. 15

      Local 802 Conducts a Dismissal Review Process Which is Also Unfair,
      Biased and Predetermined to Find Against Mr. Muckey .......................................... 17

      The Union Renders its Decision Not to Grieve Mr. Muckey's Termination
      Based Upon the Investigative Findings and Releases the Decision to the Public ....... 17

      Summary of Procedural History ............................................................................. 19

ARGUMENT ................................................................................................................ 20

   I.      STANDARD OF REVIEW .................................................................... 20

   II.     THE AMENDED COMPLAINT PLAUSIBLY PLEADS A "HYBRID"
        CLAIM UNDER COUNTS ONE AND TWO AGAINST THE
        PHILHARMONIC BASED UPON ITS BREACH OF THE CBA AND THE
        UNION BASED UPON ITS BREACH OF ITS DUTY OF FAIR
        REPRESENTATION ............................................................................. 20

    A.    Mr. Muckey Has Plausibly Alleged a Violation of the CBA Based upon the
        Suspension ...................................................................................................... 21

    B.    Mr. Muckey Has Plausibly Alleged a Violation of the CBA Based upon the
        Dismissal ........................................................................................................ 24

    C.    Plaintiff Alleges a Plausible Violation of the Union's DFR Given
        its Abject Repudiation of the Arbitration Award and its Refusal to
        Grieve the Suspension ..................................................................................... 29

D.    Plaintiff Alleges a Plausible Violation of the Union's DFR By its Subsequent Actions Up to and Including its Refusal to Grieve the Dismissal ........................ 32

III.    PLAINTIFF HAS PLAUSIBLY ALLEGED A COGNIZABLE GENDER DISCRIMINATION CLAIM UNDER COUNTS THREE AND FOUR AGAINST LOCAL 802 AND THE PHILHARMONIC UNDER TITLE VII ................................................................................................ 35

A.    The Standard ............................................................................................. 35

B.    Plaintiff Has Plausibly Alleged a Cognizable Claim Under Title VII Based Upon Gender ...................................................................................................... 38

    i.    The Suspension ................................................................................ 38

    ii.    The Investigation ............................................................................ 39

    iii.    The Dismissal.................................................................................. 40

C.    Plaintiff Has Exhausted His Administrative Remedies. ....................................... 42

IV.    PLAINTIFF HAS PLAUSIBLY ALLEGED A COGNIZABLE GENDER DISCRIMINATION CLAIM UNDER COUNTS FIVE, SIX, SEVEN AND EIGHT AGAINST LOCAL 802 AND THE PHILHARMONIC UNDER THE NYS AND NYC HUMAN RIGHTS LAW ............................................................................................. 46

A.    Plaintiff's NYSHRL and NYCHRL claims against Defendants are not pre-empted by the LMRA ............................................................................................. 46

B.    *Martin v. Curran* is inapplicable.......................................................... 49

CONCLUSION ................................................................................................ 51

## **TABLE OF AUTHORITIES**

### **Cases**

*Air Line Pilots Ass'n, Int'l v. O'Neill*,
   499 U.S. 65, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991) ............................................ 29

*Allis Chalmers Corp. v. Luek*,
   471 U.S. 202, 85 L.Ed 2d 206, 105 S. Ct. 1904 (1985) ............................................ 46

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*,
   403 U.S. 274, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971) ............................................ 29

*Areu v. Fox News Network, LLC*,
   No. 20-CV-8678 (RA),  2021 U.S. Dist. LEXIS 171332 (S.D.N.Y. Sept. 9, 2021 .................. 44

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ........................................ 20

*ATSI Communic's, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ....................................................................... 20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................................ 20

*Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers*,
   958 F.2d 1429 (7th Cir. 1992) .................................................................... 33

*Bright-Asante v. Saks & Co.*,
   242 F. Supp. 3d 229 (S.D.N.Y. 2017) ............................................................. 23

*Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union*,
   227 F.3d 29 (2d Cir. 2000) ....................................................................... 31

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ................................................................. 35, 36, 39

*Doe v. Trs. of Colum. Univ.*,
   21 Civ. 5839 (ER), 2022 U.S. Dist. LEXIS 153239 (S.D.N.Y. 2022) ................................ 35

*Eckhart v. Fox News Network, LLC*,
   No. 20-CV-5593 (RA), 2021 U.S. Dist. LEXIS 171219 (S.D.N.Y. Sept. 9, 2021) ..................... 44

*Figueira v. Black Entertainment TV*,
   944 F. Supp. 299 (S.D.N.Y. 1996) ................................................................ 43

i

*Figueroa v. Foster,*
  864 F.3d 222 (2d Cir. 2017) ............................................................... 46, 48

*Germain v. Nielsen Consumer LLC,*
  655 F. Supp. 3d 164 (S.D.N.Y. 2023) ...................................................... 44

*Goodman,*
  Case No. 10 Civ. 8352, 2011 U.S. Dist. LEXIS 86010 (S.D.N.Y. Aug. 2, 2011) ................... 46

*Harisch v. Goldberg,*
  No. 14-cv-9503 (KBF), 2016 U.S. Dist. LEXIS 39494 (S.D.N.Y. Mar. 25, 2016) ................ 20

*Hernandez v. Premium Merch. Funding One, LLC,*
  Case No. 19cv1727, 2020 U.S. Dist. LEXIS 122643 (S.D.N.Y. July 13, 2020) ..................... 44

*Huerta v. J.D. Workforce, Inc.,*
  No. 23-CV-5382 (KMK), 2025 U.S. Dist. LEXIS 40517 (S.D.N.Y. Mar. 3, 2025) ............... 44

*Hussein v. Pierre Hotel,*
  No. 99 Civ. 2715 (DC),  2000 U.S. Dist. LEXIS 8225 (S.D.N.Y. Jun. 14, 2000) ................... 44

*Jones v. Interlake S.S. Co.,*
  Case No. 20-2210, 2021 U.S. App. LEXIS 25522 (6th Cir. Aug. 23, 2021) ........................... 33

*Langford v. Int'l Union of Operating Eng'rs, Local*
  *30,* 765 F. Supp. 2d 486 (S.D.N.Y. 2011) ................................................. 39, 49, 50

*Lingle v. Norge Div. of Magic Chef,*
  486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988) ................................ 47, 48

*Linton v. United Parcel Serv.,*
  15 F.3d 1365 (6th Cir. 1994) ................................................................. 32

*Maron v. Legal Aid Soc'y,*
  605 F. Supp. 3d 547 (S.D.N.Y. 2022) ...................................................... 29

*Martini v. Fed. Nat.'l Mortg. Ass'n,*
  178 F.3d 1336 (D.C. Cir. 1999) ............................................................. 45

*Matter of Agramonte v Local 461, Dist. Council 37,* 41 N.Y.3d 483 (2024) .............................. 50

*Menaker v. Hofstra Univ.,*
  935 F.3d 20 (2d Cir. 2019) ................................................... 35, 36, 39, 48

*Morrissey v. Verizon Communs., Inc.,*
  10 Civ. 6115 (PGG), 2011 U.S. Dist. LEXIS 73202 (S.D.N.Y. Jul. 7, 2011) ........................ 46

*Muldrow v. City of St. Louis,*
  601 U.S. 346 , 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024) ...................................................... 23

*Mwangi v. Passbase, Inc.,*
  Case No. 21 Civ. 6728 (ER)**,** 2022 U.S. Dist. LEXIS 106103 (S.D.N.Y. June 14, 2022)........ 44

*National Labor Relations Board v. Weingarten,*
  420 US 251 (1975) .................................................................................................................. 11

*New York Mailers' Union No. 6,*
  166 F.3d 465 (2d Cir. 1999) ................................................................................................... 29

*Palumbo v. Lufthansa German Airlines,*
  No. 98 Civ. 5005,  1999 U.S. Dist. LEXIS 11412 (S.D.N.Y. Jul. 26, 1999). .......................... 45

*Pardovani v. Crown Bldg. Maint. Co.,*
  No. 15-CV-9065 (JPO), 2020 U.S. Dist. LEXIS 88647 (S.D.N.Y. May 20, 2020) ................ 23

*Pennsylvania Ballet Ass'n v. American Fed'n of Musicians, Local 77,*
  Civil Action No. 93-3633**,** 1994 U.S. Dist. LEXIS 8859 (E.D.Pa. June 29, 1994) ................. 26

*Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace Workers,*
  378 F.3d 269 (2d Cir. 2004) ................................................................................................... 32

*Ramroop v. Commc'ns Workers of Am. Loc. 1182,*
  Index No. 157047/2019, 2022 N.Y. Misc. LEXIS 40938
  (Sup. Ct. N.Y. Cty. Dec. 12, 2022) ........................................................................................ 50

*Rodriguez v. Connection Tech. Inc.,*
  65 F. Supp. 2d 107 (E.D.N.Y. 1999)....................................................................................... 45

*Samuels v. Air Transp. Loc. 504,*
  992 F.2d 12 (2d Cir. 1993). .................................................................................................... 30

*Scales v. N.Y. Hotel & Motel Trades Council, Local 6,*
  No. 21 Civ. 8142 (JPC), 2023 U.S. Dist. LEXIS 19741 (S.D.N.Y. Feb. 6, 2023) .................. 30

*Scheibel v. Schohari Cent. Sch. Dist.*, 1
  20 F.4th 1082 (2d Cir. 2024) ....................................................................................... 35, 37, 39

*Sethi v. Narod,*
  12 F. Supp. 3d 505 (E.D.N.Y. 2014)....................................................................................... 23

*Sim v. New York Mailers' Union No. 6,*
  166 F.3d 465 (2d Cir. 1999) ................................................................................................... 29

*Starr v. Sony BMG Music Entm't,*
    592 F.3d 314 (2d Cir. 2010) ................................................................................... 20

*Steyer v. Lyric Opera,*
    No. 17 CV 6014, 2022 U.S. Dist. LEXIS 83294 (N.D. Ill. May 9, 2022) ................................ 26

*Stidhum v. 161-10 Hillside Auto Ave, LLC,*
    No. 19-CV-5458 (RPK) (VMS), 2021 U.S. Dist. LEXIS 119043
    (E.D.N.Y. Jun. 25, 2021) .......................................................................................... 45

*Thomas v. Little Flower for Rehab. & Nursing,*
    793 F. Supp. 2d 544 (E.D.N.Y. 2011) ...................................................................... 30

*Truck Drivers, etc. v. Schneider Tank Lines, Inc.,*
    958 F.2d 171 (7th Cir. 1992) ................................................................................. 26

*Ustad v. Int'l Bhd. of Teamsters, Loc. 747,*
    No. 10-cv-3894 (FB)(RER), 2014 U.S. Dist. LEXIS 45627 (E.D.N.Y. Apr. 1, 2014) ............ 31

*Vaughn v. Air Line Pilots*, Ass'n, Int'l,
    604 F.3d 703 (2d Cir. 2010) ................................................................................. 29

*White v. White Rose Food,*
    237 F.3d 174 (2d Cir. 2001) ...................................................................... 21, 29, 48

*Whitehurst v. 1199SEIU United Healthcare Workers East,*
    928 F.3d 201 (2d Cir. 2019) ...................................................................... 46, 47, 49

*Wynn v AC Rochester*,
    273 F.3d 153 (2d Cir. 2001) ................................................................................. 46

*Young v. North Drury Lane Prods.,*
    94 C 3530, 1995 U.S. Dist. LEXIS 3092 (N.D.Il Mar. 9, 1995) .................................... 26

*Yusuf v. Vassar College,*
    35 F.3d 709 (2d Cir. 1994) ...................................................................... 35, 36, 39

*Zuckerman v. Volume Servs. Am., Inc.,*
    304 F. Supp. 2d 365 (E.D.N.Y. 2004) ................................................................... 46

**Statutes**

29 C.F.R. § 1601.28 (a)(1) ................................................................................... 43

29 C.F.R. § 1601.28 (a)(2). .................................................................................. 43

42 U.S.C. § 2000e-5(f)(1) ........................................................................................... 43, 44

Fed. R. Civ. P. Rule 12(b)(6) ........................................................................................ 20

Labor Management Relations Act § 301, 29 U.S.C. § 185 ..................................... 20, 21

**<u>Other Authorities</u>**

H.R.Rep. No. 92–238 (1971) ......................................................................................... 45

American Arbitration Ass'n, 2003 AAA LEXIS 932, at ,*2 (2003) (MacKenzie, Arb.)............. 25

MATTHEW MUCKEY ("Mr. Muckey" or "Plaintiff") submits this memorandum of law in opposition to the motions to dismiss the Amended Complaint ("Amended Complaint" or "FAC") of THE PHILHARMONIC-SYMPHONY SOCIETY OF NEW YORK, INC. a/k/a THE NEW YORK PHILHARMONIC ORCHESTRA (the "Philharmonic" or the "Society") and the ASSOCIATED MUSICIANS OF GREATER NEW YORK, LOCAL 802, AMERICAN FEDERATION OF MUSICIANS ("Local 802" or the "Union") (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

While Defendants' motions to dismiss engage in legalistic sophistry to try to justify the Philharmonic's termination of Plaintiff and the Union's collaboration and consent to it, they cannot avoid the detailed allegations in the Amended Complaint that plausibly demonstrate that their reliance on a false narrative of sexual misconduct arrived at it in an irregular and intentionally manipulated process breached the Trade Agreement (Collective Bargaining Agreement), between the Philharmonic and the Union (the "CBA"), abrogated the Union's duty of fair representation, and violated Title VII and its state and local cohorts. Certainly, it cannot be said that Plaintiff has not set forth allegations, if deemed true as they must be at this stage of the litigation, that assert viable claims that his termination was arbitrary, discriminatory and in bad faith.

Plaintiff's problems with the Philharmonic and the Union arose after publication of a magazine article in April 2024 that recounted allegations of alleged sexual misconduct from 2010 that had been the subject of an arbitration in which he prevailed. The day after publication of that article and the attendant publicity about it, the Philharmonic suspended him, with the consent and

---

[1]     Defendants have also moved to dismiss all of the claims in the Amended Complaint in the case of *Wang v. The Philharmonic-Symphony Society of New York, Inc., et al.*, 1:24-cv-03356-AS. Mr. Muckey expressly incorporates by reference all factual assertions and legal arguments made by Mr. Wang that are pertinent to arguments made by Mr. Muckey in this memorandum of law.

acquiescence of the Union, notwithstanding there were no allegations of wrongdoing against him that had not already been adjudicated in his favor. Thereafter, concerted steps were taken by Defendants to prevent his return to the Orchestra resulting ultimately in his termination.

Central to Plaintiff's termination was a skewed and flawed investigation initiated after his suspension which targeted him based solely on an alleged claim by a woman that she had nonconsensual sex with Plaintiff 16 years previously in 2008. Yet, Plaintiff had overwhelming proof in texts that the sex was consensual and, in fact, according to her contemporaneous communications, "pretty good." Nonetheless, in the face of such damning documentary evidence, the investigator found her "credible." Because the investigator found that there were no other credible claims against Plaintiff, and that since the previously adjudicated allegations no other complaint by any orchestra member of sexual misconduct against him, the Philharmonic and Union could only rely on the slender reed of the discredited 2008 claim of misconduct.

Since this sole finding by the investigator, however, could not sustain a finding of just cause under Article VII of the CBA, the Philharmonic used Article XIV to terminate Plaintiff with a "written notice of non-reengagement" (the "Notice of Non-reengagement"). However, this provision of the CBA had never been used before and the Union understood that if it permitted it in this circumstance, it would give the Philharmonic unfettered ability to bypass the just cause provision of the CBA. Thus, the Union agreed to it because of the "extreme circumstance" of the sexual misconduct claim against Plaintiff, but then negotiated a written agreement with the Philharmonic acknowledging that Article XIV would only be used this one time against Plaintiff (and his fellow suspended orchestra member, Liang Wang ("Mr. Wang")) and would never be used again as an "end run" around just cause.

In support of their motions, the Philharmonic offers the executive summary of the investigative report ("Executive Summary") prepared by the investigator retained by the Philharmonic, Tracey Levy, Esq. of Levy Employment Law, LLC ("Ms. Levy"), referred to in the Amended Complaint (*See* Exhibit F to the Declaration of Ashley R. Lynam dated June 9, 2025 (Dkt. No. 101-6)), and the Union submits the Unanimous Decision of the Executive Board of Local 802 (the "Union Decision"), also referred to in the Amended Complaint (*See* Exhibit H to the Declaration of Susan Davis dated July 9, 2025 (Dkt. No. 105-8)). These documents only further support the allegations in the Amended Complaint.

The Executive Summary confirms that there were no other claims of sexual misconduct against Plaintiff by any orchestra member after 2010 and that there was no independent evidence to support the claim that the sexual encounter in 2008 was not consensual. *See* Dkt. No. 101-6 at 9, n. 5. Even more, the Executive Summary documents the irregular procedures used in the investigation such as the polling by the investigator of orchestra members as to whether they would want to play with Plaintiff based on their reading of the magazine article or rumor within the orchestra. *Id*. at 9.

The Union Decision fares no better. It makes abundantly clear that the use of Article XIV against Plaintiff was the very "end run" of the just cause provision of Article VII that the Union and the Philharmonic agreed should never occur again. Labeling Plaintiff's case as "extreme circumstances" because of the scope of the sexual misconduct at issue" is not supported by any evidence to justify this one-time, unprecedented use of Article XIV against Plaintiff (and Wang); nor is reliance on the "overwhelming sentiment of the Orchestra members" a basis to forgo Plaintiff's rights under Article VII of the CBA. *See* Dkt. No. 105-8 at 4. In fact, these rationales are at the very core of Plaintiff's claims in this action. It certainly cannot be said that under these

circumstances, as alleged in the Amended Complaint and documented by Defendants' own submissions, as a matter of law, Defendants acted reasonably and in good faith as required under the CBA in terminating Plaintiff.

The Union Decision also documents that the review process called for in the CBA required the Philharmonic to justify its rationale for terminating Plaintiff whether under Article XIV or Article VII. In either instance the Philharmonic had to provide reasons to the Union under Article XV. As the Union Decision confirms, the Philharmonic based its reasons for the Notice of Non-Reengagement on the investigator's report and its otherwise unsubstantiated determination that Plaintiff had engaged in sexual misconduct.

Defendants' motions to dismiss Plaintiff's claims under Title VII and its sister state and city statutes are similarly without legal support and must be rejected. Instead of dealing with Plaintiff's allegations in the Amended Complaint, Defendants create their own theory of the discrimination claims alleged by Plaintiff, contending that Plaintiff failed to show that he was treated differently than women in the same circumstance. This absurd argument intentionally misses the thrust of Plaintiff's claim. The Amended Complaint clearly sets forth the elements enunciated in the leading cases in this Circuit (discussed in section. IV, *infra*) which provide that an employee can establish a claim of discrimination that his termination was motivated, in part, by improper consideration of his sex where:

(1)     there was an adverse employment action;

(2)     in response to allegations of sexual misconduct made by a female against a male;

(3)     based on an irregular investigative or adjudicative process; and

(4)     amid criticism and pressure from the community to favor an alleged female victim against an alleged male assailant.

Although there can be no doubt that the Amended Complaint contains such allegations, in their moving briefs Defendants fail to show how the law in those cases is not analogous and does not apply to the circumstances surrounding Plaintiff's termination. This is particularly remarkable given that during the conference with the Court on February 28, 2025, when the Honorable Arun Subramanian granted Plaintiff leave to file the Amended Complaint, counsel for Plaintiff provided the Court with the case names and citations and set forth the applicable legal basis upon which such a claim of discrimination under Title VII would be made (Dkt. No. 82 30:1-30:17).

It is submitted that, as the Amended Complaint outlines in detail, within days of the *Vulture* article, in the midst of public pressure and general sentiment to favor the accusing female over the accused male, there was a concerted effort by the Philharmonic and the Union to target Plaintiff and to find a basis to terminate him as an orchestra member. Taken together, Plaintiff's plausible allegations with respect to the Suspension, the Philharmonic's investigation, the adjudicative process, the deference to the purported "sentiment" of the orchestra members and public at large, and the use of Article XIV as a means of avoiding just cause in support of his termination. state legally cognizable claims against: (a) the Union pursuant to Section 9(a) of the NLRA for breach of the duty of fair representation; (b) the Philharmonic pursuant to Section 301 of the Labor Management Relations Act ("LMRA") for breach of the CBA; and (c) both the Union and the Philharmonic for sex and gender discrimination under Title VII, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").

## STATEMENT OF FACTS

The Court is respectfully directed to the facts as alleged in the Amended Complaint. A summary of the facts is as follows:

**Background**

Mr. Muckey, who is an internationally recognized musician, had a successful career as a tenured Associate Principal and Third Trumpet at the Philharmonic until 2018 when the Philharmonic terminated his employment based upon false allegations of drugging and sexual misconduct which had been made against Mr. Muckey by a Philharmonic probationary player, Cara Kizer ("Cara" or "Ms. Kizer") nearly a decade before in the summer of 2010 (the "2010 Allegations"). (FAC ¶ 24).

Mr. Muckey denied the 2010 Allegations (although he acknowledged a consensual encounter with the probationary player in which no drugs were involved) and fully cooperated with the local law enforcement authorities in multiple investigations, all of which were ultimately closed without any criminal charges against Mr. Muckey. (FAC ¶¶ 25–26). The Philharmonic took no adverse employment action against Mr. Muckey until 2018 when the 2010 Allegations resurfaced and the Philharmonic terminated his employment contending that it had "just cause" to dismiss him. (FAC ¶¶ 18, 30–34). Mr. Muckey again denied the 2010 Allegations as false and challenged the termination of his employment. (FAC ¶¶ 32, 27). The Union filed a grievance and commenced an arbitration proceeding on his behalf, pursuant to the CBA, seeking his reinstatement together with backpay. An arbitration was conducted before Richard I. Bloch (the "Arbitrator"), who was jointly selected by the Union and the Philharmonic, which encompassed a total of twenty (20) hearing days, and the Arbitrator issued an award in favor of Mr. Muckey, finding that the Philharmonic had failed to prove that Mr. Muckey had engaged in the drugging or sexual assault alleged and that there was no just cause to terminate Mr. Muckey (the "Award") (FAC ¶¶ 38, 41-46). The Award ordered Mr. Muckey's reinstatement to his tenured position with all contractual benefits lost, including full back pay and seniority -- and the Society complied in all respects. (FAC ¶ 48).

Mr. Muckey resumed his career at the Philharmonic with much success and without any issue. (FAC ¶ 49) until April 12, 2024, when an article appeared in *Vulture*, a *New York Magazine* website ("*Vulture*"), which rehashed the 2010 Allegations, inaccurately portrayed Ms. Kizer as a victim of wrongdoing by Mr. Muckey and Mr. Wang, and criticized the Philharmonic and the Award (the "Article"). (FAC ¶ 52). The *Vulture* article contained no new claims but, instead, was simply a reiteration of the same 2010 Allegations that the Arbitrator had already determined did not constitute just cause to warrant Mr. Muckey's dismissal, and, thus, Mr. Muckey's employment should not have been adversely impacted. (FAC ¶ 54). However, after the publication of the Article, and the societal pressures, both internally and externally, to permanently remove him from the orchestra, both the Philharmonic and the Union endeavored to achieve that objective. (FAC ¶ 55-56).

### Public Commentaries by Members of the Orchestra, the Classical Music Industry and the General Public Follow the Online Publication of the 2010 Allegations

The Article reported that, "[i]nterviews with current and former musicians and orchestra staff, however, reveal that some employees, particularly female employees, continue to feel unsafe." (FAC ¶ 63). The Orchestra Committee expressed that it is "the overwhelming sentiment from the orchestra that we believe Cara" and added that, "the orchestra has a culture of 'not taking musician complaints seriously so musicians often do not feel safe in raising accusations of sexual harassment and assault' and called on management to take action to provide a safe workplace." (FAC ¶ 64). A message posted on Facebook under the account name, "The Musicians of the New York Philharmonic," stated in pertinent part, "We call on our fellow musicians and the Philharmonic-Symphony Society to provide a safe environment so that no one is afraid to come to work." (FAC ¶ 66). Various web sites in the classical music community contained posts which demanded that Mr. Muckey, (as well as Mr. Wang), be ousted and permanently removed from the

Philharmonic.  (FAC ¶ 67).  Furthermore, a petition dated April 15, 2024, entitled, "An Open Letter to Local 802 AFM Regarding Allegations of Sexual Misconduct by New York Philharmonic Musicians Matthew Muckey and Liang Wang" (the "Petition") by a group called Composers Collective was circulated among the classical music community contending that Mr. Muckey was guilty of sexual assault and demanded that he be permanently removed from the Philharmonic. (FAC ¶¶ 69–70).  In addition to petitions, there were protests at the Philharmonic. (FAC ¶¶ 73– 74).  From that point, Mr. Muckey and Mr. Wang were targeted by the Philharmonic which was intent on finding a way to dismiss them.  (FAC ¶ 75).  Thereafter, both the Philharmonic and the Union took adverse action against Mr. Muckey in response to the escalating chatter in the orchestra and the classical music industry following publication of the article. (FAC ¶ 76).

### The *Vulture* Article First Leads to the Suspension, and Then the Investigation, of Mr. Muckey by the Philharmonic

Within 24 hours of the rehashing of the 2010 Allegations in the *Vulture* article, the Philharmonic both advised Mr. Muckey and announced publicly that he was prohibited from participating in all rehearsals, performances, concerts, and tours and other Philharmonic activities, he was banned from attending any meetings of the Philharmonic and barred from the Philharmonic's premises (collectively, "Philharmonic Activities"), including those to which he had already been assigned (the "Suspension") (FAC ¶¶ 56–60).  Before the Suspension, there were no allegations against Mr. Muckey brought to the Philharmonic other than what had been the subject of the Arbitration.  (FAC ¶ 50).

On April 18, 2024, the Philharmonic's then President and Chief Executive Officer, Gary Ginstling ("Mr. Ginstling"), circulated a statement addressed to the "New York Philharmonic Community," which referenced the 2010 Allegations raised in the *Vulture* magazine article, in which he articulated that "the details revealed in the New York magazine article are horrifying to

me personally" and therefore, "for the time being, musicians Matthew Muckey and Liang Wang are not being assigned to any Philharmonic activity as we work through this process, and *a decision about their future with the New York Philharmonic will be made in due course*." (FAC ¶ 77). [emphasis supplied] Mr. Ginstling further stated that the Philharmonic had engaged a law firm "to launch an independent investigation into the culture of the New York Philharmonic in recent years" (the "Culture Investigation." (FAC ¶ 77).

After Mr. Ginstling's announcement on April 18, 2024 of the Culture Investigation, Mr. Ginstling announced on April 19, 2024 that the Philharmonic had also engaged Ms. Levy. (FAC ¶¶ 92–93).

Ms. Levy's background, as she boasts on her law firm's website, https://www.levyemploymentlaw.com/tracey-l-levy/, includes a prior position as "an employment attorney with Proskauer Rose LLP for more than a third of her career, where she advised and litigated on behalf of a broad range of clients to resolve their employment law issues."  (FAC ¶ 94).   Given that the clients of Proskauer Rose include the Philharmonic, and that the Proskauer Rose has represented, and had continued to represent, the Philharmonic, including in the instant action until in or about May 2025. Ms. Levy was by no means a "neutral" or "independent" investigator appointed by the Philharmonic to perform such investigation. (FAC ¶ 95).

Ms. Levy was purportedly retained "to investigate new allegations of sexual harassment, violence and/or abuse alleged to have been committed by any musicians employed by the Philharmonic" (the "Levy Investigation"). (FAC ¶ 96).   However, the Levy Investigation was targeted towards two men only, Mr. Muckey and Mr. Wang.  In fact, from the outset, the whole investigative process was unfair and biased in order to effectuate a plan and process to make sure that both Mr. Muckey and Mr. Wang would never return to the orchestra.  (FAC ¶¶ 97–98).

Even though he was a member of Local 802 in good standing, Mr. Muckey did not receive the support of Local 802. (FAC ¶¶ 51, 79).  Instead, public statements made by Local 802's President, Sara Cutler ("Ms. Cutler" or  the "Union President"), in an article published  by *The New York Times* on April 15, 2024, demonstrated that the Union was instead supporting the Philharmonic and in fact, it refused to represent Mr. Muckey in grieving the Suspension (FAC ¶ 80).

Specifically, the Union President publicly stated that she was "horrified by what was in the [*Vulture*] story and ***we are committing the full resources of Local 802*** to erase the culture of complicity that has raged at the N.Y. Philharmonic for too long" (FAC ¶ 80) (emphasis supplied). With regard to the Levy Investigation, which was targeted at no orchestra member other than Mr. Muckey (and Mr. Wang), she explicitly stated that "the ***union*** supported the new inquiry." (FAC ¶ 80) (emphasis supplied). The Union President even went as far as advocating further disciplinary action against Mr. Muckey by proclaiming that the decision to keep Mr. Muckey (along with another musician, Liang Mr. Wang; "Mr. Wang") offstage "are good *first steps* but they can't be the last" (FAC ¶ 80) (emphasis supplied).

Mr. Muckey's counsel demanded in correspondence to Local 802 that it protect Mr. Muckey's rights as determined by the Award, perform its duty of fair representation, and take all the necessary steps to cause the Philharmonic to restore Mr. Muckey to his tenured position at the Philharmonic.  (FAC ¶ 85).  However, Local 802's counsel responded to Mr. Muckey's counsel that the Union was refusing to seek enforcement of the Award, the Award that Local 802 previously obtained in Mr. Muckey's favor which determined that Mr. Muckey could not be disciplined based upon the 2010 Allegations. (FAC ¶ 89).

The Union's attorney added that Local 802 had decided to await the outcome of the "investigation" by the Philharmonic to determine *whether* there were any new or different allegations of sexual misconduct by any members of the Orchestra, including Mr. Muckey. (FAC ¶ 90). However, Local 802's counsel failed to address the fact that the Suspension occurred before any such determination, that no member of the Philharmonic other than Mr. Muckey (and Mr. Wang) was subject to the Suspension pending "investigation," and that the Suspension was based solely upon the 2010 Allegations, which violated the Award. (FAC ¶ 91).

On or about July 9, 2024, the Philharmonic informed Mr. Muckey that Ms. Levy wanted to interview him in connection with the Levy Investigation. (FAC ¶ 101). Once it became apparent that the Levy Investigation could lead to disciplinary action against him, Mr. Muckey contacted Local 802 to invoke his rights to have a union representative appear with him in the Levy Investigation, legally referred to as his *Weingarten* rights, established in the Supreme Court case of *National Labor Relations Board v. Weingarten*, 420 US 251 (1975).

Since Local 802 and Mr. Muckey were active adversaries in the instant action, Mr. Muckey specifically requested that arrangements be made for a representative not affiliated with Local 802 to be assigned, so that he was afforded fair representation. (FAC ¶ 104). However, Local 802 rejected the request, and Mr. Muckey was required to attend the interview with Ms. Levy with a Local 802 representative, notwithstanding the obvious conflict of interest. (FAC ¶ 105).

Mr. Muckey, along with a Local 802 representative and his counsel met with Ms. Levy on August 8, 2024 (FAC ¶ 106), and during such meeting she primarily focused on a brief consensual sexual relationship that Mr. Muckey had in 2008 with a woman, C.S.[2] (FAC ¶ 107). It was apparent from the line of questioning that the Levy Investigation centered on whether Mr.

---

[2]        In the interests of the woman's privacy, she has been referred to in the FAC as C.S. ("C.S.").

Muckey's sexual encounters with C.S. were consensual. (FAC ¶ 111). Mr. Muckey's understanding was that C.S. was alleging that the sex they had was not consensual (the "C.S. Allegation"). Thereafter, on September 3, 2024, Mr. Muckey met with Ms. Levy again wherein he described the circumstances of his sexual relationship with C.S. and read to Ms. Levy messages he and C.S. exchanged on Facebook Messenger in 2008 and again in 2011-2012 (the "Facebook Messages") (FAC ¶¶ 112–13). All of the Facebook Messages definitively established that their sexual relationship was consensual and that C.S. had a clear recollection of the sex she had with Mr. Muckey, on two separate occasions. (FAC ¶ 114).

Specifically, C.S. wrote to Mr. Muckey, "I did consent," expressing regret only because she had "wronged" her boyfriend, of whom Mr. Muckey had no prior knowledge. (FAC ¶ 115). She later pleaded with Mr. Muckey not to "write back" to her boyfriend if he reached out to Mr. Muckey, stating, "i know you'll want to say that i consented, which i did…" (FAC ¶ 116). In another message, C.S. sent holiday greetings to Mr. Muckey and apologized for ignoring him, which she explained was because of problems she was having with her boyfriend after she informed him that she and Mr. Muckey had sex. (FAC ¶ 117). Specifically, C.S. stated the following:

> ….I'm sorry for ignoring you. [NAME REDACTED] and I have been going through shit. … I **had a panic attack and told him that we slept together** …. (emphasis added).

(FAC ¶ 118). Not only did C.S. recall the sex she had with Mr. Muckey, she complimented and thanked Mr. Muckey for the sex and also asked Mr. Muckey for his telephone number, so she could be in touch. (FAC ¶ 119). Specifically, C.S. stated the following:

> awwww you're really the best 😊 **thanks for everything, yes, even the sex. it was pretty good**…
>
> and i sort of need your number to get in touch with you. (emphasis added)

(FAC ¶ 119).  She also begged Mr. Muckey not to tell her boyfriend that they had sex twice, stating:

> …PLEASEEEEEEEE **don't tell him about the sex. i told him that we did it twice because we did,** but i REALLY don't want this to evolve into anything and i don't want you dragged into it. DONT REPLY PLEASE (emphasis added)

(FAC ¶ 120).

### **The Philharmonic Terminates Mr. Muckey**

The Facebook Messages exchanged between C.S. and Mr. Muckey, as well as Ms. Levy's findings that there were no other claims made by any member of the orchestra since 2010, should have convinced the Philharmonic that Mr. Muckey had not engaged in any misconduct.  (FAC ¶ 123).  However, the Philharmonic did not want Mr. Muckey returning to the orchestra under any circumstances.  (FAC ¶ 124).  Thus, on October 15, 2024, the Philharmonic gave Mr. Muckey the Notice of Non-Reengagement informing him that, pursuant to Article XIV of the collective bargaining agreement between the Union and the Philharmonic ("Article XIV"), the Philharmonic would not be re-engaging him as a member of the orchestra for the 2025-26 season and that during the remainder of the current season (2024-25), he would remain subject to the Suspension (the "Dismissal").  (FAC ¶ 127).  Mr. Muckey was also given a contract for the current season that reduced his total compensation by discontinuing the overscale weekly pay that he was entitled to receive as the Associate Principal and Third Trumpet.  (FAC ¶ 128).  No reason was given by the Philharmonic for the Dismissal.  (FAC ¶ 129).  In fact, counsel for the Philharmonic informed counsel for Mr. Muckey that no reason need be given under Article XIV and that the Philharmonic was exercising its prerogative to terminate Mr. Muckey.  (FAC ¶ 130).

Although the Philharmonic informed Mr. Muckey that no reason need be given to him for the Dismissal, it informed the public that the Dismissal was for cause, i.e., based upon a finding

of sexual misconduct. (FAC ¶ 138). On November 4, 2024, *The New York Times* reported the Dismissal in an article titled, "Philharmonic Dismisses 2 Players Over Sexual Misconduct Allegations," with the headline, "The orchestra said an inquiry found credible claims against the musicians of sexual assault and harassment. They denied the charges." (FAC ¶ 139). In the November 4th article, the Philharmonic said, "an investigation that began… has now turned up additional claims of misbehavior." (FAC ¶ 140). The article further quoted the reason for the Dismissal, which was given by the Philharmonic's Executive Adviser, Deborah Borda, as follows:

> Ms. Borda said the inquiry had uncovered "patterns of sexual misconduct and abuse of power" by the two men… The orchestra said the accusations ranged from inappropriate remarks to assault.

(FAC ¶ 141). The article also highlighted the fact that, notwithstanding the alleged "sexual misconduct" which would normally invoke Article VII.E.7, a termination based upon "just cause," "this year, the Philharmonic used a different strategy to dismiss Mr. Muckey and Mr. Wang. The orchestra invoked a section in the labor agreement known as a 'non-reengagement' provision, notifying the two men that it did not plan to rehire them in the 2025-26 season." (FAC ¶ 142). Also, on November 5, 2024, Ms. Borda made similar statements about sexual "misconduct" in the *New York Post* article titled, "NY Philharmonic fires two musicians over alleged sexual misconduct, abuse of power." (FAC ¶ 143). In the November 5th article, Ms. Borda stated that the Levy Investigation, "found that both gentlemen had been involved in sexual abuse and rape as well as abuse of power." (FAC ¶ 144). Ms. Borda also boasted in that same article that, "[Mr. Muckey, as well as Mr. Wang] are barred from the building…. They will never appear on the stage again with the philharmonic." (FAC ¶ 145).

**The Investigative Process is Revealed as Unfair, Biased, and Predetermined to Find Against Mr. Muckey**

After receiving the Notice of Non-Reengagement, on or about October 16, 2025, Mr. Muckey promptly invoked his limited rights pursuant to Article XV of the CBA and informed Local 802 that he protested the Dismissal.  (FAC ¶ 146).   Thereafter, Local 802 requested a copy of the investigative report prepared by Ms. Levy (the "Levy Report"), which it was able to obtain pursuant to a confidentiality agreement that it had entered into with the Philharmonic (the "Confidentiality Agreement").  (FAC ¶ 148).   Local 802 also obtained a copy of an executive summary of the investigative report (the "Executive Summary"), which was also subject of the Confidentiality Agreement.  However, Local 802 not only refused to send to Mr. Muckey either of the documents, it entered into an agreement with the Philharmonic not to discuss, provide or otherwise disclose to Mr. Muckey the Levy Report, and to only permit Mr. Muckey to review the Executive Summary in person, in the presence of a union representative, and upon the execution of a confidentiality Agreement.  (FAC ¶¶ 51, 148).

It was only after the execution of the Confidentiality Agreement when Mr. Muckey and his counsel were permitted to review the Executive Summary, in the presence of counsel; however, they were prohibited from taking any notes during such review or making copies of it.  (FAC ¶¶ 153–54).[3]  The Executive Summary focused on the C.S. Allegation and discussed orchestra members who expressed their reluctance to take the stage with Mr. Muckey based upon the Article and rumor circulated within the orchestra about him.  (FAC ¶ 156).   In the Executive Summary, Ms. Levy found the C.S. Allegation "credible," notwithstanding the contemporaneous statements

---

[3]    Demonstrating the inherent unfairness of its investigative process and the uneven playing field that the Philharmonic created for Plaintiff, now the Philharmonic has placed the very Executive Summary it was unwilling to share with Mr. Muckey and his counsel (save for a cursory reading without notes) into the record in support of the instant motion to dismiss (Dkt. No. 101-6).

made by C.S. in the Facebook Messages admitting her consent, to which Ms. Levy gave no weight whatsoever. Dkt. No. 101-6 at 9.

Ms. Levy also found the C.S. Allegation "credible," notwithstanding the (1) admission that she sent the Facebook Messages and (2) apology she provided to Ms. Levy when she was confronted by Ms. Levy with the Facebook Messages. (FAC ¶ 161); *see also* Dkt. No. 101-6 at 6. Indeed, there was no evidence reported by Ms. Levy that contradicted Mr. Muckey's statements and documents, or in any way called into question the authenticity or accuracy of the Facebook Messages. (FAC ¶ 163).

Also, in the Executive Summary, Ms. Levy purported to document an alleged pattern of abuse of women by Mr. Muckey, despite the fact that with the exception of the C.S. Allegation, which was proven false by the documentary evidence, there was no other credible complaint of any misconduct of Mr. Muckey made by any orchestra member, so as to establish a "pattern" of abuse. (FAC ¶ 171-172); *see also* Dkt. No. 101-6 at 9, n. 5.   In fact, Ms. Levy reported that she had not received any complaints from any of the orchestra members about Mr. Muckey and that she could not document any allegation about Mr. Muckey's conduct with women in the orchestra since 2010 involving the 2010 Allegations. (FAC ¶¶ 173, 182); *see also* Dkt. No. 101-6 at 3.

After conducting interviews of the orchestra members, and receiving no such complaints, in an extraordinary turn of events, Ms. Levy then solicited the orchestra members to consider whether or not they wanted to play with Mr. Muckey by asking them how they felt about Mr. Muckey being put on leave and how they would feel about him returning to the orchestra (the "Survey"). (FAC ¶ 174); *see also* Dkt. No. 101-6 at 9.

The Survey was a further part of the plan to concoct a rationale for removing Mr. Muckey (and Mr. Wang) from the orchestra. (FAC ¶ 177).

**Local 802 Conducts a Dismissal Review Process Which is Also Unfair, Biased and Predetermined to Find Against Mr. Muckey**

Following Mr. Muckey's review of the Executive Summary, he prepared a written response to it (the "Muckey Statement") and submitted it to Local 802's counsel for presentation to the Executive Committee, as Local 802 had directed him to do. (FAC ¶ 187). He also requested, through counsel, to appear and present the Muckey Statement to the Dismissal Review Committee since it played a role in the review process; however, Local 802 rejected the request. (FAC ¶ 189). As a result of the denial, the Dismissal Review Committee's recommendation was based only upon the Executive Summary, and Mr. Muckey was given no opportunity to either appear before the Dismissal Review Committee or present the Muckey Statement to them. (FAC ¶ 190). With only the Executive Summary, which did not contain the exonerating Facebook Messages exchanged between C.S. and Mr. Muckey, or a responsive statement from Mr. Muckey, the Dismissal Review Committee "unanimously recommended that Local 802 not contest Muckey's and Wang's terminations." (FAC ¶ 192).

Thereafter, on November 1, 2024, when Mr. Muckey orally presented his statement to the Executive Committee, he was limited to 15 minutes and there was no interaction permitted between Mr. Muckey and members of the Executive Committee. (FAC ¶¶ 193–94). Mr. Muckey had no opportunity to address the Dismissal Review Committee's recommendation since Mr. Muckey was neither given notice of what the Dismissal Review Committee recommendation was nor a copy of it. (FAC ¶ 195).

**The Union Renders its Decision Not to Grieve Mr. Muckey's Termination Based Upon the Investigative Findings and Releases the Decision to the Public**

After the Executive Committee met, it issued the Decision which stated: "Based on the information in the Executive Summaries, as well as the unanimous recommendation of the DRC…, the Union will not challenge the dismissals in arbitration." (FAC ¶ 198).

17

Specifically, the Union found that Mr. Muckey's case presented "extreme circumstances", notwithstanding there was only one allegation against Mr. Muckey by C.S. which Mr. Muckey proved to be false by submitting documentary evidence. (FAC ¶ 197).   In fact, the Union did not prepare a separate decision based solely upon the investigation of Mr. Muckey concerning the allegations of C.S. but intentionally issued a collective decision which stated that there was a "pattern of predatory conduct" so as to portray Mr. Muckey as having many allegations.  (FAC ¶ 197).  The Union concluded that its finding regarding Mr. Muckey was consistent with a "pattern" of failing to "secure meaningful consent from women" when the Union Decision could document no other allegation concerning Mr. Muckey other than the reference to the one C.S. Allegation. (FAC ¶ 197).  The Union's statement was contradicted by its admission that, "the allegations concerning Muckey are not as numerous as those involving Wang," and that, "[w]ith respect to Muckey, the Investigator credited the testimony of *a woman*."   (FAC ¶ 197) (emphasis supplied). Furthermore, the Union combined its consideration of Mr. Muckey with the allegations against Mr. Wang notwithstanding that the grievances of Mr. Muckey and Mr. Wang concerned entirely separate claims involving different allegations and findings by Ms. Levy. (FAC ¶ 197).

Also, in the Union Decision, Local 802 claimed that some percent of the orchestra members would "not take the stage" or felt "extremely uncomfortable or unsafe" without any allegation that Mr. Muckey had done anything abusive to such members.  (FAC ¶ 197).   In addition, the Union acknowledged that Article XIV had never been used to terminate a tenured musician such as Mr. Muckey previously, but that the Philharmonic had done so for the "exceptional circumstances" involving Mr. Muckey (as well as Mr. Wang).  (FAC ¶ 197).  The Philharmonic entered into an agreement with the Union that in the future it will "not use Article XIV to do an end-run around Article VII.E.7 to avoid its burden of showing 'just cause." (FAC ¶ 197).

Finally, in the Union Decision, Local 802 reveals the agreement that it entered into with the Philharmonic allowing it to rely upon Article XIV to terminate a tenured musician, only this one time, with regard to Mr. Muckey (and Mr. Wang) to support the Dismissal, but not with regard to any other orchestra member. Specifically, the Union Decision states as follows:

> [A]fter advising the NY Phil that the Local 802 Executive Board would meet shortly to determine whether to proceed to arbitration, Cutler expressed concern to Borda about the precedent that this could set for the NY Phil's use of Article XIV instead of the just cause dismissal process in Article VII.E.7. Borda acknowledged that the notices of non-reengagement issued to Muckey and Wang were based on extreme circumstances, including the type and scope of the sexual misconduct at issue and the overwhelming sentiment of the Orchestra members who spoke to the investigator concerning the impact of returning these two musicians to their workplace. She confirmed that the NY Phil would not use the Article VIX non-reengagement procedure to supplant or do an end-run around the requirement for having "just cause" for dismissals under Article VII.E.7 of the CBA. This understanding was later confirmed in writing between counsel for Local 802 and counsel for the NY Phil

*See* Dkt. No. 105-8 at 4.

### Summary of Procedural History

Plaintiff commenced the underlying action against Defendants on May 1, 2024, by the filing of the Complaint (Dkt. No. 1). Defendants each filed a motion to dismiss on June 5, 2024 (Dkt. Nos. 21-26). On July 29, 2024, Plaintiff filed a motion for partial summary judgment and opposition to each of Defendants' motion to dismiss (Dkt. Nos. 40-52). On September 18, 2024, Defendants filed their opposition to the motion for partial summary judgment and reply in further support of their motions to dismiss (Dkt.. Nos. 53-60). Then, on March 4, 2025, this Court issued an order denying the Defendants' motions to dismiss and Plaintiff's motion for summary judgment and granting Plaintiff leave to file an Amended Complaint (Dkt.. No. 81). On April 10, 2025, Plaintiff filed the Amended Complaint (Dkt.. No. 85), subject of the motions to dismiss of Defendants which Plaintiff opposes.

For the reasons set forth herein and in the accompanying papers submitted, we respectfully submit that the motions to dismiss should both be denied, in their entireties.

## ARGUMENT

### I.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion, "a plaintiff must provide grounds upon which his claim rests through 'factual allegations sufficient to raise a right to relief above the speculative level.'" *Harisch v. Goldberg,* No. 14-cv-9503 (KBF), 2016 U.S. Dist. LEXIS 39494, at *15 (S.D.N.Y. Mar. 25, 2016) (quoting *ATSI Communic's, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Thus, "the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.*, quoting *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010); *Twombly,* 550 U.S. at 570; *see also, Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

We respectfully submit that Plaintiff plausibly pleads each of the counts in the Amended Complaint.

### II.    THE AMENDED COMPLAINT PLAUSIBLY PLEADS A "HYBRID" CLAIM UNDER COUNTS ONE AND TWO AGAINST THE PHILHARMONIC BASED UPON ITS BREACH OF THE CBA AND THE UNION BASED UPON ITS BREACH OF ITS DUTY OF FAIR REPRESENTATION

The first and second counts alleged against the Union and the Philharmonic in the Amended Complaint are each in the nature of a "hybrid" claim for the Union's violation of its duty of fair representation ("DFR") and the Philharmonic's violation of Section 301 of the Labor Management Relations Act ("LMRA"; 29 U.S.C. § 185). The Second Circuit defined the

requirements and parameters of such a "hybrid" claim thusly in its decision in *White v. White Rose Food,* 237 F.3d 174, 178-79 (2d Cir. 2001):

> To establish a hybrid § 301/DFR claim, a plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-à-vis the union members. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983). The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both. *See, id*. at 165.

In the Amended Complaint, Plaintiff has plausibly alleged both prongs.

### A.    Mr. Muckey Has Plausibly Alleged a Violation of the CBA Based upon the Suspension

Section 185(a) of the LMRA (29 U.S.C. § 185) provides for the bringing of a claim for breach of a CBA as follows:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

The Society's failure, in the wake of the publication of the *Vulture* article, to honor and abide by the Arbitrator's "final and binding" determination "that Mr. Muckey could not be removed based upon" the 2010 Allegations and "ordering his reinstatement with back pay and seniority," and its wrongful actions in suspending Mr. Muckey and barring him from the premises of the Philharmonic, is the gravamen of the claim for breach of the CBA. (FAC ¶¶ 40, 48, 242).

The Complaint pleads that the only reason for the Suspension was the 2010 Allegations found in the Award not to constitute just cause for Mr. Muckey's removal, and as such, the Suspension violated the CBA's mandate (in Article XV(A) thereof) that the Award is "final and

binding." (FAC ¶¶ 238-242).   So, too, does the Suspension breach the CBA's requirement in Article VII(E)(7), that disciplinary measures taken against Mr. Muckey be supported by "just cause" (*See,* Singer Decl.; Ex. "A", at 12), given that the *Vulture* article was the sole predicate for the actions taken.

Plaintiff alleges that he was the subject of the Arbitration commenced pursuant to Article XV of the CBA in which an Award was rendered in 2020 reinstating Plaintiff as Associate Principal and Third Trumpet. (FAC ¶¶ 252-253).  Plaintiff alleges that he was suspended *before* any investigation and immediately *after* the Article which rehashed the 2010 Allegations, which can draw no conclusion other than Plaintiff was suspended and barred from all Philharmonic Activities *solely* as a result of the 2010 Allegations. (FAC ¶¶ 56, 61, 91, 254).  Thus, Plaintiff has plausibly alleged that the Suspension was thereby violative of the Award, and Plaintiff was entitled to be reinstated to his position in the Philharmonic. (FAC ¶¶ 255).

The Philharmonic's argument in its moving papers that the Suspension is not a breach of the CBA fails. While the Philharmonic attempts to justify its wrongful actions by characterizing the Suspension as simply (a) "paid leave" and (b) merely a decision to not to "schedule Muckey to play during a minimum number of rehearsals and concerts," neither excuse passes legal muster (Dkt. No. 100 at 16).   The issue in this case is not one of "scheduling," as the facts here demonstrate.  Mr. Muckey had already been scheduled to perform and attend concerts and tours for the entire 2024-2025 season. (FAC ¶ 217).  Then, after the *Vulture* article was published, the Philharmonic *removed* Mr. Muckey from every single concert and tour that he had previously been scheduled to participate in.  (FAC ¶¶ 214-217).

Local 802's argument that the Award "nowhere guarantees Plaintiff the right to permanent employment regardless of the occurrence of subsequent events" (Dkt. No. 104 at 13) fares no better

and is indicia of Local 802's repeated refusal to acknowledge that there was *no* subsequent event after the Award was issued to cause the Suspension, other than the publication of the Article. Mr. Muckey was not suspended *pending* an investigation; instead, Mr. Muckey was suspended *before* any investigation had even occurred.

Also, contrary to what Local 802 argues, the Suspension was disciplinary because not only was Plaintiff no longer receiving his full pay, he continued to remain suspended, even after the conclusion of the Levy Investigation. (FAC ¶¶ 127-128). Moreover, the holdings by courts in this Circuit support Plaintiff's allegations that the Suspension is disciplinary. *See, e.g.*, *Muldrow v. City of St. Louis,* 601 U.S. 346 , 144 S. Ct. 967, 218 L. Ed. 2d 322 (2024) (holding that the plaintiff's change in the terms and conditions of her employment constitutes an adverse employment action to hold her employer liable under Title VII even where her rank and pay remained the same); *Pardovani v. Crown Bldg. Maint. Co.,* No. 15-CV-9065 (JPO), 2020 U.S. Dist. LEXIS 88647, at *15 (S.D.N.Y. May 20, 2020) (denying the defendant-employer's motion for summary judgment because plaintiff's suspension with pay could be considered an adverse employment action where the plaintiff was placed on paid leave for a month while defendants investigated his complaints of racial discrimination); *see also, Bright-Asante v. Saks & Co.,* 242 F. Supp. 3d 229, 243-44 (S.D.N.Y. 2017) (explaining that indefinite suspension (even with pay) could constitute constructive discharge where there was "no indication that [the plaintiff] would ever be called back was tantamount to termination."); *Sethi v. Narod,* 12 F. Supp. 3d 505, 525 (E.D.N.Y. 2014) (holding that the plaintiff's suspension with pay was an adverse employment action where there was no evidence that the defendant applied reasonable disciplinary procedures when it suspended the plaintiff for reasons that were unclear).

Based upon the foregoing, Plaintiff has plausibly alleged that the Suspension, as a disciplinary measure taken against Plaintiff based solely upon the 2010 Allegations, was a breach of the CBA.

### B.    Mr. Muckey Has Plausibly Alleged a Violation of the CBA Based upon the Dismissal

The facts as alleged in the Amended Complaint state that the Philharmonic breached the CBA by employing Article XIV as a basis to terminate him when it lacked the requisite just cause to do so legitimately.  Specifically, Article XIV provides in pertinent part as follows:

> If the Society desires not to engage a member of the Orchestra for the following year (years computed September 21 to September 20), it must give written notice to that effect to said member by February 15th prior to the beginning of the year in question; otherwise, said member shall be deemed automatically re-engaged for the following year. The Society, however, will endeavor whenever possible to give the Orchestra member concerned one year's dismissal notice.

Dkt. No. 101-3 at 20; Dkt. No. 105-1 at 20.

The facts as alleged also state that both the Philharmonic and Local 802 acknowledge that Article XIV should not be used as a means to do an "end run" around the just cause requirement in terminating tenured musicians, but that in this *one* instance, the Philharmonic was permitted to do exactly that so that it could terminate Plaintiff, a tenured musician, in the absence of just cause.

Both the Philharmonic and Local 802 would like this Court to hold that because the Philharmonic made the decision to couch the Dismissal as one arising under Article XIV, which they purport gives the Philharmonic the unfettered right to dismiss Plaintiff for any reason, rather than as one arising under Article VII, which instead requires "just cause," then the Court need not review its exercise of this provision to terminate a tenured musician in the absence of such just cause.  Their argument is simply that, because the Philharmonic chose to employ a certain

provision of the CBA to terminate Mr. Muckey without just cause, then there is no breach of the CBA. Their argument fails for a host of reasons.

First, the fact that both the Philharmonic and Local 802 agreed that this unprecedented use of Article XIV is an "end run" of the just cause required under the CBA is a clear *admission* of the breach of the CBA. It does not matter that Local 802 made the Philharmonic promise to never do it again. It should not have been utilized against Plaintiff in the first instance to avoid the just cause required under the CBA for a tenured musician. But because the Philharmonic (with the cooperation of Local 802) had endeavored to permanently remove Mr. Muckey from the orchestra, that was the vehicle it decided to employ, since it had no just cause. After the mission was accomplished, the Philharmonic boasted to the public that Mr. Muckey would never appear on the stage again with the orchestra. (FAC ¶ 145).

Second, the Philharmonic cannot be allowed to employ a non-reengagement provision of the CBA as a basis to terminate Mr. Muckey, when such a provision had never been used by the Philharmonic for that purpose and will never again be used by the Philharmonic for that purpose.

In fact, in the industry as a whole, similar non-reengagement provisions are used for nondisciplinary reasons, not based upon just cause, such as artistic quality, or in other circumstances when a musician is incapable of performing. As counsel for Local 802, Susan Davis, Esq., similarly represented to this Court, such a provision is normally used for a nondisciplinary reason, such as artistic quality. (Dkt.. No, 82, lines 15-17 at p. 9).

Other examples of non-reengagement provisions are found in caselaw. For example, in American Arbitration Ass'n, 2003 AAA LEXIS 932, at ,*2 (2003) (MacKenzie, Arb.), the non-reengagement clause in the collective bargaining agreement between a dance company and the union outlined procedures, including notice, for "[t]he non-reengagement of a Dancer for reason

other than for cause, failure to fulfill contract or incapacitation in manner as to be incapable of performing professional duties." Also, in *Pennsylvania Ballet Ass'n v. American Fed'n of Musicians, Local 77*, Civil Action No. 93-3633, 1994 U.S. Dist. LEXIS 8859, at *1-2 (E.D.Pa. June 29, 1994), the Pennsylvania Ballet Company did not reengage its principal clarinetist subject to Section 5(c) of the Collective Bargaining Agreement, a provision which permitted the employer to refuse reengagement for artistic reasons. Also, in *Steyer v. Lyric Opera,* No. 17 CV 6014, 2022 U.S. Dist. LEXIS 83294, at *9, 12-13 (N.D. Ill. May 9, 2022), the Lyric Opera issued both former choristers notices of non-reengagement in the Core Supplementary Chorus and demoted them to the Supplementary Chorus subsequent to their vocal performances in their respective chorus auditions based upon a provision of the collective bargaining agreement which provided that "[t]he experience that Core Supplementary Choristers and Supplementary Choristers acquire with the Employer will be considered at chorus auditions for Regular Chorus openings ***provided they qualify*** in other artistic areas such as vocal and physical qualifications, temperament, previous attendance record, etc." (emphasis in original).

The cases cited by the Philharmonic, *Truck Drivers, etc. v. Schneider Tank Lines, Inc.*, 958 F.2d 171 (7th Cir. 1992) and *Young v. North Drury Lane Prods.*, 94 C 3530, 1995 U.S. Dist. LEXIS 3092 (N.D.Il Mar. 9, 1995) in support of the argument that are distinguishable. In *Truck Drivers, etc.* and *Young,* no provision in the CBA required just cause for termination. *See Truck Drivers, etc.*, 958 F.2d at 173; *Young*, 1995 U.S. Dist. LEXIS 3092 at *6. Therefore, the courts would not imply just cause into the respective CBAs where the CBAs were silent. *See Truck Drivers, etc.*, 958 F.2d at 175; *see also Young*, 1995 U.S. Dist. LEXIS 3092 at *8.

Here, unlike the collective bargaining agreements in *Truck Drivers, etc.* and *Young*, there is a just cause provision in the CBA. Mr. Muckey is not seeking to have the Court imply a just

cause provision in the CBA because there *is* a just cause provision specifically expressed in Article VII of the CBA.  The Defendants, however, have agreed that the Philharmonic would be permitted in this one instance to circumvent the just cause provision in the CBA and do an "end run" of such requirement by employing the non-reengagement provision instead, in order to terminate Plaintiff in the absence of just cause.

Third, the argument by Defendants that the Dismissal is not based upon cause is belied by statements it made the public that the Dismissal was for cause, i.e., based upon a finding of sexual misconduct.  (FAC ¶¶ 138-145).  Similarly, the Union publicly announced in the Decision that the determination it made not to grieve the Dismissal was based upon the purported investigative findings as they pertained to alleged sexual misconduct.  Also, in the Union Decision, Local 802 refers to "The Evidence" and the investigative finding in the Executive Summary, as the basis for its decision not to file a grievance on behalf of Plaintiff. *See* Dkt. No. 105-8 at 5-9.   Local 802 goes on to explain that, "we are sickened by the *pattern* of predatory conduct and the failure to comprehend the concept of "consent" of Mr. Muckey (and Mr. Wang). *Id*. at 7.  This was notwithstanding that there was only one allegation against Mr. Muckey by C.S. which Mr. Muckey proved to be false by submitting documentary evidence to the contrary.

Moreover, this Court too noted that the reason provided for the Dismissal was for cause and questioned counsel for the Union as to why it believed that Article XIV rather than Article VII would apply to the Dismissal.  (Dkt. No. 82).

Specifically, during the conference held on February 28, 2025, the Court stated that, "there was an investigation, and it was because of the results of this investigation that the union didn't take any further steps to grieve the termination through arbitration right that's specified in the section right after paragraph 14." *See* Dkt. No. 82 at 5:22-6:1.

The Court went on to ask as follows: "this is a situation that was based on the investigation that occurred, or, as you just said, can the Society just terminate anyone for no reason based on paragraph 14 and the union would never do anything about it?  *Id*. at 6:2-6:5.

Counsel for the Union responded,  ."[a]s long as the Society provides a reason judgment for the grounds for the nonengagement, the Union believes that they have the right to not reengage them. …  And the dismissal review committee in this case unanimously determined that there was reason for the decision not to reengage, and then proceeded through the process of going to the executive board, who unanimously also upheld the determination that there was not a basis to challenge the non-reengagement." *Id*. at 6:6-6:16. Counsel further stated that, "[t]here was a belief that there was such an extreme violation that it was appropriate to use Article 14 for this purpose…" *Id*. at 7:25-8:2.

The Court correctly noted that, "but what you just said was that if there are extreme circumstances, then that would be an instance where paragraph 14 could be used, but that was puzzling to me because it would seem that if there were extreme circumstances, that would be where you would have very good grounds for a just-cause dismissal under paragraph seven, so you wouldn't want the Society to instead utilize paragraph 14, which doesn't require any just cause." *Id.* at 8:24-9:6.

In sum, both the Philharmonic and the Union, on the one hand, have used the purported findings of Levy Investigation as a basis for the Dismissal of Plaintiff and then, on the other hand, argue before this Court that no cause is required to terminate Plaintiff simply because the Philharmonic cunningly chose to cloak the baseless termination of Plaintiff as a non-reengagement. The use of Article XIV is nothing more than a strategic device to circumvent the just cause requirement of the CBA to terminate a tenured musician in the absence of just cause.

It is respectfully submitted that the unlawful application of Article XIV, as an admitted "end run" around the just cause requirement to terminate Plaintiff in breach of the CBA, should not be countenanced by the Court.

####      C.      Plaintiff Alleges a Plausible Violation of the Union's DFR Given its Abject Repudiation of the Arbitration Award and its Refusal to Grieve the Suspension

A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *White*, 237 F.3d at 179, (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991)). Also, "bad faith requires a showing of fraudulent, deceitful, or dishonest action." *Id*. (quoting *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 472 (2d Cir. 1999)). Moreover, a union's acts are discriminatory when "substantial evidence" indicates that it engaged in discrimination that was "intentional, severe, and unrelated to legitimate union objectives." *See Vaughn v. Air Line Pilots, Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge*, 403 U.S. 274, 301, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971)); *see also Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 568 (S.D.N.Y. 2022) (holding that a union's "publication of 'a statement maliciously accusing [its] own member of being unable to do her job because of her race' was discriminatory conduct that breached the duty of fair representation").

Close examination of the factual averments regarding the Union's unconscionable reaction to the *Vulture* article demonstrates that Mr. Muckey has alleged facts sufficient to prove that the Union breached its DFR by acting discriminatorily, arbitrarily and in bad faith. Simply stated, all the allegations in the *Vulture* magazine article regarding Mr. Muckey were well known to both the Union and the Philharmonic, as they were the subject of the arbitration proceeding commenced by the Union which culminated in the Award in favor of Mr. Muckey. However, notwithstanding

that the Arbitrator's determination came after a plenary hearing where all the facts and circumstances were aired and the purported victim was subjected to cross-examination, instead of stepping up and defending the process and the binding Award, the (then) new Union President, Ms. Cutler, "opined that the decision to impose the Suspension on Mr. Muckey and Mr. Wang "are good first steps but they can't be the last." (FAC ¶ 80). Ms. Cutler's public statements directly contravened the Award, a finding that the Union had previously fought for and prevailed upon, and furthermore, demonstrated the Union support of the Philharmonic taking further action against Mr. Muckey. Her statements foreshadowed what was yet to come in terms of the Union's actions against Mr. Muckey to appease societal pressure to favor the female accuser over the male accused. Specifically, Ms. Cutler publicly declared that "[a]s a woman, a musician, and a new union president, I was horrified by what was in the story and we are committing the full resources of Local 802 to erase the culture of complicity that has raged at the N.Y. Philharmonic for too long," thereby seriously undermining both the arbitral process that the Union had commenced as well as the Award in Mr. Muckey's favor. (FAC ¶ 80). A clearer example of repudiation of an arbitration determination could scarcely be found.

Instead of publicly declaring that Local 802 would seek enforcement of the Award on Mr. Muckey's behalf and demanding that he be restored to active status in his tenured position, Ms. Cutler caused Local 802 to walk away from the Award and refuse to seek its enforcement. The caselaw in this Circuit is clear that a "union acts arbitrarily 'when it ignores or perfunctorily presses a meritorious claim.'" *Scales v. N.Y. Hotel & Motel Trades Council, Local 6,* No. 21 Civ. 8142 (JPC), 2023 U.S. Dist. LEXIS 19741, at *20-21 (S.D.N.Y. Feb. 6, 2023) (quoting *Thomas v. Little Flower for Rehab. & Nursing,* 793 F. Supp. 2d 544, 548 (E.D.N.Y. 2011)); *Samuels v. Air Transp. Loc. 504,* 992 F.2d 12, 16 (2d Cir. 1993). The duty applies to enforcement of the terms of collective

bargaining agreements, including enforcement of arbitration awards. *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union*, 227 F.3d 29, 33–34 (2d Cir. 2000).

Here, the Union disregarded a final and binding Arbitrator's determination in favor of adopting a politically correct position that wholly contradicted and repudiated the Award, which both the Philharmonic and Local 802 freely admit was final and binding. Local 802's actions -- when no new facts have been adduced and the circumstances have not changed since the Arbitrator's determination (save for a rehashing of allegations he already ruled had not been proven) -- are so far outside the range of reasonableness as to constitute nothing short of arbitrariness. Local 802 did not even perfunctorily press Plaintiff's meritorious claim for breach of the CBA. Rather, Local 802 ignored the claim entirely.

Also, the assertion that Local 802 intended to await the results of the investigation before determining whether to grieve the Suspension fails because the Suspension occurred *before* any such investigation and was commenced within 24 hours of the publication of the *Vulture* article and thus, was unwarranted from the outset.

Finally, Local 802's reliance on the case *Ustad v. Int'l Bhd. of Teamsters, Loc. 747*, No. 10-cv-3894 (FB)(RER), 2014 U.S. Dist. LEXIS 45627, at *2-3, 6 (E.D.N.Y. Apr. 1, 2014) for the proposition that there is no DFR breach in the case where the union filed a grievance only after the employee was terminated and not while he was on paid leave pending investigation is ironic, given that it neither grieved the Suspension nor the Dismissal, the latter of which is next addressed. Indeed, the Suspensions of Mr. Muckey and Mr. Wang were, as the Union President publicly touted, "first steps" but they certainly were not the last. Thereafter, Local 802 colluded with the Philharmonic to permanently remove Mr. Muckey from the orchestra and agreed that the Philharmonic could use the CBA as a vehicle to effectuate Mr. Muckey's dismissal in absence of

just cause and in such a manner to leave him with no meaningful avenue to successfully grieve it. In fact, Local 802 outright denied grieving the Dismissal altogether as discussed in section II. D, *infra*.

### D.    Plaintiff Alleges a Plausible Violation of the Union's DFR By its Subsequent Actions Up to and Including its Refusal to Grieve the Dismissal

The facts as alleged in the Amended Complaint plausibly state that Local 802 completely disregarded and, in fact, dismissed the interests of its member, Mr. Muckey, and acted with hostility and discrimination towards him throughout the entire process from the Suspension, up to, and including, its collaboration with the Philharmonic in the Dismissal and the review process. Plaintiff sufficiently alleges that, following the Suspension, Local 802, in collaboration with the Philharmonic, created a process whereby Plaintiff, a tenured musician, could be terminated without "just cause" and engaged in a series of actions calculated to avoid Plaintiff's rights pursuant to the "just cause" provisions of the CBA. Plaintiff plausibly alleges that the Union's behavior was (1) so far outside a 'wide range of reasonableness,' as to be irrational, (2) in bad faith and (3) was intentionally discriminatory, severe, and unrelated to any legitimate union objectives.

In fact, the Union's disparate treatment of Plaintiff and Mr. Wang, in the context of a claim of a breach of the duty of fair representation, is a form of "discrimination" that voids any deference that might otherwise be given to the Union. That is, a union's refusal to press a meritorious grievance is discriminatory when it favors some of its members at the expense of others without legitimate purpose or when it causes an employer to discriminate against employees on arbitrary, hostile or bad faith grounds. *Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 277 (2d Cir. 2004); *Linton v. United Parcel Serv.*, 15 F.3d 1365, 1373 (6th Cir. 1994)) (holding that "failure to accord a member the same treatment given to all other members might very well constitute a breach of the union's duty of fair representation, thus creating a jury

question on this issue."); *Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers*, 958 F.2d 1429, 1435 (7th Cir. 1992) ("There is an important distinction between a negotiated modification of an agreement's terms and an unstated 'modification' intended to apply only to selected individuals: we call the latter a 'breach.'"); and, *Jones v. Interlake S.S. Co*., Case No. 20-2210, 2021 U.S. App. LEXIS 25522, at *16 (6th Cir. Aug. 23, 2021) (denying motion to dismiss where complaint emphasized that the Union had negotiated a "side letter" with the employer that "negotiate[d] a just cause carveout" for certain union members, declining to infer that the carveout was reasonable in light of the "these distinctions among union members.").

Among other things, Plaintiff alleges against the Union that:

(a)    Local 802 refused to provide Plaintiff with an independent *Weingarten* representative at the Levy investigation inquiry.  (FAC ¶ 246);

(b)    it conducted a sham dismissal review process under Article XV, including convening a Dismissal Review Committee, which is the designated body to consider the validity of the basis for the Philharmonic's claimed actions under Article XIV and providing it with the Executive Summary but refusing Plaintiff the opportunity to appear and rebut it (FAC ¶ 246);

(c)    it rejected Mr. Muckey's request to appear and present a statement to the Dismissal Review Committee (FAC ¶ 189);

(d)    it requested the Levy Report from the Philharmonic, notwithstanding that the Philharmonic had given Plaintiff Notice of Non-Reengagement that purportedly avoided the need for "just cause" (FAC ¶ 246);

(e)    it adopted the Levy Report as to the allegations by C.S. against Plaintiff, notwithstanding the overwhelming documentary evidence refuting it; (FAC ¶ 246);

(f)     it consented to the Dismissal under Article XIV of the CBA as an "end run" around the "just cause" requirement in order to ensure that Mr. Muckey would be permanently removed from the orchestra without an opportunity to challenge it as not constituting "just cause" (FAC ¶¶ 246-247);

(g)     it used the Levy Report or Executive Summary to demonstrate Mr. Muckey's purported abuse of women as a basis to support the Dismissal, notwithstanding that it knew that such claim could not withstand scrutiny under a "just cause" standard (FAC ¶ 233);

(h)     it amended the Confidentiality Agreement with the Philharmonic without any notice to Plaintiff, to permit it to publish the reasons for the non- reengagement of Plaintiff and shared contents of the Executive Summary with orchestra members and the public, and no such amendment was provided to Plaintiff (FAC ¶ 233);

(i)     it released the Decision to the public at large to inform the public of the hoax investigative "finding" with regard to C.S. (FAC ¶ 246); and,

(j)     it refused to grieve on behalf of Plaintiff the Dismissal pursuant to Article XIV, notwithstanding that it was executed as an "end run" around the just cause requirement (FAC ¶ 233).

We respectfully submit that the facts as alleged could serve as classic hornbook examples of a union's breach of its duty of fair representation to a union member, given that they are arbitrary, discriminatory and in bad faith

### III.    PLAINTIFF HAS PLAUSIBLY ALLEGED A COGNIZABLE GENDER DISCRIMINATION CLAIM UNDER COUNTS THREE AND FOUR AGAINST LOCAL 802 AND THE PHILHARMONIC UNDER TITLE VII

#### A.    The Standard

Plaintiff states a claim under Title VII against both the Philharmonic in its ultimate termination of Plaintiff and Local 802 in its breach of its duty of fair representation.  The Amended Complaint clearly sets forth with particularity "circumstances suggesting that gender bias" was a motivating factor in the actions by both Defendants and, certainly at this stage of the action, support a minimum plausible inference "that he was subjected to discrimination on account of his sex."

Although both Defendants go to great length to contend that Plaintiff has failed to establish that when similarly situated were treated differently – a claim Plaintiff does not allege – they utterly fail to address the crux of Plaintiff's claim of discriminatory animus in the Philharmonic's termination of Plaintiff and Local 802's consent to it.  Even more they do not even cite nor attempt to distinguish the leading cases on which the discrimination causes of action are derived.

Starting with *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994), as further amplified in *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016),[4] *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019), and *Scheibel v. Schohari Cent. Sch. Dist.*, 120 F.4th 1082 (2d Cir. 2024), the Second Circuit has set forth the framework of a claim of discrimination under Title VII (or Title IX) by a male accused of sexual misconduct subjected to an investigative process resulting in discipline or termination of employment.  Essentially, there are three components that can comprise such a claim: <u>first</u>, an erroneous outcome; <u>second</u>, an irregular process resulting in the termination and <u>third</u>, public pressure in the institution involved to act more forcefully in cases of sexual

---

[4]    The Philharmonic cites to the decision of *Doe v. Trs. of Colum. Univ.*, 21 Civ. 5839 (ER), 2022 U.S. Dist. LEXIS 153239 (S.D.N.Y. 2022) but somehow missed the leading Second Circuit opinion in *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

misconduct in favor of the female complainant.  Depending on the circumstances, each of these factors or a consideration of them when pled with more than conclusory allegations suffice to support a claim of gender discrimination.

Thus, in *Yusuf*, the court held that a complaint survived a motion to dismiss where the Plaintiff met the *prima facie* standards of McDonald Douglas and alleged an "erroneous outcome" based upon circumstances that would "allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 716.

*Doe v. Columbia Univ.* expanded on *Yusuf* and held that if a complaint "pleads specific facts that support a minimal plausible inference of such discrimination," it will survive a Rule 12(b)(6) motion to dismiss. *Columbia Univ.*, 831 F.3d at 56. The court further noted that,

> when the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator had been influenced by bias.

*Id.* at 57.

*Menaker v. Hofstra Univ.* further refined the scope of *Doe v. Columbia. Menaker* stands for the general principal that where a university (1) takes an adverse action against a student or employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex, these circumstances provide the requisite support for a *prima facie* case of sex discrimination." *Menaker*, 935 F.3d at 39. *Menaker,* building on *Doe*, focuses on whether there is "some pressure" on the institution to react more "forcefully to allegations of male misconduct," in the context of the investigation. *Id*. at 34.

*Schiebel v. Schoharie* undertook an overall analysis of the law involving claims of sexual misconduct and allegations of discrimination through improper discipline or sanctions. It held that where there is "deliberate indifference" that may be alleged as basis for such sex-based claims of discrimination. *Schiebel*, 120 F.4th at 1097. It is in this context that allegations of an "erroneous outcome" or "procedural irregularity" or "public pressure to favor the accusing female over the accused male" will form the basis of a plausible claim of discrimination of official action. *Id.* at 1096. So, too, there can be a claim based on deliberate indifference to a male where there is an alleged false accusation and the institution "imposed discipline or sanctions under circumstances that indicate deliberate indifference to the truth or falsity of the accusation..." *Id.* at 1097.

Applying these standards to the Amended Complaint leaves no doubt but that Plaintiff has alleged a "minimum plausible inference" that his termination by the Philharmonic and Local 802's breach of its duty of fair representation state a cause of action against both institutions under Title VII. In making their motions to dismiss the Philharmonic sought to introduce the "Executive Summary" of the investigator, Ms. Levy, summarizing her findings with regard to the investigation she did on behalf of the Philharmonic and Local 802 offered the Union Decision. describing the reasons why the Executive Board voted to deny Plaintiff's grievance and consent to Plaintiff's termination. Notwithstanding that Defendants seem to be confusing their motions to dismiss with a motion for summary judgment, these documents only reinforce Plaintiff's allegations of discrimination as set forth in the Amended Complaint.

**B.    Plaintiff Has Plausibly Alleged a Cognizable Claim Under Title VII Based Upon Gender**

i.    <u>The Suspension</u>

The Suspension on April 13, 2024, is addressed in more detail in the discussion in Section II.C., *supra,* regarding the hybrid claim but is also part of the discrimination claim as well.  The Suspension set the stage for Plaintiff's ultimate termination.

Notwithstanding that there were no allegations against Plaintiff other than the already adjudicated 2010 Allegations, Plaintiff was treated as if he was accused of sexual misconduct.  The Philharmonic publicly announced that he was removed from all orchestra activities (FAC ¶ 77) and in conformity with the Suspension, it was initiating "investigations" to look into the "culture" at the Philharmonic and potential claims of sexual harassment (FAC ¶ 80).  Although Plaintiff sought to have Local 802 enforce the Award and have him restored to his position as Associate Principal Trumpet and Third Trumpet, the Union refused to do so and publicly endorsed the investigation and suspension of Plaintiff even though it was aware that there were no allegations against him other than the 2010 Allegations (FAC ¶¶ 79-80, 85).  All this took place amidst public pressure to favor Plaintiff's female accuser and criticism of the Philharmonic for continuing to employ Plaintiff and the Union for defending him in the arbitration.

Thus, even at this time the elements of the discrimination against Plaintiff were beginning to be formed and even though there were no claims of sexual misconduct against Plaintiff, he was treated by both the Philharmonic and Local 802 as if there were, prompting the irregular process of Plaintiff's suspension and Local 802's refusal to protest it, while there was ongoing public pressure to have the Philharmonic and Local 802 to take action against him.

ii.    <u>The Investigation</u>

Plaintiff's allegations as to the discrimination of bias of the investigatory process and ultimate report in the Executive Summary certainly meet the plausibility requirements outlined in *Yusuf, Doe, Menaker*, and *Schiebel*. While the entire investigatory process was replete with irregularities as discussed earlier in the "hybrid" claim section of this brief two aspects of the Levy Report as evidenced by the Executive Summary and as alleged in detail in the Amended Complaint, bear emphasis in considering Plaintiff's allegations under Title VII.

First, the finding by Ms. Levy that she found credible the unsubstantiated claim by a woman who came forward, after the *Vulture* article, that she was too inebriated to consent to sex with Plaintiff 16 years earlier and second, the undertaking by the investigator to "poll" the orchestra members who had no claims against Plaintiff and cause them to offer their personal views on whether they would take the stage with Plaintiff if he were to return to his position on the orchestra are indicative of the bias and discrimination Plaintiff alleges.

Certainly, Plaintiff's production of contemporaneous Facebook Messages from this accuser in which she affirmatively states that she "consented" to having sex with Plaintiff on at least two occasions and that, as she put it, "the sex was pretty good" raises the issue that the finding by the investigator was an "erroneous outcome" that substantially favors the female accuser. *See Yusuf*, 35 F.3d at 715; *see also Columbia Univ.*, 831 F.3d at 57; *see also Menaker*, 935 F.3d at 38; *see also Schiebel*, 120 F.4th at 1096-97. Nowhere in the Facebook Messages does C.S. indicate or imply that she was inebriated or not in control when she had sex with him after the party or when she returned to his apartment to have sex with Plaintiff a second time (or that she was too intoxicated to remember when she remarked how it was pretty good). And the Philharmonic's introduction of the Executive Summary does not at this stage of the proceeding contradict Plaintiff's allegations of bias.

Second, and more disturbing is the Levy Report on the so-called "poll" Ms. Levy took of the orchestra members. It is the epitome of an irregular process that clearly documents the "public pressure" with the orchestra community to favor the woman accuser and keep Plaintiff from returning to the orchestra. Under what authority or basic concept of due process does an investigator presumably charged to be objective take a poll of the community as to whether the accused male is guilty of sexual misconduct? The orchestra members she questioned have no knowledge of any wrongdoing by Plaintiff since even the investigator conceded that there were NO allegations of sexual misconduct against Plaintiff by any orchestra members after 2010. All the orchestra members who were polled could base their opinion on Plaintiff was the *Vulture* article about events in 2010 and hearsay and rumors within the orchestra and classical music community. Yet it is this hearsay and rumor on which the investigator relied and which influenced her conclusions about Plaintiff. The report is then relied on by the Philharmonic in deciding to terminate Plaintiff and Local 802's decision not to challenge it.

       iii.   <u>The Dismissal</u>

The use of Article XIV's Notice of Non-Reengagement to terminate Plaintiff is further evidence of the discriminatory bias of both the Philharmonic and the Union to find a way to prevent Plaintiff's return to the orchestra. Although Defendants both now argue that the provision in the CBA can be interpreted to simply terminate a tenured musician without reason and separate from the requirement of just cause provided in VII, their action and agreements belie otherwise.

First, both the Union and the Philharmonic do not dispute that this provision of the CBA had never been used before to terminate a tenured musician. Second, the Union and the Philharmonic entered into a written agreement that, but for the use of this provision in this instance against Plaintiff (and Wang), it will never again be used as an "end run" around the just cause provision of Article VII. Third, the Philharmonic invoked the investigative findings as the

rationale to justify to Local 802 the use of this provision, and fourth, Local 802's decision to consent to the use of Article XIV to terminate Plaintiff in its evaluation of the termination under Article XV is premised on the supposed findings in the Levy Report and the pressure of other orchestra members to find Plaintiff to be a sexual predator.

The Philharmonic's discriminatory bias in terminating Plaintiff as alleged is not shielded by invoking the Notice of Non-Reengagement. Under the CBA it still had the obligation pursuant to Article XV to justify to the Union and its Dismissal Review Committee its basis for the Notice. It did so by circulating to the Union the Levy Report and Executive Summary, both of which, as previously discussed, were flawed and biased against Plaintiff.

It makes no difference what section of the CBA the Philharmonic claims to have used to terminate Plaintiff. By relying on the Levy Report, it certainly is evidence that the Philharmonic's decision to terminate Plaintiff was motivated in part by the bias against Plaintiff. The Notice of Non-Reengagement must also be viewed in the context of the Philharmonic's decision to suspend Plaintiff, its acknowledgement of the "pressure" of members of the orchestra and the community to find grounds to prevent Plaintiff's return to the orchestra and the statements by the President of the Philharmonic to the press that Plaintiff was a sexual predator and would "never" be permitted to return.

The Union's response to the Notice of Non-Reengagement only further documents the bias against Plaintiff by both the Union and the Philharmonic. As alleged in the Amended Complaint and as further documented by the Unanimous Decision, the Union's decision to not grieve Plaintiff's termination was a breach of its duty of fair representation based at the very least, in part on its discriminatory animus against Plaintiff as a male accused of sexual misconduct. By its own characterization, it agreed with the Philharmonic to do an "end run" around the just cause

requirements of the CBA that it concedes that would normally apply to Plaintiff's termination. The Union's agreement to forgo Plaintiff's right to just cause because his case presents an "extreme circumstance" is the very bias Plaintiff complains about.  Yet, there is no such "extreme circumstance" with regard to Plaintiff other than the Union's animus.  The allegations of sexual misconduct which were the subject of the arbitration and resolved in Plaintiff's favor with the support of the Union are certainly not a basis for such "extreme circumstance" does the allegation from 2008 which is refuted by the Facebook Messages justify such a conclusion.  In fact, even the investigator in her Executive Summary acknowledged that there had been no other allegations against Plaintiff by any orchestra member since the 2010 Allegations.  Thus, even the flawed investigative report offered no support for the one-time use of Article XIV against Plaintiff.

Plaintiff's claim of bias by the Union is further documented by the Dismissal Review Committee process.  As provided by CBA, the Union convened the DRC to evaluate Plaintiff's objection to his termination.  While the DRC received the Executive Summary, Plaintiff was not permitted to present his response to it nor comment on its report to the Union's Executive Committee.  Further, the report of the DRC only amplified the pressure on the Union's decision to reject Plaintiff's grievance based upon unsupported hearsay and rumor that Plaintiff was guilty of sexual misconduct, warranting the Union making this one-time exemption to the application of the CBA.

Local 802's collaboration with the Philharmonic to find a mechanism under the CBA to effectuate the Plaintiff's termination was based on discriminatory animus and was violative of its duty of fair representation.

### C.    Plaintiff Has Exhausted His Administrative Remedies.

With regard to Counts Three and Four of the Amended Complaint, the claims should not be dismissed based upon the flawed argument made by the Philharmonic that Plaintiff has failed

to exhaust his administrative remedies, an argument that Local 802 correctly does not make. The Philharmonic misleads this Court in its argument regarding the 180 days it claims is a prerequisite to show an exhaustion of administrative remedies. While it is true that under the EEOC's regulations, a person can request a right-to-sue notice in writing after 180 days from the charge's filing. 29 C.F.R. § 1601.28 (a)(1), this does not lead to the automatic bar of a claim based upon a right to sue letter issued *before* the expiration of an 180 day period. In fact, when a person requests a notice of right to sue to be issued before the 180-day period expires, the EEOC may issue the notice if it has determined that it is "***probable***" that it "will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect." 29 C.F.R. § 1601.28 (a)(2). (emphasis added).

Section 42 U.S.C. § 2000e-5(f)(1) governs the process by which an aggrieved person can bring a civil action after receiving a right-to-sue letter. It provides, in relevant part:

> If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or ***if within*** one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action . . . or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . ***shall*** so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge . . . .

While some courts have found the language in the statute to be unambiguous and invalidate the EEOC's regulation, the *majority* opinion in the Southern District is that early right to sue letters are permitted. The word "if" together with "shall" does not bar the conclusion that even when neither of the two conditions occurs, EEOC may still issue a notice of right to sue. *Figueira v. Black Entertainment TV*, 944 F. Supp. 299, 305 (S.D.N.Y. 1996) (finding that an employee who brought a Title VII suit was not barred from bringing suit after the EEOC issued a right to sue letter 15 days after her charge was filed). The court also notes that the legislative history of 42

U.S.C. § 2000e-5(f)(1) is ambiguous. *Id.* at 305. The regulation does not undermine the investigation process because a designated official at the EEOC--such as a District Director-- must still make a determination "that it is probable that the Commission will be unable to complete its administrative processing of the charge within 180 days from the filing of the charge . . ." *Id.* at 30; *see also., Huerta v. J.D. Workforce, Inc.,* No. 23-CV-5382 (KMK), 2025 U.S. Dist. LEXIS 40517, at *32-35 (S.D.N.Y. Mar. 3, 2025) (joining the majority of courts in the Southern District of New York to hold that early right-to-sue letters are permissible and enforceable and ruling that nothing in the plain text of the statute prohibits the early notice regulation and that the regulation does not conflict with the purpose of the relevant statute of Section 2000e-5(f)(1)); *Germain v. Nielsen Consumer LLC*, 655 F. Supp. 3d 164, 181 (S.D.N.Y. 2023) (finding no statutory bar to early issuance and applying Chevron deference to uphold EEOC regulations allowing early notice); and, *Mwangi v. Passbase, Inc.,* Case No. 21 Civ. 6728 (ER)**,** 2022 U.S. Dist. LEXIS 106103, at *10-15 (S.D.N.Y. June 14, 2022) (rejecting argument that a right-to-sue letter issued 42 days after the charge was invalid and holding that the Title VII does not prohibit early issuance and that early letters advance the goal of efficient resolution); *Hernandez v. Premium Merch. Funding One, LLC*, Case No. 19cv1727, 2020 U.S. Dist. LEXIS 122643, at *8-18 (S.D.N.Y. July 13, 2020) (acknowledging a split in interpretation and noting that the Second Circuit has not ruled definitively but has expressed skepticism towards the minority approach); *Eckhart v. Fox News Network, LLC*, No. 20-CV-5593 (RA), 2021 U.S. Dist. LEXIS 171219, at *39-40 (S.D.N.Y. Sept. 9, 2021); *Areu v. Fox News Network, LLC*, No. 20-CV-8678 (RA), 2021 U.S. Dist. LEXIS 171332, at *21-22 (S.D.N.Y. Sept. 9, 2021); *Hussein v. Pierre Hotel*, No. 99 Civ. 2715 (DC), 2000 U.S. Dist. LEXIS 8225, at *12-13 (S.D.N.Y. Jun. 14, 2000) (acknowledging a circuit split and a split among the district courts within the Second Circuit, the court found the reasoning of the group

that upholds the validity more persuasive both in terms of statutory interpretation and on policy grounds, without providing its own analysis); and, *Palumbo v. Lufthansa German Airlines*, No. 98 Civ. 5005, 1999 U.S. Dist. LEXIS 11412, at *5 (S.D.N.Y. Jul. 26, 1999).

Despite the EEOC's stated duty to investigate every charge, Congress acknowledged that the EEOC's inability to complete its performance of that duty should not deprive a private charging party of the right to institute a court action and thus terminate the EEOC's jurisdiction. There is an explicit acknowledgment in the legislative history that "it will not be possible to render a decision in all cases within the time limits prescribed" (H.R.Rep. No. 92–238 (1971), reprinted in 1972 U.S.C.C.A.N. 2137). *Id.* at 1275.

Furthermore, even in the districts holding the minority view, where the court has dismissed a Title VII claim based upon a right to sue letter issued prior to the expiration of 180 days, such dismissal is without prejudice. *See e.g.*, *Martini v. Fed. Nat.'l Mortg. Ass'n,* 178 F.3d 1336, 1348 (D.C. Cir. 1999) (where the court dismissed the claim without prejudice), *Stidhum v. 161-10 Hillside Auto Ave, LLC,* No. 19-CV-5458 (RPK) (VMS), 2021 U.S. Dist. LEXIS 119043, at *2 (E.D.N.Y. Jun. 25, 2021) (dismissal of the complaint without prejudice and the EEOC was directed to reopen plaintiff's charge); *Rodriguez v. Connection Tech. Inc.,* 65 F. Supp. 2d 107, 112-13 (E.D.N.Y. 1999) (where the court dismissed the claim without prejudice and administratively closed the case and permitted the plaintiff to reopen the case after the charge had been before the agency for 180 days.

IV.    **PLAINTIFF HAS PLAUSIBLY ALLEGED A COGNIZABLE GENDER DISCRIMINATION CLAIM UNDER COUNTS FIVE, SIX, SEVEN AND EIGHT AGAINST LOCAL 802 AND THE PHILHARMONIC UNDER THE NYS AND NYC HUMAN RIGHTS LAW**

A.    **Plaintiff's NYSHRL and NYCHRL claims against Defendants are not pre-empted by the LMRA**

Plaintiff's causes of action against the Philharmonic and Local 802 for discrimination under the NYSHRL and the NYCHRL are not pre-empted under the LMRA.  Resolution of Plaintiff's claims under the discrimination statutes that his termination was motivated by discriminatory animus because he is a man are neither "inextricably intertwined" with nor "substantially dependent" upon an interpretation of the terms of the CBA.  *See Allis Chalmers Corp. v. Luek*, 471 U.S. 202, 85 L.Ed 2d 206, 105 S. Ct. 1904 (1985).

The courts have grappled with this concept in considering this issue, and as the Second Circuit succinctly put it in *Wynn v AC Rochester*, 273 F.3d 153, 158 (2d Cir. 2001): "The boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive." There certainly is no firm rule in this Circuit as to whether a claim under these state and city statutes is preempted. Compare, for instance, the holdings of *Whitehurst v. 1199SEIU United Healthcare Workers East*, 928 F.3d 201 (2d Cir. 2019) with *Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017) and *Zuckerman v. Volume Servs. Am., Inc.*, 304 F. Supp. 2d 365 (E.D.N.Y. 2004) with cases such as *Goodman*, Case No. 10 Civ. 8352, 2011 U.S. Dist. LEXIS 86010 (S.D.N.Y. Aug. 2, 2011) or *Morrissey v. Verizon Communs., Inc.*, 10 Civ. 6115 (PGG), 2011 U.S. Dist. LEXIS 73202 (S.D.N.Y. Jul. 7, 2011) cited by the Defendants to support their motions. In each of these cases, and numerous others, there is a collective bargaining agreement and a claim of discrimination, so that the holding of whether or not the claims are pre-empted or not is not dependent on whether the collective bargaining agreement is at issue in the case, but

rather whether the discrimination claim requires as an element of proof an interpretation of the terms of the collective bargaining agreement to prove the discrimination.

The Supreme Court in *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988) analyzed the issue this way:

> In other words, even if dispute resolution pursuant to a collective-bargaining agreement on the one hand and state law on the other, would require addressing the same set of facts, as long as the state law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for §301 pre-exemption purposes.

*Id.* at 409-10.

Thus, it is respectfully submitted that this Court's analysis needs to be focused on the elements of proof that Mr. Muckey needs to establish under the state and city claims and whether that proof is dependent on interpreting the CBA.  Reliance on *Whitehurst* does not change the analysis. In *Whitehurst*, the plaintiff needed to establish a right to even grieve her termination as well as a right to reinstatement after termination under the collective bargaining agreement before she could have any claim under the statutes against either the employer or the union. *See Whitehurst*, 928 F.3d at 209-08. We submit that in contrast to *Whitehurst*, there is no question but that Mr. Muckey's right of employment and his right to grieve require no "interpretation" of the CBA to bring a claim that his termination was violative of the discrimination statutes. Moreover, as discussed below, for purposes of Mr. Muckey's discrimination claims, it makes no difference whether he was terminated under Article XIV or Article VII of the CBA. Under either provision, he had a right to not have his employment terminated by reason of discriminatory animus, and he had a right to have his union grieve his termination, nonarbitrarily, in good faith, and free of discriminatory bias under the NYSHRL and the NYCHRL.

47

We submit that the elements of Plaintiff's discrimination causes of action under Title VII and the NYSHRL and the NYCHRL are best set forth in *Menaker v. Hofstra,* 935 F.3d at 23 as follows:

(1)    there was an adverse employment action;
(2)    in response to allegations of sexual misconduct by a man against a woman;
(3)    based on an irregular investigative or adjudicative process; and
(4)    amid criticism and pressure from the community to favor a woman victim against a male assailant.

No interpretation of the CBA is needed when applying these four elements to the claims against the Philharmonic. With regard the first element, all Plaintiff has to show is that he was employed under the CBA and that the Philharmonic invoked a provision of it to take an adverse action against him to terminate him. Whether the Philharmonic used Article VII or Article XIV, or even if there was no collective bargaining agreement at all, makes no difference – in either case he suffered an adverse employment action.

Nor do the second, third or fourth elements require an "interpretation" of the CBA. Even as to element 3, whether the Philharmonic used Article VII or Article XIV, it still had to offer a rationale to the Union for Plaintiff's non-reengagement under the terms of Article XV and that rationale was based on the flawed investigative report and determination by the Philharmonic that Plaintiff had engaged in sexual misconduct. Although the dispute over the CBA may involve some of the "same set of facts" as the state and city law claims, applying the teaching of *Lingle,* we submit that Plaintiff's state and city law claims "can be resolved without interpreting the agreement itself" and are therefore independent of the agreement for pre-emption purposes.

The claims against Local 802 are likewise independent of an interpretation of the CBA. Since Local 802 makes no argument of pre-emption under the NLRA (it could not under *Figueroa*, 864 F.3d at 236 and relies solely on the LMRA for its claim of pre-emption, its reliance on *Whitehurst* is misplaced.

First, unlike *Whitehurst*, the claim of discrimination against the Philharmonic withstands pre-emption as discussed above. Second, the unique facts presented in this case go well beyond the question whether there is a legitimate claim of Local 802's "good faith" in not taking Plaintiff's grievance to arbitration. As pled, Local 802 affirmatively collaborated with the Philharmonic to discriminate against Plaintiff and prevent his return to the Orchestra because he was a male accused of sexual misconduct involving a female. Local 802 had the same discriminatory animus as the Philharmonic because of its determination that his case was an "extreme circumstance" that justified what it essentially labeled as an "end-run" around just cause. Whether Plaintiff's termination should have been considered under Article VII or Article XIV is not the issue, since under either clause, Local 802 had an obligation to consider the grievance under Article XV. It is Local 802's agreement with the Philharmonic - which has not yet been produced – to accede and acquiesce to this one-time use of a CBA provision.to effectuate Plaintiff's termination that is the issue to be resolved under *Menaker* and that requires no interpretation of the CBA.

**B.    *Martin v. Curran* is inapplicable**

With regard to Counts Five and Seven of the Amended Complaint, Plaintiff has plausibly alleged causes of action under the NYSHRL and NYCHRL against Local 802 as a labor organization as defined in those statutes. The limitations of *Martin v. Curran,* that a union association cannot be sued as an entity but can only be sued by naming all its members, is inapplicable where there are statutory references to the labor organization as a juridical entity.

The issue raised by Local 802 in its motion to dismiss was considered in *Langford v. Int'l Union of Operating Eng'rs, Local 30*, 765 F. Supp. 2d 486, 511 (S.D.N.Y. 2011) involving these very statutes in which the court found that *Martin* is not determinative when a statute is involved. As the court noted:

> When the statute specifically charges labor organizations such as Local 30 with liability for discriminatory practices in apprenticeship programs, it has evinced the Legislatures judgment that for the purposes of the statute, contrary to *Martin's* holding that the labor organization does have an existence independent of its members.

*Id.*

The court in *Langford* therefore held that the *Martin* holding was limited to claims under common law and is not binding where there is specific statutory language such as the NYSHRL to the contrary. *Id.*

More recently, the holding of *Langford* was adopted in a New York Supreme Court decision *Ramroop v. Commc'ns Workers of Am. Loc. 1182*, Index No. 157047/2019, 2022 N.Y. Misc. LEXIS 40938, at *7-8 (Sup. Ct. N.Y. Cty. Dec. 12, 2022) analyzing the same issue under the same statutes. In finding that the union is the proper named entity it stated:

> At common-law, an unincorporated association, like a union, and unlike a corporation, is not considered to be an "artificial person" and has "'no existence independent of its members.'" That is the logical reason why a common-law action against a union cannot be maintained unless a party alleges that all members of the union are liable for the unlawful conduct. The NYSHRL and/or the NYCHRL, by contrast, specifically charges labor organizations with discriminatory practices, demonstrating the Legislature's intent under the statute to treat the existence of the labor organization as independent of its members. A party bringing a NYSHRL claim against a union, accordingly, does not need to plead that all members of the union ratified the unlawful conduct. …

*Id.* (internal citations omitted).

The rationale of *Langford* and *Ramroop* is fully determinative of the Union's motion and we respectfully submit that this Court should adhere to it.

There may also be another theory under which the Union is the proper defendant in this action. In *Matter of Agramonte v Local 461, Dist. Council 37*, 41 N.Y.3d 483, 490-91 (2024), the Court of Appeals reaffirmed the holding of *Madden v. Atkins* which held as follows:

> To address that risk, we held that where union members delegate disciplinary and expulsion authority to part of the membership, "the act of expulsion will be regarded as the act of the union for which damages may be recovered from union funds" even if the act was not specifically ratified by every individual member (*id.*).…"

*Id.*

While the court did not apply this to a claim of discrimination under the NYSHRL, the rationale of *Madden* that where the Union membership has delegated "disciplinary and expulsion authority" it can be held liable notwithstanding *Martin*, is applicable to the case at bar.

Here, the Union agreed that Plaintiff should be terminated by action of its Executive Committee, which presumably has delegated authority to act in lieu of its members. The extent of the authority cannot be determined without resort to the Union's organizational documents which are not accessible at this stage of the proceedings.

## CONCLUSION

For the reasons set forth, above Plaintiff respectfully submits that the motions to dismiss of both Defendants must be denied in their entirety.

Respectfully submitted,
McLaughlin & Stern, LLP

By:    *Steven J. Hyman*
Steven J. Hyman, Esq.
Jacqueline C. Gerrald, Esq.
Paul H. Levinson, Esq.
McLaughlin & Stern, LLP
260 Madison Avenue, 16th Floor
New York, New York 10016
Phone: (212) 448-1100
Fax: (212) 448-0066
E-mail: shyman@mclaughlinstern.com
E-mail: jgerrald@mclaughlinstern.com
E-mail: plevinson@mclaughlinstern.com
*Counsel for Plaintiff Matthew Muckey*

Dated:  New York, New York
July 29, 2025

## **WORD COUNT CERTIFICATION**

The undersigned attorney hereby certifies that this document complies with the word count limitation of Local Rule 7.1 and the Order Granting Leave to File Excess Pages (Dkt. No. 110) because it contains 16,503 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and certificates.

*Steven J. Hyman*
Steven J. Hyman, Esq.